UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| TIMOTHY E. JEFFRIES | ) | |
|     Plaintiff | ) | |
| | ) | |
|     v. | ) | Civil Action No. 15-1007 (BAH) |
| | ) | |
| LORETTA E. LYNCH, | ) | |
| ATTORNEY GENERAL, | ) | |
| U.S. DEPARTMENT OF JUSTICE | ) | |
|     Defendant | ) | |

PLAINTIFF'S STATEMENT OF MATERIAL FACTS
AS TO WHICH THERE IS A GENUINE DISPUTE

Plaintiff Timothy E. Jeffries ("Jeffries"), by his attorney, Jerry R. Goldstein,

submits the following Statement of Material Facts as to Which There is a Genuine

Dispute pursuant to Local Rule 7(h).[1]

**Supervisory Grants Program Manager (Announcement No. JP-11-036)**

1.  Defendant contends that it was Jeffries' own error on his application that led to

his  receiving the priority consideration letter. However, Jeffries properly filled out his

application and was issued the letter pursuant to the Defendant's own Merit Promotion

Plan after its automated AVUE system incorrectly rated it and HR didn't correct the error.

 Exs. 1; 8 at pp. 4-5; 9.

2.  The Defendant contends that it didn't have a priority consideration policy. Ex.

25.  Yet, its written Merit Promotion Policy specifically mentions "priority consideration"

and defines it to mean "The referral and consideration of qualified candidates who were

_____

[1] As noted in Plaintiff's Opposition and Plaintiff's Motion for Relief Under Rule 56(d),
  there was not full discovery at the EEOC and no depositions have been taken yet.

not afforded proper consideration through merit promotion procedures . . . or entitled by other provisions of law and/or regulation, and who are considered by the selecting official, ahead of other candidates for a particular job vacancy." Ex. 8 at pp. 4-5.

3. Defendant contends that the only other person in BJA who was given priority consideration also did not meet with the selecting official, but there had been no need to in that case. Because the employee had not been given priority consideration as required, the Defendant was directed to place her into the subject position or a similar one. Ex. 27.

4. Defendant contends that Jeffries was properly given priority consideration for the position of Supervisory Grants Program Manager and rejected. However, there is evidence to show that:

(a) The panelists were provided with the best qualified certificate and the applications of the other applicants on April 19, 2011, before they interviewed Jeffries on or about May 11, 2011. Ex. 13.

(b) Two of the three panelists said in their affidavits that they compared Jeffries' qualifications with those of the other applicants  Exs. 21 at p. 318; 22 at p. 298.

(c) When Jeffries asked the panel when a decision would be made he was told that other applicants had made the best qualified certificate and had to be interviewed before a decision was made. Ex. 1.

(d) Jeffries was never interviewed by the selecting official as required by the priority consideration letter and by law. Exs. 1; 9.

(e) Naydine Fulton-Jones, one of the selectees, told Jeffries and a coworker that she had been interviewed for the position at a time before Jeffries had been interviewed

for it,  Exs. 1; 24, while the Defendant maintains that Fulton-Jones was not interviewed

until September, 2011.

(f) The interview questions that Jeffries was asked were not identical to those

asked of the other applicants.  Exs. 16 at p. 417; 20 at p. 436-37.

(g) The interview notes for Jeffries were not on the same type of rating and

scoring sheets used for the other applicants and did not contain any scores, such that they

are entirely subjective.  Exs. 16; 20.

(h) Jeffries was sent a rejection letter on July 29, 2011, with four reasons why he

was not selected by the panelists, only one of which was directly tied to the questions he

was asked and that was about what experience or skill sets have prepared him to

supervise staff, and the interview notes show that he did provide answers to demonstrate

that.  Ex. 26; 16.

(I) The other alleged reasons for Jeffries' rejection are vague and are contradicted

by the information that the panelists had from his resume/application which showed that

he had addressed his experience with all of them.  Ex. 14 at pp. 360-64.

(j) Although Ed Aponte, one of the panelists, criticized Jeffries' abilities in his

affidavit (Ex. 22), when Jeffries worked for him as a Grants Manger, Aponte praised his

abilities in those same areas, which supported Jeffries' qualifications for the stated duties

of the Supervisory Grants Program Manager position.  Aponte even praised Jeffries for

voluntarily completing 16 redbooks (detailed documentation about the processing of each

grant) for selectee Fulton-Jones and another employee who were unable to finish them.

Ex. 28

(k) Both Jonathan Faley and Ed Aponte, who were panelists, had been named as responsible management officials by Jeffries in his prior EEO complaints, and Faley had been deposed in connection with those cases.  Ex. 1.

(l) Faley and Tracey Trautman, who claims that she was the selecting official, Ex. 17 (although there is evidence to the contrary), engaged in email correspondence joking about telling people that Jeffries had been selected for another Supervisory Grants Management  position in issue in this case (Announcement No. JP-13-110) in order to get reactions out of them, including Tammy Reid, one of the other panelists for this position, who expressed her anger when told that Jeffries had been selected. There is an indication in the emails that "Ed" (presumably Aponte, another panelist for the 2011 Supervisory Grants Program Manager positions) should try the joke out on "D" (presumably BJA Director Denise O'Donnell).  Ex. 19.

(m) Defendant claims that some of the records with respect to this selection were destroyed "on or about November 6, 2013" pursuant to policy, even though this was while Jeffries' complaint over this selection was pending. Ex. 4.  As a result, a number of documents dealing with the selection process are missing, including the crediting plan and the KSA qualifications and ratings which the Defendant had refused to provide to the ROI investigator.  Ex. 33.

(n) There has been a long history of a lack of promotions of African-American males to GS-14 and above positions in BJA.  Prior to Jeffries' original EEO complaint there had been no African-American males promoted or hired into management positions at BJA for more than eight years, and no African-American male supervisors had been

hired in BJA in about 17 years.  In addition, two African-American male supervisors who

had been in BJA from before that time had left after filing EEO complaints. Ex. 1.  As of

2011 when the series of non-selections involved in this case began, the leadership of BJA

and the Policy Office consisted almost entirely of Caucasians.  As of January 2012,

according to the Defendant's own records, all 11 GS-15 and SES positions in BJA were

occupied by Caucasians, and, of the 34 GS-14 and above positions, African-Americans

occupied only five GS-14 positions. Ex. 2.

**Special Assistant (Announcement No. JP-11-077)**

5.  Defendant contends that the selectee, Cornelia Sorenson Sigworth, a Caucasian

female with no prior EEO activity, was properly selected as the best qualified applicant

for the position of Special Assistant to the Deputy Director.  However, there is evidence

to show that:

(a) One of the panelists was Ruby Qazilbash, Jeffries' supervisor who admitted

that she was aware of Jeffries' prior EEO case and the settlement of that case which

resulted in his placement on her team.  She also admitted that she was told in March 2011

by Pamela Cammarata, a Caucasian female and the Associate Director of BJA, and

Jennifer McCarthy, the OJP HR Director, about Jeffries' priority consideration letter "as a

result of an EEO-related settlement," and was also informed about EEO complaints or

pre-complaints filed by Jeffries on July 1, 2011, and other dates.  Ex. 34 at p. 327.

(b) Sigworth and Qazilbash were both members of the so-called "mommies

group" at BJA who socialized in and outside of the office, traveled together, and shared

babysitters.  Ex. 1,

(c) The "mommies group" also included Kim Ball (Norris).  Ex. 1.  A BJA

attorney, Maureen Dimino, submitted an affidavit stating that Ball, her supervisor, told

her that Jeffries only had his job in the Policy Office because he was black and filed an

EEOC complaint, that she had objected to the settlement of his prior cases, and that she

intended to get him fired.  Dimino also said that Ball made racist statements about other

black employees and solicited negative information about them in an effort to get them

fired.  Ex. 32.

(d) Cammarata, who was Sigworth's supervisor prior to the selection, had

determined the qualifications for this position, drafted the interview questions and the

scoring system, selected the interview panelists, and scheduled the interviews.  Ex. 35.

(e) One of the panelists, Patrick McCreary, acknowledged that the panelists

discussed their independent scores for each candidate for purposes of "reconcil[ing] the

scores," Ex. 36 at p. 149, and it appears that another panelist, Ellen Williams, scratched

out a number of scores for Jeffries and lowered them, Ex. 37 at pp. 380-82, so it is

entirely possible that Qazilbash, who was Jeffries' supervisor and aware of his EEO

complaints, influenced the other panelists.

(f)  Sigworth was given a special assignment shortly before the selection to work

with grant-funded programming and technical assistance to Puerto Rico which enabled

her to enhance her qualifications for the position.  Ex. 1.

**Senior Policy Advisor for Evidence Integration (Announcement No. JP-13-009)**

6.  Defendant contends that the selectee, Clarence Banks, an African-American

with no prior EEO activity, was properly selected as the best qualified applicant for the

position of Senior Policy Advisor for Evidence Integration.  However, there is evidence

to show that:

(a) The applications of Banks and Jeffries are missing from the ROI provided to

Jeffries and have never been produced, and the affidavit of Denise O'Donnell, one of the

two selecting officials, is also missing from the ROI provided to Jeffries.

(b) Ed Aponte, discussed above in Par. 4(j) and (k), was one of the panelists for

this position.  Aponte, who acknowledged that he had been named as a responsible

management official in one of Jeffries' prior EEO complaints (actually more than one),

gave Jeffries the lowest score for all but one of the interview questions, Ex. 39 at pp. 150-

56, which naturally affected Jeffries' overall score.

(c) Elizabeth Griffith, another panelist, acknowledged that she was named in one

of Jeffries' prior EEO complaints.  Ex. 40 at p. 67.  She was in fact deposed twice in

connection with Jeffries' prior EEO cases and named as a responsible management

official in connection with Jeffries' EEO complaint regarding his performance evaluation

and failure to receive a cash award for 2010.  Ex. 1.

(d)  Jeffries was the only applicant to collaborate with the National Institute of

Justice on a joint solicitation to package evidence into useful tools, and he had worked

with research partners to select a provider to disseminate research integration to drug

court practitioners, which should have been highly relevant to the duties of the position.

Ex. 41 at p. 45.

(e)  Jeffries had complained to the Attorney General's Diversity Committee

shortly before this selection about BJA's history of promoting Caucasians, particularly

females, over more qualified African-American males, including the lack of promotion of

African-American males to supervisory positions in 17 years. Jeffries' complaint was

acknowledged by the Attorney General who indicated that BJA would attempt to increase

the number of African-American males in such positions after the current hiring freeze

was lifted. Shortly thereafter, Banks was selected. Ex. 41 at pp. 44-45.

**Administrative Services and Logistics Director (Announcement No. JP-13-15)**

7.  Defendant contends that the selectee, Michelle Martin, a Caucasian female

with no prior EEO activity, was properly selected as the best qualified applicant for the

position of Administrative Services and Logistics Director.  However, there is evidence to

show that:

(a) Substantial changes were made to the KSA's for the position before the

vacancy announcement which raise the possibility that it was tailored for Martin.  Ex. 43.

(b) There is a discrepancy as to who the third panelist for this position was, along

with Kristen Mahoney and Shanetta Cutler.  The Agency said that it was Tracey

Trautman, Ex. 42, but the initials on the interview form suggest that it was Hope Janke.

Ex. 66 at p. 120.

(c) The affidavits of Kristen Mahoney and Hope Janke, as well as that of the

selecting official, Denise O'Donnell, are not in the ROI, provided to Jeffries and were

never produced.

(d)  According to the interview notes, separate scores were assigned for the

applicant's resumes, work experience, and work history, as well as for the interviews.

Yet, there is nothing to indicate how the scoring for the resumes, work experience, and

work history were actually determined. Ex. 66.

(e) Defendant contends that there was a second interview panel consisting of Denise O'Donnell and Eileen Garry (Par. 58), but Jeffries was not interviewed by such a panel and there is nothing in the ROI provided to Jeffries, nor were any notes to actually verify this or to detail what occurred.

(f) A supplemental investigation was conducted because apparently two employees allegedly got advance notice of the selectee, although it appears that the investigation disclosed that the advance notice was actually of the Cory Randolph selection in Announcement No. JP-13-110 which occurred at about the same time.  One of the employees who got advance notice, Anthony Burley, an African-American, stated that "Tim [Jeffries] does not meet the definition of a safe 'Negro' by OJP's standards.  Tim seems to be extremely knowledgeable within the Criminal Justice domain and that makes him dangerous to several non-progressive/racist OJP Managers who tend to prefer the 'Negro' men of OJP are humble, quiet, and docile." Ex. 44.

**Supervisory Grants Management Specialist (Announcement No. JP-13-110)**

8.  Defendant contends that the selectees, Brenda Worthington, a Caucasian female with no prior EEO activity, and Cory Randolph, a bi-racial male with no prior EEO activity, were properly selected as the best qualified applicants for the position of Supervisory Grants Management Specialist.  However, there is evidence to show that:

(a)  The vacancy announcement for JP-13-110 was for only one GS-13/14 position Ex. 46, but two applicants were selected.

(b)  Prior to the vacancy announcement, the position was changed from a GS-14 to

a GS-13/14 with a reduction in qualifications. Ex. 45.

(c) The panelists were Ed Aponte, who oversaw the selection process and who had

been named as a responsible management official in Jeffries' 2007 case as well as in the

pending case involving Announcement No. JP-11-036 for the other Supervisory Grants

Program Manager positions; Jonathan Faley, who had been  named as a responsible

management official and deposed in the 2007 EEOC case and also named as a responsible

management official in the JP-11-036 case; and Kellie Dressler, a Caucasian female.  The

selectees were also interviewed by Denise O'Donnell, who was also named as a

responsible management official by Jeffries, and by Kristen Mahoney.

(d) The interview notes of Jeffries and the selectees are missing from the ROI

provided to Jeffries, except for one person's unrated notes for Worthington. Ex. 47.  In

response to Jeffries' discovery request for the documents for this selection, Defendant

produced only one interviewer's unsigned notes for Jeffries, one interviewer's unsigned

notes for Worthington that appears to be on a different form than the one in the ROI, and

one interviewer's unsigned notes for Randolph.

(e)  Jeffries was not interviewed until January 14, 2013, nearly a month after the

other applicants were interviewed. According to Trautman, the second interviews were

conducted in February 2013.  Ex. 48 at p. 70. However, according to Randolph, his second

interview was conducted on an unspecified date in January 2013.  Ex. 49 at p. 91.  If

Randolph is correct, it would mean that he had a second interview before Jeffries even had

a first interview.

(f)  Randolph acknowledged that Faley had suggested that he apply for the position

even though he did not qualify for a GS-14 position, which undoubtedly is why the

position was changed and announced as a GS-13/14 position.  Ex. 49 at p. 92.

(g) Randolph also said that his race played a factor in his selection because of the

[need to correct] the bad historical climate at BJA, noting that there had been only one

African-American division chief in the history of BJA, and that Trautman, the Deputy

Director, had a picture of Confederate troops carrying the Confederate flag in her office.

Id.

(h)  Trautman and Faley engaged in email correspondence joking about selecting

Jeffries for this position to get a reaction from other BJA managers.  Ex. 19 (See Par. 4(l)

above).

**Senior Policy Advisor for Byrne Criminal Justice Innovation/Building Neighborhood Capacity Programs (BCJI/BNCP (Announcement No. JP-13-008)**

9.  Defendant contends that the selectee, Alissa Huntoon, a Caucasian female with

no prior EEO activity, was properly selected as the best qualified applicant for the position

of Senior Policy Advisor for BCJI/BNCP.  However, there is evidence to show that:

(a) Two separate panels were used to conduct the initial interviews.  The one that

interviewed Jeffries and the selectee consisted of Cornelia Sorenson Sigworth, Jane

Hodgdon, and Shanetta Cutler.  The second round of interviews was conducted by

Elizabeth Griffith, Kristen Mahoney, and Denise O'Donnell.  Jeffries had named Griffith

and O'Donnell as responsible management officials in several of his EEO cases.  Ex. 1.

(b) The vacancy announcement for the position has never been produced, and it

appears that Griffith made substantial changes to the KSA's for the position before the

position was advertised.  Ex. 51.

(c) One of the panelists, Shanetta Cutler, complained to one of the interviewees that the panelists received no scoring guidance and did not know how they were supposed to score the applicants.  Ex. 52 at p. 72.

(d) Although total scores were indicated for the applicants Ex. 53, there is no explanation of how those scores were determined and how separate scores were assigned to applicants' resumes and work histories, which also factored into the overall scores.

(e)  According to Jeffries, O'Donnell arrived 15 minutes late for his interview and rushed through it, cutting off his answers, Ex. 54 at pp. 36-37, as if she had already determined who she was going to select, or did not want to select him.

(f) An FOIA request by Jeffries produced evidence that (I) the selectee was invited to attend meetings about the anticipated work of the position in advance of her and Jeffries' interviews, even though as a GS-13 she should not have attended such meetings, which are normally attended only by persons at the GS-14 level or higher, and that (ii) persons outside of BJA with whom the selectee for the position would interact may have participated in the selectee's interview.  They did not participate in Jeffries' interview. Exs. 1; 55.

**Senior Policy Advisor for Health and Criminal Justice**
**(Announcement No. JP-14-067)**

10.  Defendant contends that the selectee, Danica Binkley, a Caucasian female with no prior EEO activity, was properly selected as the best qualified applicant for the position of Senior Policy Advisor for Health and Criminal Justice.  However, despite no discovery

whatsoever, there is evidence to show that:

(a) This is the long vacant GS-14 Senior Policy Advisor (Substance Abuse and Mental Health) position in Jeffries' Division which was renamed with some additional duties, although the Drug Court Program, which has been administered by Jeffries with high praise for some 14 years, still receives the bulk of the funding. Ex. 1. Yet, the ROI provided to Jeffries does not contain the vacancy announcement (which is included for the first time with Defendant's Motion), the position description, information indicating how and why the changes were made, how the selection arose and was processed, or any information on how the scores were determined for applicants' resumes and for work histories for purposes of rating the applicants.

(b) In her affidavit attempting to justify the selection of Binkley, Denise O'Donnell claimed that the major difference between Jeffries and Binkley "is that while the complainant demonstrated good qualifications for his current position as a policy advisor for the criminal justice and health portfolio with responsibility for drug and problem solving courts, he did not demonstrate the more advanced qualifications needed for a GS-14 Senior Policy Advisor." (Ex. 57 at p. 92. However, Jeffries had served successfully as the Acting Senior Policy Advisor, demonstrating that he could perform in the position, while Binkley had not. Ex. 1.

(c) O'Donnell claims that she relied upon the recommendation of Ruby Qazilbash during the interviews for the selection of Binkley. Ex. 57 at p. 91. Qazilbash in fact wrote the justification for the selection stating that Binkley "has performed to a very high level in her work as a policy advisor within the Substance Abuse and Mental Health portfolio." Ex.

13

56 at p. 182.  To the contrary, (a) Qazilbash had admitted to Jeffries that she had to spend

significant time in meetings with Binkley because of Binkley's inexperience with the

subject matter, (b) Qazilbash had to remove the Prescription Drug Monitoring Program

from Binkley's portfolio and reassign it to someone else because Binkley had caused

strained relations with the private partners in the Program, (c) Binkley repeatedly cried at

work and said that her job was too demanding and the subject matter was outside of her

prior Adjudication Division experience, and (d) in a high-level grant review it was

discovered that Binkley had allowed jurisdictions to receive repetitive grant funding for

multiple years contrary to a major BJA audit recommendation. Exs. 1; 58 at pp. 264-65.

(d) Both Qazilbash and O'Donnell were named as responsible management

officials in Jeffries' pending EEO complaints.

(e)  Binkley told Jeffries that Qazilbash had secretly reassigned her from the

Adjudication Division to the Substance Abuse and Mental Health Division after the

vacancy in the latter Division had been announced and other candidates had been

interviewed, which is contrary to normal policy and procedures. Binkley was given the

impression that this was done because of the anticipated promotion potential. Ex. 58 at p.

264.

**Awards**

11.  Defendant says that Jeffries was given a time-off award in calendar year 2011.

However, that was a performance award.  Jeffries' claim is for a special act time-off award

for FY 2011.  He learned through a response to an FOIA request that he was the only

member of the Justice Systems Team supervised by Qazilbash who didn't receive such an

award for FY 2011.  Ex. 59.  His failure to receive such an award was confirmed by

Jennifer McCarthy, the HR Director. Ex. 60 at pp. 285-86. Yet, he was rated as "Exceeds

Expectations" on his performance appraisal for that fiscal year, had to perform many

additional duties (due to lack of staff help) including those of the vacant Senior Policy

Advisor position, and had a lengthy list of accomplishments. Exs. 29; 61 at pp. 216-18.

Jeffries is the only member of his team who had filed EEO complaints, and he discussed in

his affidavit why he believed that discrimination was involved in his not receiving a time-

off special act award for 2011. See  Ex. 61 at pp. 218-220.

> 12.  Defendant contends that Jeffries elected to receive a performance cash award

for FY 2011.  Jeffries was in fact supposed to get it, but he didn't receive it.  As reflected

in the list of cash performance awards for FY 2011, others who reported to Qazilbash at

the time all got $4,000, but Jeffries did not.  Ex. 62.

> 13. Defendant contention regarding time-off awards for FY 2012 is incorrect.

There were a number of different special act time-off awards issued in BJA for FY 2012.

Some were issued on February 26, 2012 for the first quarter of FY 2012 and some were

issued on July 29, 2012 supposedly for the first two quarters of FY 2012.  Exs. 63; 64. The

time-off awards issued on December 30, 2012, referred to by Defendant, were only for the

fourth quarter of FY 2012.  Ex. 65. Jeffries did not receive a time-off award for the first

quarter of FY 2012 like some of his coworkers, and his award supposedly covering the

first two quarters issued on July 29, 2012, was only for six hours instead of the 10 hours

that his female GS-13 coworkers received. Ex. 64  In each case Jeffries had at least as

many accomplishments as his coworkers such that he should have received the same as the

others.  Ex. 1.

Respectfully submitted,


/s /   **JERRY R. GOLDSTEIN**
Jerry R. Goldstein (Bar No. 173690)
Jerry R. Goldstein, P.C.
4610 Elm St.
Bethesda, MD 20815
(301) 656-1177
(301) 986-9719 Fax
jrg4law@aol.com
Attorney for Plaintiff