# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

TIMOTHY JEFFRIES,

        Plaintiff,

        v.

LORETTA LYNCH,
ATTORNEY GENERAL
U.S. DEPARTMENT OF JUSTICE,

        Defendant.

Civil Action No. 1:15-cv-01007

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Timothy Jeffries, is an African-American male and an employee of the Bureau of Justice Assistance ("BJA") within the Department of Justice ("DOJ"). Compl. ¶ 6, ECF No. 1. He asserts a multitude of claims against the defendant, United States Attorney General Loretta Lynch, in her official capacity, alleging discrimination on the basis of his race and sex, and retaliation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-1–2000e-17. Compl. ¶¶ 44, 47. These claims arise out of the plaintiff's non-selection for seven BJA positions for which he applied between 2011 and 2014, as well as the alleged denial of cash and time-off awards in 2011 and 2012. *See generally* Compl.

The plaintiff paints a picture of an agency marked by factionalism, with Caucasian, middle-age mothers, whom the plaintiff calls collectively the "mommies group," on one side and African-American men on the other.[1] From DOJ's perspective, the plaintiff is a "prolific

---

[1] According to the plaintiff, the "mommies group," which formed in 2009, consists of Caucasian females "who get together frequently, travel together, and share babysitters." Pl.'s Opp'n Def.'s Mot. J. Pleadings or Summ. J. ("Pl.'s Opp'n") at 3, ECF No. 9. The plaintiff also describes a "bad historical climate" at the BJA, pointing out a dearth of promotions of African-American males as well as other disconcerting facts, such as that Tracey Trautman, the Deputy Director of the BJA, had a picture in her office that included troops carrying a Confederate flag. *See id.* at 36.

complainer," Def.'s Reply Supp. Def.'s Mot. J. Pleadings or Summ. J. ("Def.'s Reply") at 1,

ECF No. 16, who "routinely applie[s] for positions for which he [is] not the most qualified" and

then brings an EEO complaint, Mem. Supp. Def.'s Mot. J. on the Pleadings or Summ. J. ("Def.'s

Mem.") at 1, ECF No. 7-1.

Before discovery commenced in this lawsuit, DOJ moved for judgment on the pleadings,

pursuant to Federal Rule of Civil Procedure 12(c), or, alternatively, for summary judgment

pursuant to Federal Rule of Civil Procedure 56(a), *see* Def.'s Mot. J. on the Pleadings or Summ.

J. ("Def.'s Mot."), ECF No. 7, prompting the plaintiff to move for relief under Federal Rule of

Civil Procedure 56(d), *see* Pl.'s Mot. Relief Under Rule 56(d) ("Pl.'s Mot."), ECF No. 10.[2]  For

the reasons set forth below, DOJ's motion for summary judgment is granted, and the plaintiff's

motion is denied.

## I.      BACKGROUND

The plaintiff has been an employee of the Office of Justice Programs ("OJP") in DOJ

since 2000.  Compl. ¶ 6.  He is currently employed as a Policy Advisor, a GS-13 position, in the

Substance Abuse and Mental Health Division ("SAMH") of the BJA, which is housed within

OJP.  *Id.* ¶ 4.  A brief recitation of the allegations underlying each of the plaintiff's claims is set

out below.

---

[2]       DOJ has cautioned that the plaintiff's broad discovery requests laid out in his Rule 56(d) motion would
consume the BJA for a significant period of time, diverting BJA leadership and staff from their mission-critical
duties.  *See, e.g.*, Def.'s Mem. at 1.  The point is well taken.  In addition to seeking additional documentary
evidence, the plaintiff's Rule 56(d) motion seeks depositions of 21 people, including much of the BJA leadership.
*See generally* Pl.'s Mot.  The plaintiff's motion also suggests that he wishes to depose the Attorney General and
members of the Attorney General's Diversity Committee in connection with his non-selection for the position of
Senior Policy Advisor for Evidence Integration.  *See id.* at 5–6.  Finally, the plaintiff seeks a Rule 30(b)(6)
deposition "regarding the long-term lack of African-American males in management/supervisory positions in BJA,
the changes in duties and grade for several of the positions . . . , the destruction of some of the records, BJA
selection policies and procedures, and the awards in issue and the policies and procedures for awards at BJA." *Id.* at
14.

### A.      The Plaintiff's Previous EEO Activity and Priority Consideration Letter

In 2006, the plaintiff was passed over for a GS-14 Program Analyst position in the BJA.

Compl. ¶ 15; Pl.'s Opp'n, Ex. 1 ("Jeffries Decl.") ¶ 10, ECF No. 9-3.  According to the plaintiff,

"[his] application . . . had been given the highest score among all of the applicants," but "[he]

was neither interviewed nor selected."  Compl. ¶ 15; Jeffries Decl. ¶ 10.  DOJ offered the

position to a Caucasian female applicant, who ultimately turned down the offer.  Jeffries Decl.

¶ 10.  The plaintiff submitted an application when the vacancy was re-advertised in 2007, but he

was not given an interview.[3]  *Id.*  Ruby Qazilbash, an Asian female,[4] was selected for the

position.  *Id.*  Acknowledging that the plaintiff had mistakenly not been interviewed for the

position, on July 30, 2007, DOJ gave the plaintiff a priority consideration letter "for the next

open position similar and in the same geographical area to the one which proper consideration

was missed."  Pl.'s Opp'n, Ex. 9, ECF No. 9-5.  The letter further indicated that the plaintiff

would be considered for any such position before issuing public notice of the vacancy and that he

would be notified in writing when he had received priority consideration for a position.  *Id.*

"For four years after [he] received the priority consideration letter, [the plaintiff] was

never notified that [his priority consideration letter] had been used."[5]  Jeffries Decl. ¶ 11.

---

[3]      In the EEO administrative proceedings regarding these 2006 and 2007 non-selections, DOJ denied having discriminated or retaliated against the plaintiff, "but contended that it simply made a mistake in failing to consider [his] application for an interview when the position was re-advertised."  Jeffries Decl. ¶ 10.  The parties agree that DOJ's failure to interview the plaintiff in 2007 was due to an erroneous entry in the plaintiff's application, which listed him as occupying a GS-14 position when in fact he had only temporarily held a GS-14 position.  *Id.*; Def.'s Mem. at 12 n.4.  The parties disagree, however, as to whether the error was caused by the plaintiff or by a computer glitch that went uncorrected by DOJ.  Pl.'s Statement of Facts ("Pl.'s SMF") ¶ 1, ECF No. 9-1.  This disagreement is immaterial to the plaintiff's instant claims.
[4]      Apparently, Ms. Qazilbash is both Asian and Caucasian.  Def.'s Mot., Ex. 14 ("Qazilbash Aff.") at 2, ECF. No. 7-3.  The plaintiff neglects to mention Ms. Qazilbash's Asian ethnicity, repeatedly referring her as Caucasian, *see, e.g.*, Compl. ¶ 16; Pl.'s Opp'n at 2–3, presumably because her minority status does not square with the plaintiff's narrative of the BJA being divided between a "mommies group" comprised of Caucasian women, of which Ms. Qazilbash is allegedly a part, *see* Pl.'s Opp'n at 3, on one side and African-American men on the other.
[5]      DOJ explains that "[n]o permanent vacancy occurred between July 30, 2007 and February 2009 to which the priority consideration letter applied, nor were any GS-343-14 Program Analyst positions advertised between February 2009 and January 2011 due to an OJP-wide hiring freeze."  Def.'s Mem. at 13 n.5.  The plaintiff

Consequently, in late January 2011, the plaintiff inquired with the Deputy Director of OJP Human Resources ("HR"), Jennifer McCarthy, as to the status of the letter. *Id.* Initially, Ms. McCarthy was unable to locate the letter, but in late February 2011, after the plaintiff furnished a copy and stated that he would contact his attorney, Ms. McCarthy found HR's copy. *Id.*

**B.   The Plaintiff's Non-Selections and Award Denials at Issue in This Case**

The plaintiff's instant claims arise out of seven non-selections occurring from 2011 to 2014, and alleged denials of cash and time-off awards in 2011 and 2012, which non-selections and awards denials are described below.

**1.   First Non-Selection in Spring 2011**

In March 2011, DOJ announced two vacancies for GS-14 Supervisory Grants Program Manager positions within the BJA. *Id.* ¶ 12. After seeing the vacancy announcements, the plaintiff asked Ms. McCarthy why HR had not used his priority consideration letter for the open positions. *Id.* Ms. McCarthy agreed to allow the plaintiff to utilize the letter for the recent openings. *Id.*; Def.'s Statement of Material Facts ("Def.'s SMF") ¶¶ 10–14, ECF No. 7-2. The plaintiff submitted a résumé as well as his "knowledge, skills, and abilities" ("KSAs"), as requested by HR. Jeffries Decl. ¶ 13. On May 11, 2011, the plaintiff was interviewed by a three-person panel consisting of Jonathan Faley (Caucasian male), Tammy Reid (African-American female), and Edison Aponte (Hispanic male), each of whom had been named as a "responsible management official" in his previous EEO complaints. *Id.*; Def.'s SMF ¶ 15. At the end of his interview, the plaintiff "asked the panelists if they felt [he] was qualified for the

---

summarily disagrees, asserting that the hiring freeze was not in place "for the entire four-year period." Pl.'s Opp'n at 16. In any event, DOJ "has no record of [the plaintiff] requesting to use the July 30, 2007 priority consideration letter before March 29, 2011." Def.'s Mem. at 13 n.5.

position and when a decision would be made," to which the panel responded that other candidates would have to be interviewed before a decision could be reached.  Jeffries Decl. ¶ 15.

The panel did not recommend the plaintiff for an interview with the selecting official, *id.* ¶ 14; Def's SMF ¶ 16, and DOJ subsequently notified the plaintiff by letter that he was not selected for the position because he had failed to: (1) "demonstrate what experience or skills set ha[d] prepared [him] for staff supervision and oversight of a grant management team;" (2) "explain or identify work methods, organizational structures and management processes or other procedures to resolve issues;" (3) "address complex issues that impacted grant programs or facets of large complex projects and programs;" and (4) "interpret any participation in management operation or planning meetings to discuss program or project milestones and activities,"  Def.'s Mot., Ex. 2, ECF No. 7-3.  DOJ ultimately hired two candidates who were unanimously recommended by the interview panel to fill the two positions: Naydine Fulton-Jones (African-American female) and Esmerelda Womack (Caucasian female).  Compl. ¶ 24; Def.'s SMF ¶ 25.  Neither Ms. Fulton-Jones nor Ms. Womack had prior EEO activity.  Compl. ¶ 24.

### 2.    Second Non-Selection in Late 2011/Early 2012

In the fall of 2011, the plaintiff applied for a GS-13/14 level position as Special Assistant to the Deputy Director in the BJA Policy Office.  Compl. ¶ 26; Def.'s SMF ¶ 30; Def.'s Mot., Ex. 57, ECF No. 7-4.  The vacancy announcement describes the Special Assistant's responsibilities as, *inter alia*, preparing, writing, and reviewing a wide variety of written materials; collecting and assembling key documents and reports; facilitating administrative processes and handling special projects; tracking Policy Office performance; attending briefings; preparing correspondence; developing and maintaining relationships with internal and external stakeholders; and researching and analyzing problems and issues.  Def.'s Mot., Ex. 57.

The interview panel, consisting of Patrick McCreary (Caucasian male), Ellen Williams (African-American female), and Ruby Qazilbash (Asian female), rated the plaintiff sixth out of the eight interviewees.  Def.'s SMF ¶ 32; Def.'s Mot., Ex. 17, ECF No. 7-3.  In a letter dated December 8, 2011, the panel unanimously recommended the ultimate selectee, Cornelia Sorensen-Sigworth (Caucasian female) for the position, and BJA Director Denise O'Donnell concurred.  Def.'s SMF ¶ 33; Def.'s Mot., Ex. 17.

Mr. McCreary and Ms. Williams did not know about the plaintiff's prior EEO complaints.  Def.'s SMF ¶ 37; Pl.'s Opp'n at 31.  Ms. Qazilbash was first made aware of the plaintiff's protected activity in 2008 and received notice on July 1, 2011, of a pre-complaint or complaint filed by the plaintiff.  Def.'s Mot., Ex. 18 at 3, ECF No. 7-3.

### 3.   Third Non-Selection in Early 2013

Toward the end of 2012, the plaintiff applied for several vacancies within the BJA.  First, the plaintiff unsuccessfully applied for the GS-14 position of Senior Policy Advisor for Evidence Integration opening.  Def.'s SMF ¶ 40.  The position's job duties were described as managing and directing quality improvement programs; analyzing the effectiveness of programs; designing and maintaining methods to implement the Government Performance and Results Act; planning and directing a variety of service functions such as communication, procurement of administrative supplies, printing, property and space management, records management, mail service, facilities maintenance, and transportation; and researching and analyzing problems. Def.'s Mot., Ex. 58, ECF No. 7-4.

A panel consisting of Edison Aponte, Elizabeth Griffith, and either Becky Rose or Kristina Rose interviewed six candidates.  Def.'s Mot., Ex. 19, ECF No. 7-3.  Kristina Rose conducted the plaintiff's interview.  Def.'s SMF ¶ 42.  There was "strong consensus" among the panelists that "Ed Banks and Kristen Kracke were clearly the top candidates" and these

individuals were recommended for a second interview.  Def.'s Mot., Ex. 19.  As between Mr.

Banks and Ms. Kracke, the panel recommended Mr. Banks (African-American male) because he

"ha[d] already been doing an outstanding job and working at a level that exceed[ed] his [] grade

and role and its [sic] good to promote staff from within where possible."  *Id.*  Mr. Banks was

ultimately chosen for the job in 2013.  Compl. ¶ 28; Def.'s SMF ¶ 45.  The panelists each stated

that the plaintiff was not as qualified as, nor did he interview as well as, either Mr. Banks or Ms.

Kracke.  Def.'s SMF ¶¶ 46–49.  Indeed, on a five-point scale, the panelists rated Mr. Banks a

5.0, Ms. Kracke a 4.8, and the plaintiff a 1.6.  *Id.* ¶ 50.

Ms. Rose was not aware of the plaintiff's prior protected activity at the time of the

interview.  Def.'s SMF ¶ 51.  The other two interviewers became aware of the plaintiff's

protected activity in 2007.  *Id.* ¶¶ 52–53.  Ms. Griffith was also involved in the plaintiff's

September 2011 complaint.  *Id.* ¶ 53.

### 4.      Fourth Non-Selection in Early 2013

The plaintiff applied for the GS-14 position of Administrative Services and Logistics

Director in late 2012, Def.'s Mot., Ex. 25, ECF No. 7-3, and was notified of his non-selection in

January 2013, Def.'s SMF ¶ 55.  The vacancy announcement for the position states that the job

responsibilities include performing tasks related to the administrative management of the

organization, such as interpreting administrative policies, developing and implementing

organizational policies, defining administrative requirements, and providing advice to

management on related issues; providing administrative and technical supervision necessary for

accomplishing the work of the unit; performing administrative and human resource management

functions; and installing, troubleshooting, and maintaining hardware and software to ensure the

functionality of systems.  *Id.* ¶ 56.

The plaintiff and one other candidate, Michelle Martin (Caucasian female), Def.'s SMF ¶ 59, were interviewed by a panel consisting of Shanetta Cutlar (African-American female), Hope Janke (Caucasian female), and Kristen Mahoney (Caucasian female), *id.* ¶ 57.  The panel did not recommend the plaintiff for a second-round interview, and Ms. Martin—who received higher interview scores from each of the panelists—was ultimately selected for the position.  *Id.* ¶¶ 57, 59–60.  All three panelists explained that Ms. Martin was more qualified than the plaintiff, who lacked experience with procurement and contracts and was not as experienced in human resources or technological support.  *Id.* ¶¶ 61–64.  Ms. Martin had no prior EEO activity.  Pl.'s SMF ¶ 7.

Ms. Mahoney learned of the plaintiff's EEO activity "sometime after she started at BJA in July of 2012."  Def.'s SMF ¶ 92.  The parties and the record are silent as to whether the other two interviewers were aware of the plaintiff's protected activity.

### 5.      Fifth Non-Selection in Early 2013

The plaintiff applied for another GS-14 position, Supervisory Grants Management Specialist, in November of 2012.  Def.'s SMF ¶ 65; Def.'s Mot., Ex. 60, ECF No. 7-4.  The vacancy announcement describes the job duties for this position as including reviewing, analyzing, and tracking awardee compliance with the terms of the grant; overseeing risk assessments, financial reviews, and audits of grant awardees; providing training to staff, management, program officials, awardees, and others; overseeing a variety of pre- and post-award tasks including designing solicitations, reviewing applications, conducting financial reviews of applicants, and negotiating the terms of grant awards; evaluating the effectiveness of grants; and supervising employees performing work at the GS-7 through GS-13 level.  Def.'s Mot., Ex. 60.

A panel consisting of Edison Aponte, Jonathan Faley, and Kellie Dressler interviewed four candidates for the position between December 19, 2012, and January 4, 2013.  Def.'s SMF ¶¶ 67–68.  The plaintiff was the lowest-scoring candidate.  *Id.* ¶ 71.  The panel recommended Cory Randolph (African-American male)[6] and Brenda Worthington (Caucasian female) for second-round interviews with Denise O'Donnell and Kristen Mahoney, and both candidates were offered a position in early 2013.  *Id.* ¶¶ 69–70.  The interviewers noted that the plaintiff struggled to answer interview questions compared to the other candidates.  *Id.* ¶¶ 72–74.

Ms. Dressler was not aware of the plaintiff's prior protected activity when she interviewed him.  *Id.* ¶ 76.  Mr. Aponte's most recent participation in the plaintiff's EEO activity prior to this non-selection occurred on August 23, 2012, when an EEO investigator interviewed Mr. Aponte.  *Id.* ¶ 77.  As noted, Mr. Aponte also was aware that he had been named in one of the plaintiff's EEO complaints.  *Id.*  Mr. Faley had most recently been involved in the plaintiff's EEO conduct when he signed a statement for an EEO investigator on August 24, 2012, though he had first learned of the plaintiff's protected activity over a year before that.  *Id.* ¶ 78.  Ms. O'Donnell became aware of the plaintiff's EEO activity shortly after June 2011, *id.* ¶ 91, and, as previously noted, Ms. Mahoney became aware of his EEO activity at some point after she started at the BJA in July of 2012, *id.* ¶ 92.

### 6.    Sixth Non-Selection in Early 2013

Also in late 2012, the plaintiff applied for a GS-14 position as Senior Policy Advisor for Byrne Criminal Justice Innovation/Building Neighborhood Capacity Programs.  Def.'s SMF ¶ 79.  The job duties for that position entail analyzing data, with the goal of enhancing the use of

---

[6]        The plaintiff describes Cory Randolph as a "bi-racial male," *see, e.g.*, Compl. ¶ 33; Pl.'s Opp'n at 35, presumably in an effort to minimize the impact of Mr. Randolph's shared African-American ethnicity, which undercuts the plaintiff's claim of a racially discriminatory non-selection.

research and data by staff and its stakeholders and partners; overseeing program planning,

coordination of solicitations, project deliverables, and implementation of complex research

projects related to research evidence; providing technical expertise to BJA staff and leadership;

and coordinating projects with research agencies.[7]  *Id.* ¶ 80.  Of fifteen applicants, thirteen were

initially interviewed by one of two panels: a panel comprised of Rebecca Rose (Caucasian

female), Clarence Banks (African-American male), and David Adams (Caucasian male), which

interviewed both the plaintiff and the selectee; and another panel comprised of Cornelia

Sorensen-Sigworth (Caucasian female), Jane Hodgdon (female of unknown race), and Shanetta

Cutlar (African-American female).  *Id.* ¶¶ 81–82.

      The plaintiff was ranked fourth of the thirteen candidates.  *Id.* ¶ 85.  The first-round

panels recommended that only the top two candidates from each panel move on to a second-

round interview.  *Id.*  ¶ 86.  Instead, the panel of second round interviewers—Denise O'Donnell,

Elizabeth Griffin, and Kristen Mahoney (all Caucasian females)—chose to interview the top six

candidates, which included the plaintiff.  *Id.*  Ultimately, in 2013, *id.* ¶ 93, the second-round

panel selected Alissa Huntoon (Caucasian female) for the position, noting that she had "lengthy

experience with law enforcement, overseeing projects that can be critical to the core projects of

BCJI and BNCP" as well as strong communication skills, project-management skills, and

experience representing OJP in high-level meetings.  *Id.* ¶¶ 87, 89 (internal quotation marks

omitted).

      Of the three second-round interviewers, Ms. Griffith first became aware of the plaintiff's

protected activity around 2007; Ms. O'Donnell first became aware of the plaintiff's protected

activity shortly after June 2011; and Ms. Mahoney became aware of his protected activity at

---

[7]    DOJ has not produced the vacancy announcement for the position as it did for other openings.  Pl.'s SMF
¶ 9(b).

some time after she started at the BJA in July 2012.  *Id.* ¶¶ 90–92.  Both Ms. Griffith and Ms.

O'Donnell had been named as responsible management officials in several of the plaintiff's EEO

cases.  Pl.'s SMF ¶ 9(a).

### 7.      Seventh Non-Selection in Summer 2014

The plaintiff applied for a GS-14 position as a Senior Policy Advisor for Health and

Criminal Justice in April 2014 and was not selected for the position.  Def.'s SMF ¶ 94; Def.'s

Mot., Ex. 44, ECF No. 7-4.  The Senior Policy Advisor's job duties include overseeing efforts to

improve state, local, and tribal justice system responses to people with behavioral problems,

increasing access to health care for justice-involved individuals, developing policy initiatives

aimed at improving recidivism and health outcomes for justice-involved individuals, and

coordinating with other agencies.  Def.'s Mot., Ex. 62, ECF No. 7-4.  The first-round interview

panel consisted of Cornelia Sorensen-Sigworth (Caucasian female), Anna Johnson (female of

unknown race), and Michael Dever (Caucasian male).  Def.'s SMF ¶ 96.  Based on the panel's

recommendations, Ms. Qazilbash wrote a memorandum detailing the top five candidates for a

second-round interview with Ms. O'Donnell, Ms. Mahoney, and Ms. Qazilbash.  *Id.* ¶ 97.  The

plaintiff was among the top five candidates.  *Id.*  Danica Binkley (Caucasian female) was

selected for the position after the second-round interviews.  *Id.*

Ms. O'Donnell had been named in the plaintiff's previous EEO complaints.  Def.'s Mot.,

Ex. 41 at 2, ECF No. 7-4.  Ms. Mahoney had been made aware of the plaintiff's previous EEO

activity by Ms. Qazilbash, Def.'s Mot., Ex. 42 at 2, ECF No. 7-4, who had been named as a

responsible management official in numerous of the plaintiff's previous EEO complaints, Def.'s

Mot., Ex. 43 at 1, ECF No. 7-4.

### 8.      Time-Off and Cash Awards Denied in 2011 and 2012

The plaintiff alleges that he was "denied certain awards that his coworkers received,"

including "a time-off award in 2011, a performance cash award in 2011, and [a] . . . time-off

award[] for 2012." Compl. ¶ 42. The plaintiff avers that he "discovered through a response to

a[] FOIA request that [he] was the only member of the Justice Systems Team supervised by

[Ms.] Qazilbash . . . who [did not] receive a special act time-off award for FY 2011." Jeffries

Decl. ¶ 27. He further states that, "[t]o the best of [his] knowledge, [he] did not receive a

performance cash award for FY 2011, although [he] was supposed to." *Id.* ¶ 28. Finally,

"[a]ccording to documents [he] received from a [FOIA] request," the plaintiff avers that he "did

not receive a time-off award for the first quarter of FY 2012," even though some of his

coworkers did receive such an award, and his award covering the first two quarters of FY 2012

"was only for six hours instead of the 10 hours that [his] female GS-13 coworkers received." *Id.*

¶ 29.

## II.     LEGAL STANDARDS

### A.      Federal Rule of Civil Procedure 12(c)

Federal Rule of Civil Procedure 12(c) authorizes a party to move for judgment on the

pleadings at any time "after the pleadings are closed—but early enough not to delay trial." Fed.

R. Civ. P. 12(c). "In considering a motion for judgment on the pleadings, the Court should

'accept as true the allegations in the opponent's pleadings' and 'accord the benefit of all

reasonable inferences to the non-moving party.'" *Stewart v. Evans*, 275 F.3d 1126, 1132 (D.C.

Cir. 2002) (quoting *Haynesworth v. Miller*, 820 F.2d 1245, 1249 n.11 (D.C. Cir. 1987)); *Hohri v.

United States*, 782 F.2d 227, 241 (D.C. Cir. 1986) (explaining that, in reviewing a grant of a Rule

12(c) motion to dismiss, "allegations of the complaint should be construed favorably to the

pleader") (internal quotation marks omitted), *rev'd on other grounds*, 482 U.S. 64 (1987). The

movant is entitled to judgment under Rule 12(c) by demonstrating that "no material fact is in dispute and that it is 'entitled to judgment as a matter of law.'"  *Peters v. Nat'l R.R. Passenger Corp.*, 966 F.2d 1483, 1485 (D.C. Cir. 1992) (citation omitted).

When, however, resolution of a motion for judgment on the pleadings relies upon material outside the pleadings, "the motion must be treated as one for summary judgment under Rule 56," so long as the parties have been afforded "reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d); *see also Weisberg v. U. S. Dep't of Justice*, 543 F.2d 308, 310 n.5 (D.C. Cir. 1976) (finding that consideration of "affidavits outside the pleadings" required treating a dismissal under Rule 12(c) as a grant of summary judgment in favor of the defendant, raising the question, under Rule 56(a), "whether a genuine issue as to any material fact remains to be resolved").

**B.      Federal Rule of Civil Procedure 56(a)**

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 256–57 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, a reasonable jury could return a verdict for the nonmoving party") (internal quotation marks omitted)); *see also* Fed. R. Civ. P. 56(c), (e)(2)–(3).

13

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth*., 651 F.3d 118, 123 (D.C. Cir. 2011).  This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 1863 (quoting *Liberty Lobby,* 477 U.S. at 255 (alteration in original)).  Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150-51 (2000) (internal quotation marks omitted); *see also Burley v. Nat'l Passenger Rail Corp*., 801 F.3d 290, 295–96 (D.C. Cir. 2015).  In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011); *Veitch v. England*, 471 F.3d 124, 134 (D.C. Cir. 2006); *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993); *accord* Fed. R. Civ. P. 56(e).  If "opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."  *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir. 2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

### C.       Federal Rule of Civil Procedure 56(d)

Federal Rule of Civil Procedure 56(d) "establishes a mechanism for nonmovants who lack the facts they need to seek an opportunity to gather more information before responding to a motion for summary judgment." *Grimes v. Dist. of Columbia*, 794 F.3d 83, 92 (D.C. Cir. 2015); *see also Crawford-El v. Britton*, 523 U.S. 574, 599 n.20 (1998) (noting that, under Rule 56(d)'s predecessor provision, a district judge "ha[s] discretion to postpone ruling on a defendant's summary judgment motion if the plaintiff needs additional discovery to explore 'facts essential to justify the party's opposition'" (quoting the former Rule 56(f))).

To obtain relief under Rule 56(d) and thereby forestall summary judgment, "the movant must submit an affidavit which 'states with sufficient particularity why additional discovery is necessary.'" *Convertino v. U.S. Dep't of Justice*, 684 F.3d 93, 99 (D.C. Cir. 2012)[8] (quoting *Ikossi v. Dep't of Navy*, 516 F.3d 1037, 1045 (D.C. Cir. 2008)).  Based on the language of the rule, which requires the nonmovant to show by affidavit or declaration "specific reasons" why "it cannot present facts essential to justify its opposition," Fed. R. Civ. P. 56(d), the D.C. Circuit has outlined "three criteria" that must be satisfied.  *Cannon v. Dist. of Columbia*, 717 F.3d 200, 207–09 (D.C. Cir. 2013) (citing *Convertino*, 684 F.3d at 99).  First, the affidavit must "outline the particular facts [the movant] intends to discover and describe why those facts are necessary to the litigation."  *Convertino*, 684 F.3d at 99.  Second, the affidavit "must explain why [the movant] could not produce the facts in opposition to the motion for summary judgment."  *Id.* at 99–100 (internal quotation marks omitted).  Finally, the affidavit "must show the information is in fact discoverable."  *Id.* at 100 (citation omitted).  A district court should carefully scrutinize a

---

[8]       *Convertino* discusses Rule 56(f), which has subsequently been recodified, without substantive change, to subsection (d) of Rule 56.  *See U.S. ex rel Folliard v. Gov't Acquisitions, Inc.*, 764 F.3d 19, 26 n.3 (D.C. Cir. 2014) ("Rule 56(d) 'carried forward without substantial change the provisions of former subdivision (f).'" (alteration omitted) (quoting Fed. R. Civ. P. advisory committee's notes to 2010 Amendments)).

Rule 56(d) affidavit to ensure that it meets the three *Convertino* criteria.  *See U.S. ex rel Folliard*, 764 F.3d at 26–27; *see also SEIU Nat'l Indus. Pension Fund v. Castle Hill Health Care Providers, LLC*, 312 F.R.D. 678, 684 (D.D.C. 2015) ("*Folliard* thus directs trial courts to scrutinize Rule 56(d) motions and not to reflexively grant them.").  While dicta in *Convertino* suggested that "Rule 56(d) request[s] should be granted more often than not," the D.C. Circuit has since clarified that this is "incorrect."  *See U.S. ex rel Folliard*, 764 F.3d at 26.  Instead, under this standard, "boilerplate" language or vague assertions will not do.  *Id.* at 29 (affirming the district court's conclusion that a "boilerplate discovery request" is insufficient to obtain additional discovery under Rule 56(d)); *see also Morales v. Humphrey*, 309 F.R.D. 44, 48 (D.D.C. 2015) ("Rule 56(d), moreover, may not be used to defeat a motion for summary judgment when there is 'mere speculation' of evidence not yet discovered." (quoting 11 Moore's Federal Practice, ¶ 56.102 (Matthew Bender 3d Ed.))).

## III.   DISCUSSION

DOJ produced over 17,000 pages of documents in response to the plaintiff's various discovery requests in the proceedings before the EEOC.[9]  Def.'s Mem. at 3 n.3.  Both parties have submitted hundreds of pages of documents and declarations from the underlying administrative proceedings to support their positions, and the parties rely on these evidentiary materials throughout their filings.  Thus, while well cognizant that the plaintiff has had no opportunity to depose any of his many colleagues whom he claims were involved in the alleged discriminatory and retaliatory activity, *see* Pl.'s Mot. at 1–3, DOJ's pending motion will be

---

[9]     The plaintiff complains that DOJ "parceled [his] [administrative] cases out to three different EEOC offices around the country for processing instead of keeping them all with one Administrative Judge in the Washington Field Office."  Pl.'s Opp'n at 4 (criticizing DOJ for balkanizing the review process "in its infinite wisdom").  This complaint is misplaced, however, for overlooking the benefits in terms of efficiency, thoroughness, and speed of having three separate examiners assigned to review the plaintiff's claims consider the claims and the associated thousands of pages of documents.

converted to a motion for summary judgment.  Set against that standard, the plaintiff's claims of age and sex discrimination, and retaliation, in connection with seven non-selections and the alleged denial of cash and time-off awards during the three year period of 2011 to 2014, Compl. ¶ 1, 44, 47, will be examined to assess whether he has raised a genuine issue of material fact for trial such that "a reasonable jury could return a verdict for [him]," *Liberty Lobby*, 477 U.S. at 248, and if not, whether he has explained what specific additional discovery he seeks and how such discovery would advance his case, *see Convertino*, 684 F.3d at 99.  At the outset, the applicable statutory framework is addressed.

### A.      Statutory Framework

"Title VII prohibits the federal government from discriminating in employment on grounds of race or sex, and from retaliating against employees for engaging in activity protected by Title VII." *Montgomery v. Chao*, 546 F.3d 703, 706 (D.C. Cir. 2008) (internal citations omitted).  In this case, the plaintiff alleges all three varieties of Title VII claims.  The standards governing discrimination and retaliation claims are discussed below.

### 1.      Title VII Discrimination Claims

Under Title VII, "the two essential elements of a discrimination claim are that (i) the plaintiff suffered an adverse employment action (ii) because of the plaintiff's race, color, religion, sex, [or] national origin." *Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *accord Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008).  Where a plaintiff presents no direct evidence of discrimination, the Court's analysis of circumstantial evidence follows the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).  "A plaintiff establishes a *prima facie* case of discrimination by showing that [he]: 1) is a member of a protected class; 2) suffered an adverse employment action; and that 3) the unfavorable action gives rise to an inference of

discrimination." *Nurriddin v. Bolden*, 818 F.3d 751, 758 n.6 (D.C. Cir. 2016).  If the plaintiff

establishes a *prima facie* case, the burden then shifts to the employer "to articulate some

legitimate, nondiscriminatory reason" for its actions.  *McDonnell Douglas*, 411 U.S. at 802.

While this framework generally requires the plaintiff to bear the initial burden of making

out a *prima facie* case of discrimination, the D.C. Circuit has clarified that courts "need not—*and

should not*—decide whether the plaintiff actually made out a *prima facie* case under *McDonnell*

*Douglas*," where (1) "an employee has suffered an adverse employment action" and (2) "an

employer has asserted a legitimate, non-discriminatory reason for the decision."  *Brady*, 520 F.3d

at 494 (emphasis in original).  "Where an employer offers clear and reasonably specific

nondiscriminatory reasons for the adverse employment action, the court need not decide whether

the plaintiff has made out a *prima facie* case, and proceeds to the ultimate question of

discrimination *vel non*."  *Royall v. Nat'l Ass'n of Letter Carriers, AFL-CIO*, 548 F.3d 137, 144

(D.C. Cir. 2008) (internal quotation marks, alteration, and citation omitted).

### 2.    Title VII Retaliation Claims

"To prove retaliation, a plaintiff must show that '(1) [he] engaged in protected activity;

(2) he was subjected to an adverse employment action; and (3) there was a causal link between

the protected activity and the adverse action.'"  *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir.

2015) (alteration in original) (quoting *Hairston v. Vance–Cooks*, 773 F.3d 266, 275 (D.C. Cir.

2014)).  As with disparate treatment claims under Title VII, allegations of retaliation that are

based on circumstantial evidence are subject to the *McDonnell Douglas* three-step burden-

shifting framework outlined above.  To briefly recapitulate, under this framework, where an

employer offers a legitimate, nondiscriminatory reason for its challenged action, the court must

assume the plaintiff has made out a *prima facie* case of retaliation and "proceed to the question

of retaliation *vel non*," which can be resolved "in favor of the employer based either upon the

employee's failure to rebut its explanation or upon the employee's failure to prove an element of [his] case," *Taylor v. Solis*, 571 F.3d 1313, 1320 n.4 (D.C. Cir. 2009); *see also Hernandez v. Pritzker*, 741 F.3d 129, 133 (D.C. Cir. 2013) (noting that "the 'central question' . . . is whether [the plaintiff] has produced sufficient evidence for a reasonable jury to find those reasons were but pretexts for retaliation" (quoting *McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012))).  Focus on this "one central inquiry" is appropriate because a legitimate nondiscriminatory reason for the employer's actions breaks the necessary "but-for causation" link between the protected activity and the adverse employment action.  *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S. Ct. 2517, 2528, 2533 (2013); *Adeyemi v. Dist. of Columbia*, 525 F.3d 1222, 1226 (D.C. Cir. 2008).

### B.      The Plaintiff's Non-Selection Claims

The plaintiff raises discrimination and retaliation claims for each of his seven non-selections.  As will be discussed, DOJ has offered a legitimate, non-discriminatory reason for each non-selection.  Thus, the plaintiff's burden as to both his discrimination and retaliation claims is to show that DOJ's explanation is pretextual.  Accordingly, the plaintiff's discrimination and retaliation claims for each non-selection are addressed in tandem.

### 1.      First Non-Selection

The plaintiff claims that DOJ discriminated against him on the basis of his race and sex, and retaliated against him, in selecting Naydine Fulton-Jones (African-American female) and Esmerelda Womack (Caucasian female) for the Supervisory Grants Program Manager position in 2011.[10]  Compl. ¶ 24.  The plaintiff's complaint states that his qualifications were "superior" to

---

[10]      As to the first non-selection, the plaintiff asserts discrimination and retaliation claims arising out of both the non-selection itself *and* the DOJ's alleged failure to afford the plaintiff priority consideration.  *See* Pl.'s Opp'n at 14–15.  Any such priority consideration claim fails at the threshold.  As DOJ points out, *see* Def.'s Mem. at 15, denial of priority consideration is not an adverse action for purposes of Title VII because such a denial is adverse

those of the Caucasian women selected, without actually comparing their relative qualifications. *Id.* ¶ 25.

DOJ asserts that the plaintiff was not selected for the position because he lacked the requisite qualifications and interviewed poorly.  Indeed, each of the panelists attests that the plaintiff lacked the necessary professionalism, leadership skills, and communication skills for the job and that his shortcomings were brought into sharp relief during his interview.  *See* Def.'s Mot., Ex. 8 ("Aponte Aff.") at 4, ECF No. 7-3 ("The panel members unanimously felt that [the plaintiff] lacked the qualifications and qualifying experience for the position. . . . On the other hand, the selectees demonstrated qualifying experience and knowledge, and demonstrated an ability to fulfill the requirements of the job.");[11] Def.'s Mot., Ex. 9 ("Reid Aff.") at 5, ECF No. 7-3 ("[The plaintiff's] entire interview was solely focused on his work with the Drug Court Program and this just did not translate into the full range of skills needed to manage state policy advisors. . . .  [The plaintiff] just does not possess strong leadership skills.  During the interview, I discovered that his oral communications skills were lacking."); Def.'s Mot., Ex. 6 ("Faley Aff.") at 5, ECF No. 7-3 ("The interview panel discussed [the plaintiff's] qualifications and responses to the interview questions and informed the selecting official that [the plaintiff] was not suitable for the position because he did not adequately articulate the qualities, skills, and

---

only insofar as it diminishes the plaintiff's odds at being selected for a position.  This alleged harm "is too speculative to constitute materially adverse action." *Bridgeforth v. Jewell,* 721 F.3d 661, 664 (D.C. Cir. 2013) ("The path from [the plaintiff's] alleged acts of bravery to a time-off award is, as in *Douglas,* a labyrinth, with many ways to fail but only one way to succeed.").

[11]      The plaintiff points to a performance review by one of the interviewers, Edison Aponte, which review supposedly "praise[s] [the plaintiff's] work in great detail."  Pl.'s Opp'n. at 25.  In the plaintiff's view, this undermines Mr. Aponte's affidavit, which suggests that the plaintiff was unqualified for the position for which he applied.  *Id.*  Contrary to the plaintiff's view, however, Mr. Aponte's favorable performance review cuts the other way: the positive feedback makes clear that Mr. Aponte did not harbor racial animus toward the plaintiff or resent the plaintiff for his protected activity but instead simply concluded that another candidate was more qualified, particularly given the plaintiff's interview performance.

knowledge that would prepare him for the position, such as explaining . . . what experience . . . ha[s] prepared him for staff supervision.").

The panelists' affidavits are consistent with their interview notes, which indicate, *inter alia*, that the plaintiff did not dress appropriately for his interview, Pl.'s Opp'n, Ex. 16 at 422 (noting lack of suit jacket), 433 (same), ECF No. 9-8; that he was unable to meaningfully respond to multiple questions, and in particular those questions about supervisory skills, *id.* at 424, 426–27, 433–34; that he "never really talked about grants," *id.* at 427; and that he repeatedly referenced the same example in answering the interviewers' questions, *id.* at 433. Furthermore, Tracey Trautman noted in her affidavit that the plaintiff "voluntarily provided the interview panel with a writing sample that contained grammatical, spelling and punctuation errors, which demonstrated a lack of good writing skills." Def.'s Mot., Ex. 4 at 6, ECF No. 7-3.

The plaintiff's effort to show that DOJ's rationale for his non-selection is pretextual fails. First, the plaintiff points to an email exchange between Tracey Trautman and Jonathan Faley in which they speculate as to how their colleagues would react upon hearing that the plaintiff was selected for a promotion. *See* Pl.'s Opp'n, Ex. 19, ECF No. 9-8. This email chain, which even the plaintiff characterizes as a "joke," Pl.'s Opp'n at 29, occurred in March 2013, *two years* after the non-selection at issue here. More importantly, however, there is no evidence that would permit a jury to conclude that the authors' attitudes toward the plaintiff were rooted in his race, sex, or protected activity. The email chain merely states that when other colleagues were jokingly told that the plaintiff was selected for the position, their faces were "priceless," and one of the interview panelists, Ms. Reid, "kept say[ing] 'what'" in an increasingly loud and agitated tone. Pl.'s Opp'n, Ex. 19. Considering the plaintiff's interview performance, Ms. Reid's consternation upon hearing that the plaintiff was selected to fill the position is not surprising.

Second, the plaintiff attempts to show pretext by pointing to what he views as differences between his interview and other candidates' interviews. Pl.'s Opp'n at 19. At the outset, it is worth noting the incoherence of this position: the plaintiff insists that he was entitled to a specialized and independent evaluation in advance of other candidates due to his priority consideration letter but then takes issue with minor differences between his interview process and the interview process for other applicants. The plaintiff first highlights that the interviewers' notes from his interview were on paper rather than a rating and scoring sheet like that used for the other applicants. *Id.* The interviewers' many pages of extremely thorough notes cataloguing the plaintiffs' response to each question, as well the interviewers' overall impressions, however, make clear that their assessment was not "entirely subjective" as the plaintiff contends. *See* Pl.'s Opp'n, Ex. 16. The plaintiff also points out that he was asked one fewer question than the other candidates, though the plaintiff does not explain how such fact demonstrates pretext. *See* Pl.'s Opp'n at 19. The record shows that the plaintiff was asked 14 questions and other applicants were asked 15 questions, including the 14 questions that the plaintiff was asked. *See* Pl.'s Opp'n, Ex. 16; Pl.'s Opp'n, Ex. 20, ECF Nos. 9-9, 9-10. The addition of a single interview question posed to other candidates is not sufficient to show any irregularity, let alone pretext.

Third, the plaintiff argues that the reasons given for his non-selection in the letter notifying him of his non-selection are "vague" and that three of the four reasons were "not directly tied to a question . . . asked by the panelists." Pl.'s Opp'n at 23. The letter states that the plaintiff was not selected because: (1) he did not demonstrate the skills and experience he had that would prepare him for a supervisory role; (2) he did not explain the methods or processes he uses to resolve issues; (3) he did not address complex grant management issues; and (4) he did not discuss program or project milestones. *See* Pl.'s Opp'n, Ex. 26, ECF No. 9-11. The plaintiff

cites no authority for the proposition that an employer's failure to provide exceptionally specific reasons for a non-selection can permit an inference of pretext, and the Court is aware of none.  In any event, as discussed above, the broader reasons noted in the rejection letter are amply supported in the panelists' detailed interview notes.

Next, the plaintiff notes that one of the ultimate selectees, Esmerelda Womack, "had no prior supervisory experience, did not serve as Acting Branch Chief like [the plaintiff], and in fact had taken over his responsibilities in the Program Office after he had transferred to the Policy Office in 2008."  Pl.'s Opp'n at 25.   Even if Ms. Womack had no previous supervisory experience, the panelists' notes make clear that she spoke at length during her interview about how she had mentored BJA staff, providing multiple examples.  *See* Pl.'s Opp'n, Ex. 20 at 507.  Moreover, according to the panelists, it was not the plaintiff's supervisory experience, or lack thereof, that doomed his application but rather his inability to articulate how any of his experience had prepared him for the Supervisory Grants Program Manager role during his interview.  By contrast, as reflected in the interviewers' notes, Ms. Womack cited numerous examples of her experience helping staff at the BJA and articulated a vision as to how she would lead and supervise if offered the position.  *See, e.g., id.* at 499–513.

Finally, the plaintiff points to a statement by BJA attorney Maureen Dimino that Kim Ball, a division supervisor, had commented that the plaintiff "'only' had his job in the policy office of BJA because he was black and filed an EEOC complaint."  Pl.'s Opp'n, Ex. 32, ECF No. 9-12.  This comment, even if made, does not create a genuine issue of material fact as to whether the real motivation for the plaintiff's non-selection for the Supervisory Grants Program

23

Manager position was discrimination or retaliation because the plaintiff does not allege that Ms.

Ball had any role in the decision not to hire him.[12]

In sum, then, the undisputed evidence bolsters the interviewers' conclusion that the

plaintiff was unable to explain his qualifications during his interview, dressed unprofessionally

for the interview, and submitted a writing sample riddled with errors.  No reasonable jury could

infer that DOJ's explanation as to why the plaintiff was not selected for the Supervisory Grants

Management position was pretextual.  The defendant is entitled to summary judgment as to the

plaintiff's discrimination and retaliation claims arising out of his first non-selection.[13]

---

[12]     In addressing this claim, the plaintiff also attempts to show a pattern of discrimination against African-American males in the BJA.  *See* Pl.'s Opp'n at 26 ("[T]here is evidence demonstrating a lack of promotions of African-American males to GS-14 and above positions in the BJA.").  The D.C. Circuit recently dealt with an analogous argument that "there are too few black employees in GPO management positions."  *Hairston*, 773 F.3d at 274.  As the D.C. Circuit explained, "'in *individual* disparate treatment cases, . . . statistical evidence is less significant because the ultimate issue is whether the *particular* plaintiff was the victim of an illegitimately motivated employment decision.'"  *Id.* at 274–75 (quoting *Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984)).  Here too, the plaintiff's allegations of broad-based racism and sexism cannot carry the day given the undisputed evidence concerning the plaintiff's objective shortcomings for the position at issue, as discussed above.

[13]     The plaintiff's Rule 56(d) motion for additional discovery concerning his first non-selection asserts that he needs to depose at least six of his colleagues, including the three interview panelists, the selecting official, the selectee, and others.  Pl.'s Mot. at 4.  Despite the fact that the panelists and selecting official executed lengthy affidavits in 2012, shortly after the non-selection, *see* DOJ Mot., Exs. 6, 8–9, the plaintiff apparently seeks more information, *see* Pl.'s Mot. at 4, without, however, "outlin[ing] the particular facts he intends to discover and describ[ing] why those facts are necessary to the litigation."  *Convertino*, 684 F.3d at 99.  As explained above, the panelists' interview notes amply substantiate the rationale provided for the plaintiff's non-selection in his rejection letter.  In any event, HR Deputy Director Jennifer McCarthy issued the letter, *see* Pl.'s Opp'n, Ex. 26 at 2, and the plaintiff has not explained how the interview panelists would be able to testify to the letter's underlying rationale.

To the extent that the plaintiff seeks additional discovery concerning his priority consideration, that discovery is irrelevant given that an employer's failure to afford an employee priority consideration does not amount to an adverse action for purposes of Title VII.  *See supra* note 9.  The plaintiff also claims a "need to depose Kim Ball (Norris) who, according to one of her staff attorneys had objected to the settlement of [the plaintiff's] prior cases, made racist statements, and said she intended to try to get him fired."  Pl.'s Mot. at 4.  Again, Ms. Ball's statements are immaterial given that the plaintiff does not allege that she had any role in the selection process.  The plaintiff's discovery requests that are irrelevant to his claims do not pass *Convertino* muster.  *See Brewer v. Holder*, 20 F. Supp. 3d 4, 17 (D.D.C. 2013) ("Because Plaintiffs do not point to particular facts that they intend to discover which are *relevant* to addressing Defendants' arguments, the Court declines Rule 56(d) relief with respect to the [Plaintiffs'] claim." (emphasis added)); *Swann v. Office of Architect of Capitol*, 73 F. Supp. 3d 20, 27–28 (D.D.C. 2014) ("If the requested discovery is not directed towards evidence that would create a genuine question of material fact, the Court may grant summary judgment despite the discovery request.").  Accordingly, the plaintiff's motion for additional discovery concerning his first non-selection is denied.

### 2.    Second Non-Selection

The plaintiff asserts that he applied for and was not selected for the Special Assistant position due to his race, sex, and protected activity when DOJ selected Cornelia Sorensen-Sigworth, a Caucasian female with no EEO activity, to fill the vacancy.  *See* Compl. ¶ 26.  DOJ contends that Ms. Sorensen-Sigworth was selected for the Special Assistant position because she "was deemed more qualified by the interview panel and performed better in the interview process."  Def.'s Mem. at 22.  The plaintiff does not dispute that he scored seventh out of the eight applicants on his interview and came in sixth out of eight overall.  *Id.* at 22–23.  Indeed, the plaintiff's overall score was 76.09, significantly lower than Ms. Sorensen-Sigworth's score of 95.70.  *Id.* at 23.  The panelists observed that Ms. Sorensen-Sigworth brought "years of experience developing and implementing national policy and programs to th[e] position as she ha[d] worked a number of years for both the National Institute of Justice and BJA's Policy Office."  Def.'s Mot., Ex. 17 at 2.  Furthermore, the panelists concluded that Ms. Sorensen-Sigworth was "positioned to make a seamless transition to th[e] new role supporting the Policy Office Deputy Director and leadership team."  *Id.*  One of the panelists, Ms. Williams, concluded that Ms. Sorenson-Sigworth "was more qualified than [the plaintiff] . . . [because] [s]he was a lead writer of solicitations, prepared guidance for congressional responses, authored and edited an on-line 'Gaming Paper[,]' . . . and 'created' a proposal to initiate a Fellowship Program," among other things.  Def.'s Mot., Ex. 15 ("Williams Aff.") at 4–5, ECF No. 7-3.

In an effort to show that DOJ's rationale for selecting Ms. Sorensen-Sigworth is pretextual, the plaintiff asserts that Ms. Sorensen-Sigworth "had been given a special assignment immediately prior to her selection to enhance her qualifications for the position, but [the plaintiff] still had superior qualifications to her," without identifying any such qualifications.  Compl. ¶ 27; *see also* Pl.'s Opp'n at 31.  The plaintiff also alleges that the selectee's supervisor,

Pamela Cammarata, "determined the qualifications for th[e] position, drafted the interview questions and the scoring system, selected the interview panelists, and scheduled the interviews." Pl.'s Opp'n at 31.  Even assuming these allegations to be true, they do not create a genuine issue of material fact as to whether DOJ's reason for selecting Ms. Sorensen-Sigworth is pretextual for several reasons.

First, the plaintiff's bald assertion in his complaint that he was more qualified does not create an issue of fact, particularly set against undisputed evidence in the record that belies this assertion.  *See, e.g.*, Williams Aff. at 4–5.  Second, the fact that Ms. Sorensen-Sigworth received a special assignment *might* support an inference of pre-selection, but pre-selection does not violate Title VII if premised on the selectee's qualifications rather than some prohibited basis. *See Downing v. Tapella*, 729 F. Supp. 2d 88, 97 (D.D.C. 2010) ("'[The] plaintiff's pre-selection claim does not advance his case for pretext unless he produces some evidence that discrimination [or retaliation] played a role in the selectee's pre-selection and thus [the] plaintiff's non-selection.'" (quoting *Oliver-Simon v. Nicholson*, 384 F. Supp. 2d 298, 310 (D.D.C. 2005))).   The plaintiff has cited no evidence to suggest that even if DOJ had settled on Ms. Sigworth-Sorenson in advance of the interviews such pre-selection was based on race, sex, or protected activity. Here, moreover, the panelists' affidavits make clear that Ms. Sorensen-Sigworth was selected not only because of her qualifications but also due to her superlative interview performance, especially as compared to the plaintiff's dismal interview performance.[14]  *See* Def.'s Mot., Ex.

---

[14]     The applicants were ranked in four categories: (1) Interview, (2) Work History, (3) Experience, and (4) Resume-Education.  Def.'s Mot., Ex. 17 at 2.  The plaintiff and Ms. Sorensen-Sigworth received the same score (100) for their "Resume-Education."  *Id.*  Even if the plaintiff had received perfect scores for his Work History and Experience (as Ms. Sorensen-Sigworth did), his overall ranking *still* would have been significantly lower than hers due to her much stronger interview performance (87.7 out of a total of 100 possible points versus the score of 63.1 that the plaintiff received).  *Id.*

17 at 1 ("Ms. Sigworth is the highest ranking candidate for this position based on the combination of her overall scores for her interview, work history, experience, and resume.").

Finally, regarding the plaintiff's concerns that Ms. Sorenson-Sigworth's supervisor, Ms. Cammarata, directed the interview process, the undisputed record evidence shows that Ms. Cammarata thought highly of the plaintiff. Indeed, Ms. Cammarata stated in her affidavit that she was "a fan of Tim Jeffries" and sought to be his first-line supervisor in November 2010 so that she "would have the opportunity to work directly with [the plaintiff]." Def.'s Mot., Ex. 47 ("Cammarata Aff.") at 18, ECF No. 7-4. Thus, if anything, Ms. Cammarata's involvement in the interview process likely redounded to the plaintiff's benefit.[15]

In sum, then, DOJ has supported with evidence its proffered rationale for selecting Ms. Sorensen-Sigworth, and the plaintiff has done nothing to establish that this reason is pretextual. Accordingly, DOJ is entitled to summary judgment as to the plaintiff's discrimination and retaliation claims arising out of the plaintiff's non-selection for the Special Assistant position.[16]

---

[15] Regarding his retaliation claim, the plaintiff notes that the panelists admitted to "reconciling" their scores after conducting interviews and believes that it is "entirely possible that [Ms.] Qazilbash, who was [the plaintiff's] supervisor and aware of his EEO complaints, and was named as a responsible management official in one of them, influenced the other panelists." Pl.'s Opp'n at 31 (citing Pl.'s Opp'n, Ex. 36, ECF No. 9-13). The plaintiff's rank speculation is belied by the affidavits of the other two panelists, Mr. McCreary and Ms. Williams, who unambiguously state that they were not aware of the plaintiff's EEO complaints until long after they interviewed the plaintiff. Williams Aff. at 2 (stating that she became aware of the plaintiff's previous EEO activity when asked to submit an affidavit, after the plaintiff's non-selection for the Special Assistant position); Def.'s Mot., Ex. 16 ("McCreary Aff.") at 2, ECF No. 7-3 (stating that he became aware of the plaintiff's previous EEO activity three to four months before executing his affidavit, which was after the plaintiff discovered that he was not selected for the Special Assistant position). Thus, to the extent that the interviewers reconciled their scores, the record makes clear that the plaintiff's previous EEO activity did not factor into the interviewers' discussions. See McCreary Aff. at 5–6 ("I can unequivocally state that [the plaintiff's] scores in the interview process were based on the evidence presented to the selection panel members. The selection for this vacancy was not based on the race, sex, or prior EEO activity of the [plaintiff] or any of the applicants.").

[16] The plaintiff's Rule 56(d) motion requests an opportunity to depose all the interview panelists involved in this second non-selection, in particular so that he can question them concerning whether they reconciled their scores at the end of his interview and why Ms. Sorenson-Sigworth was given a "special assignment" prior to this selection. See Pl.'s Mot. at 5. As explained, score reconciliation is not itself probative of pretext, so discovery into whether the panelists discussed their individual scores is immaterial to the plaintiff's claims. See Brewer, 20 F. Supp. 3d at 17; Swann, 73 F. Supp. 3d at 27–28. As for Ms. Sorenson-Sigworth's alleged preselection, DOJ contends that it was not only her qualifications but also her interview performance that distinguished her from the plaintiff. Even if the plaintiff is able to show that the "special assignment" boosted Ms. Sorenson-Sigworth's qualifications, the fact

### 3.     Third Non-Selection

In the latter part of 2012, the plaintiff was not selected for the position of Senior Policy

Advisor for Evidence Integration.  The plaintiff claims that DOJ's hiring decision was based on

the plaintiff's race, sex, and previous EEO activity.  Compl. ¶ 28. Again, the plaintiff's

complaint summarily asserts that his qualifications were "superior" to those of the selectee,

Clarence Banks.  *Id.* ¶ 29.  DOJ contends that summary judgment is warranted as to the

plaintiff's discrimination and retaliation claims arising out of this non-selection because the

record shows that Mr. Banks was the more qualified applicant.  Def.'s Mem. at 26–27.

As to this non-selection, the record evidence conclusively shows that no reasonable jury

could find that DOJ discriminated against the plaintiff based on race or gender in not selecting

him for the Senior Policy Advisor position.  For starters, the selectee, Mr. Banks, is an African-

American male, and this significantly undercuts the plaintiff's discrimination claims.  *See, e.g.*,

*Murray v. Gilmore*, 406 F.3d 708, 715 (D.C. Cir. 2005) ("[A] replacement within the same

protected class cuts strongly against any inference of discrimination."); *Burley v. Nat'l*

*Passenger Rail Corp.*, 33 F. Supp. 3d 61, 76 n.15 (D.D.C. 2014).

Beyond that, the vacancy announcement for the Senior Policy Advisor position shows

that the position is focused primarily on research and data analysis, Def.'s Mot., Ex. 58, and the

applicants' résumés make clear that Mr. Banks was plainly the more qualified candidate.  Mr.

Banks holds a PhD in Interdisciplinary Social Science with a focus on Criminal Justice.  Def.'s

Reply, Ex. 66, ECF No. 16.  Prior to beginning work at DOJ, Mr. Banks served as a Senior

Research Associate & Evaluation Coordinator at the Michigan Prisoner Reentry Initiative for

---

remains that her selection is largely attributable to her interview.  Finally, it is worth noting that all three panelists
the plaintiff seeks to depose provided lengthy affidavits shortly after this non-selection occurred in 2012, *see* Def.'s
Mot., Exs. 14–16, and the plaintiff has never alleged that there is any reason to doubt the veracity of those affidavits.
Accordingly, the plaintiff's motion for additional discovery concerning his second non-selection is denied.

nearly three years.  *Id.*  Prior to that, he worked as a Technical Assistance Coordinator &

National Research Team member for six years.  *Id.*  Mr. Banks held numerous other research-

oriented positions.  *See id.*  His résumé lists 13 publications.  *Id.*  The plaintiff, in contrast, holds

one graduate degree, a Master of Social Work.  Def.'s Reply, Ex. 67, ECF No. 16.  Furthermore,

the plaintiff has far fewer awards than Mr. Banks, lists no publications on his résumé, and has

much less research experience.  *Id.*

       As a last-ditch effort to show that he was more qualified than Mr. Banks, the plaintiff

contends that he "was the only applicant to collaborate with the National Institute of Justice on a

joint solicitation to package evidence into useful tools, and he had worked with research partners

to select a provider to disseminate research integration to drug court practitioners, which should

have been highly relevant to the duties of the position."  Pl.'s Opp'n at 33.  The plaintiff's

conclusory assertion as to what experience is relevant is of limited value.  Even so, the plaintiff's

own description of his work with the National Institute of Justice shows that it did not involve

research or data analysis—the key responsibility for the position of Senior Policy Advisor for

Evidence Integration.  *See* Def.'s Mot., Ex. 21 ("Griffith Aff.") at 4–5, ECF No. 7-3 ("[The

plaintiff] oversaw the grant and collaboration with NIJ [National Institute of Justice], but did not

do the research translation work himself.  In contrast, the other candidates had both overseen

multiple research projects . . . and had also conducted their own research and evaluate [sic]

projects, and used research and data methods in their programs.").

       Based on the foregoing, a reasonable jury could not conclude that DOJ discriminated or

retaliated against the plaintiff in selecting Mr. Banks for the position of Senior Policy Advisor

for Evidence Integration.  Accordingly, DOJ is entitled to summary judgment as to the plaintiff's

claims arising out of the plaintiff's non-selection for the Senior Policy Advisor for Evidence

Integration position.[17]

### 4.      Fourth Non-Selection

Next, the plaintiff asserts that DOJ discriminated and retaliated against him when he was

not selected to fill the Administrative Services and Logistics Director vacancy.  Compl. ¶ 31.

Again, the plaintiff claims that he was more qualified than the selectee, Michelle Martin

(Caucasian female).  *Id.* ¶¶ 31–32.  DOJ contends that Ms. Martin was chosen because she

"made a better impression on the interview panel" and was more qualified than the plaintiff, and

that the plaintiff cannot produce evidence to show that DOJ's reason is pretextual.  Def.'s Mem.

at 28.

DOJ's argument prevails, as the plaintiff effectively conceded to the interviewers that he

did not possess the requisite experience for the job.  *See* Def.'s SMF ¶¶ 61–63.  During his

interview, the plaintiff was asked whether he was "well versed and experienced in the various

areas of the vacancy announcement, specifically, human resources, contracting, procurement,

[and] technology support."  Def.'s Mot., Ex. 25 at 2.  The plaintiff indicated that he was not

particularly experienced in the relevant areas and, according to one interviewer's notes, stated

that he was applying for the job because he "[w]ould like to be the director of an agency and

needs the admin[istrative] experience to do this."  *Id.*  Indeed, one of the interviewers, Shanetta

---

[17]      As explained *supra*, notes 13, 16, the plaintiff's vague assertion that "[t]he panelists for this position also
need to be deposed to explain their notes and scoring and exactly what occurred during the interview process," Pl.'s
Mot. at 5, does not satisfy *Convertino*'s first requirement, that a Rule 56(d) movant "outline the particular facts he
intends to discover and describe why those facts are necessary to the litigation," *Convertino*, 684 F.3d at 99,
particularly since  the record already contains the panelists' contemporaneous affidavits, *see* Def.'s Mot., Exs. 12,
21, 24, ECF No. 7-3.  The plaintiff simply does not explain why the other discovery he seeks concerning this non-
selection, for example, whether the Attorney General undertook a formal effort to "increase the number of African-
American males in [supervisory] positions," Pl.'s Mot. at 6, is relevant to these particular discrimination and
retaliation claims.  *See supra*, note 12.  Thus, the plaintiff's Rule 56(d) motion concerning his non-selection for the
position of Senior Policy Advisor for Evidence Integration is denied.

Cutlar, recalled in an affidavit that the plaintiff was not selected for the position because "[h]e readily identified that he did not have . . . experience in the area," and that he informed the interviewers that he was "looking to learn how to do the job because he wanted to be better prepared for [another] job." Def.'s Mot., Ex. 29 ("Cutlar Aff.") at 3, ECF No. 7-3. By contrast, the interviewers' notes reflect that Ms. Martin had indirect experience with procurement and contracting, significant experience in technology support, as well as experience with human resources—a response that would clearly instill more confidence than the plaintiff's response concerning his experience. Def.'s Mot., Ex. 26 at 2, 7, 12, ECF No. 7-3.

In the face of his admission that he did not possess the requisite experience for the Administrative Services and Logistics Director position, the plaintiff feebly endeavors to establish pretext by arguing that the selection process was plagued by a number of irregularities. *See* Pl.'s Opp'n at 34–35. In particular, the plaintiff points to (1) "substantial changes to the KSAs for the position before the vacancy" was announced, "which raise[s] the possibility that [the position] was tailored for [the selectee];" (2) "conflicting information on who the third panelist was;" (3) "the fact that both [Ms.] Mahoney's and [Ms.] O'Donnell's affidavits are missing from the ROIs and were never produced;" and (4) "the lack of any documentation of how the applications of [the plaintiff] and [Ms.] Martin were specifically scored by HR versus the panelists."[18] *Id.* at 34.

---

[18]      The plaintiff also notes, in passing, that one of his African-American colleagues, Anthony Burley, suggested that the plaintiff was not selected for this position because he "does not meet the definition of a safe 'Negro' by OJP's standards. [The plaintiff] seems to be extremely knowledgeable within the Criminal Justice domain and that makes him dangerous to several non-progressive/racist OJP Managers, who tend to prefer the 'Negro' men of OJP are humble, quiet, and docile." Pl.'s Opp'n at 35 (quoting Pl.'s Opp'n, Ex. 44 ("Burley Aff.") at 2, ECF No. 9-15). Mr. Burley's troubling opinion sheds little light on the non-selection at issue, however, since he concedes: "I am not privy to any . . . information regarding this particular non-selection, beyond what [the plaintiff] has shared with me." Burley Aff. at 2. Thus, his opinion falls short of raising a genuine issue of material fact as to pretext in connection with the plaintiff's non-selection for either the Supervisory Grants Management Specialist position or the Administrative Services and Logistics Director position. The record makes clear that Ms.

The last three alleged "irregularities" are not probative of pretext, as they are not

"inconsisten[cies] with established policies" or "violation[s] of protocol." *Perry v. Shinseki*, 783

F. Supp. 2d 125, 138–40 (D.D.C. 2011).  Instead, they are alleged evidentiary gaps identified

during after-the-fact administrative proceedings.  The alleged alteration of the KSAs prior to the

vacancy announcement may under some circumstances be used to demonstrate tailoring, which,

in turn, may be used to show pretext.  Here, however, the plaintiff does not even attempt to

explain *how* the KSAs were changed with Ms. Martin in mind, *i.e.*, how the modifications match

up with her qualifications.  Indeed, some changes were so generalized that it is hard to see how

they could be tailored to a particular candidate.  For example, DOJ deleted "[p]lanned and

executed work assignments" from the list of KSAs.  Pl.'s Opp'n, Ex. 51 at 7, ECF No. 9-17.

Other changes were so minor as to not represent substantive changes at all.  For example, the

KSA titled "[c]onveyed information in written form" was deleted, and a KSA titled "[a]bility to

communicate in writing" was added.  *Id.* at 4.  Yet other KSAs were altered to provide more

detail and context.  For example, the DOJ changed one KSA from "[a]bility to provide program

management advice and assistance" to "[a]bility to provide advice and guidance to senior

management on administrative functions within an organization including human resources,

contracting, procurement, and technology support."  *Id.* at 3.  In short, the plaintiff has not raised

a genuine issue of material fact based on the KSA changes as to pre0selection, let alone

pre0selection based on race, sex, or protected activity.  *See Porter v. Shah*, 606 F.3d 809, 816

(D.C. Cir. 2010) ("[The plaintiff] has not shown that changing the job criteria was 'so irregular

or inconsistent with [the agency's] established policies as to make its hiring explanation

unworthy of belief.'" (quoting *Simms v. Oklahoma ex rel Dep't of Mental Health & Substance*

_____

Martin was selected to fill the vacancy because she had more experience and was more qualified in the relevant
areas than the plaintiff.

*Abuse Servs.*, 165 F.3d 1321, 1330 (10th Cir. 1999))).  Accordingly, summary judgment is

granted in favor of the defendant as to the plaintiff's claims arising out of his non-selection for

the Administrative Services and Logistics Director position.[19]

### 5.      Fifth Non-Selection

The plaintiff also alleges that he was discriminated and retaliated against when he was

not chosen for the Supervisory Grants Management Specialist opening in 2013.  Compl. ¶ 33.

DOJ selected Brenda Worthington (Caucasian female) and Cory Randolph (African-American

male), neither of whom had any previous EEO activity.  *Id.*   DOJ asserts that the selectees were

chosen because they interviewed significantly better than the plaintiff.  *See* Def.'s Mot. at 31.

DOJ points out that the plaintiff "scored *last* of the four candidates" who were interviewed and

"significantly lower than the two [selectees]."  *Id.* (emphasis in original).  Indeed, the plaintiff's

cumulative score was 93, just over half the score of Ms. Worthington at 157 and Mr. Randolph at

163.  Def.'s Mot., Ex. 31 at 1, ECF No. 7-3.

As the interviewers later recounted by affidavit, they "were looking for two main

qualities" in candidates for the Supervisory Grants Management Specialist: "[f]irst, a high level

of technical expertise in grants management, because the new hire would manage grants and

oversee the assigned grants management staff[, and] [s]econd, . . . leadership experience or

ability, because this new hire [would] supervise people and need to understand how to allocate

work and motivate people."  Pl.'s Opp'n, Ex. 48 ("Trautman Aff.") at 3, ECF No. 9-16; *accord*

Def.'s Mot., Ex. 28 ("Dressler Aff.") at 3, ECF No. 7-3; Def.'s Mot., Ex. 32 ("Aponte Aff. II") at

---

[19]      Once again, the plaintiff seeks to postpone summary judgment until he has had an opportunity to depose
the panelists involved in this non-selection, this time because of the alleged irregularities in the selection process.
Pl.'s Mot. at 7.  The plaintiff does not "outline the particular facts he intends to discover and describe why those
facts are necessary to the litigation."  *Convertino*, 684 F.3d at 99.  As explained, three of the "irregularities" the
plaintiff cites are not actually probative of pretext, and as for the fourth "irregularity," the KSA status log for the
position shows that the KSAs were not tailored to the selectee.  Accordingly, the plaintiff's motion for additional
discovery concerning his non-selection for the Administrative Services and Logistics Director position is denied.

3, ECF No. 7-3; Def.'s Mot., Ex. 34 ("Faley Aff. II") at 3, ECF No. 7-3.  Ms. Trautman, who

conducted second-round interviews for the position along with Ms. O'Donnell, noted that both

selectees "had extensive grants management knowledge" and that Ms. Worthington had

"supervisory experience in a previous position" and that Mr. Randolph "demonstrated a high

level of knowledge of leadership, coaching and mentoring techniques based on his work with a

non-profit organization."  Trautman Aff. at 3.  In contrast, the interview panelists uniformly

explained that the plaintiff's responses to interview questions "did not adequately address the

question or all parts of the questions, and some of the examples he cited to support this response

did not correspond" to the question asked.  Dressler Aff. at 4; *see also* Aponte Aff. II at 3 ("[The

plaintiff] did not demonstrate any of the skill sets we sought.  He did not fully answer the

questions.  He also did not show adequate experience with dealing with employees and being a

team lead."); Faley Aff. II at 4 ("[The plaintiff] did not do a good job of providing answers to the

interview questions.  He did not provide specific examples and could not articulate how he

demonstrated the abilities we asked for.").

   Notwithstanding the overwhelming and uncontroverted evidence of the plaintiff's

abysmal interview performance, as well as evidence that Ms. Worthington and Mr. Randolph

were highly qualified for the position, the plaintiff attempts to show that DOJ's reason for non-

selection is pretextual by arguing that DOJ pre-selected Mr. Randolph for the position.  Pl.'s

Opp'n at 35–37.  Although pre-selection "is undeniably relevant to the question of

discriminatory [and retaliatory] intent and may allow a factfinder to reasonably reject the

employer's asserted non-discriminatory [or non-retaliatory] justification, . . . preselection does

not violate Title VII when such preselection is based on the qualifications of the party and not on

some basis prohibited by Title VII."  *Fields v. Vilsack*, 798 F. Supp. 2d 82, 90 (D.D.C. 2011)

(internal quotation marks, citations, and alteration omitted). Here, as discussed further below, virtually all the evidence relied upon by the plaintiff fails to show that Mr. Randolph was pre-selected. The plaintiff's "evidence" is addressed *seriatim*.

First, the plaintiff suggests that DOJ's hiring of two rather than one candidate demonstrates that Mr. Randolph was pre-selected for the position. *See* Compl. ¶ 33; Pl.'s Opp'n at 35. This argument falls flat. Ms. Trautman explained in her affidavit that DOJ ultimately recommended two candidates for the position because "[d]uring the time of the announcement, [DOJ] [was] . . . going through a justification process for additional hiring with [its] leadership." Trautman Aff. at 3. Ms. Trautman had "put forth a proposal to Director O'Donnell about an additional supervisory position because there were too many people under one supervisor. Ideally, [Ms. Trautman] want[ed] supervisors to oversee no more than 7 individuals, not 9 or 10." *Id.* Ms. Trautman recommended that DOJ make offers to both Ms. Worthington and Mr. Randolph because DOJ "was already engaged in the vacancy announcement and hiring justification processes." *Id.* The plaintiff has not so much as alleged that this explanation is unworthy of credence, let alone suggested the existence of any evidence to rebut DOJ's legitimate rationale as to why two candidates were selected.

Next, the plaintiff notes that some interview notes are missing from the Record of Investigation and that "missing interview notes . . . can lead to an adverse inference, or at least preclude summary judgment." Pl.'s Opp'n at 36. The plaintiff cites *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 170–71 (D.C. Cir. 2013), a case involving a spoliation inference, to support this proposition. *Gerlich*, however, says only that a negative inference based on missing evidence "*may* be justified where the defendant has *destroyed* potentially relevant evidence." *Id.* at 170. Here, the plaintiff does not argue, nor does any evidence suggest, that DOJ *destroyed* the

missing notes.  In any event, ample evidence aside from the missing notes supports DOJ's

proffered rationale for selecting Ms. Worthington and Mr. Randolph for the Supervisory Grants

Management Specialist position.

Third, the plaintiff states that he was not interviewed until nearly a month after the other

three applicants, so that at least Mr. Randolph had a second-round interview before the plaintiff

had a first-round interview.  Pl.'s Opp'n at 36.  Even if the plaintiff's first-round interview

occurred after the other three candidates' first-round interviews, *see* Def.'s Mot., Ex. 31, the

plaintiff does not contend that DOJ violated its internal policy by conducting interviews on

different dates.  *Cf. Perry*, 783 F. Supp. 2d at 138–39 ("A violation of protocol may be probative

of the employer's true motivation if (1) the violation is suspicious, in and of itself, (2) the agency

inexplicably departed from its normal procedures, or (3) the violation inherently raises credibility

questions." (internal quotation marks and citations omitted)).  More importantly, however, the

plaintiff plainly misreads Mr. Randolph's affidavit in claiming that Mr. Randolph's "second

interview was conducted on an unspecified date in January 2013."  Pl.'s Opp'n at 36.  To the

contrary, Mr. Randolph stated only that he was "*invited* for a second round of interviews" in

January.  Pl.'s Opp'n, Ex. 49 ("Randolph Aff."), ECF No. 9-17.  The record makes clear that

second-round interviews were conducted on February 13, 2013, after the plaintiff's first-round

interview.  Def.'s SMF ¶ 70.  Moreover, to the extent that the plaintiff is arguing that he can

show pre-selection because Mr. Randolph was given a second-round interview before the

plaintiff, the plaintiff does not dispute that Mr. Randolph's second-round interview occurred

after the third applicant's first-round interview.  Def.'s Mot., Ex. 31 at 2.  Thus, even if there was

some sort of procedural irregularity vis-à-vis the plaintiff's application, such irregularity does not

show that Mr. Randolph was pre-selected, since additional candidates were clearly under consideration.

Fourth, the plaintiff notes that the position was changed from a GS-14 level position to a GS-13/14 level position shortly before the vacancy announcement was posted, and the plaintiff posits that this change was made to afford Mr. Randolph an opportunity to apply.  Pl.'s Opp'n at 36.  There is no evidence in the already voluminous record to support this inference.  But even assuming *arguendo* that the grade were changed to afford Mr. Randolph an opportunity to compete, such opportunity does not amount to pre-selection.

Fifth, the plaintiff points to Mr. Randolph's affidavit, which states that he was congratulated by a vice president of the union on his selection before his second-round interview occurred.  *Id.* at 37.  The affidavit suggests that DOJ may have been "processing [Mr. Randolph's] paperwork for promotion" "[b]efore [his] second interview," Randolph Aff. at 3, which could support an inference of pre-selection.  Even if true, any such pre-selection was decided upon *after* Mr. Randolph's first-round interview, and the record makes clear that his performance during that interview was much stronger than the plaintiff's performance.[20] Accordingly, Mr. Randolph's affidavit is insufficient to show pretext in the face of all the other evidence showing that Mr. Randolph was chosen over the plaintiff because Mr. Randolph was highly qualified and had much better interviews.

In sum, DOJ has already produced ample evidence that the plaintiff was not selected for the Supervisory Grants Management Specialist position because he interviewed so poorly relative to the other candidates.  The plaintiff's argument that Mr. Randolph was pre-selected for

---

[20]    The plaintiff again references, in passing, the joke email chain between Mr. Faley and Ms. Trautman.  Pl.'s Opp'n at 37.  As explained above, *see supra* III.B.1., the emails cannot be reasonably construed to evince animus toward the plaintiff based on his race, sex, or protected activity.

the position fails, and the plaintiff has produced no evidence to show that discrimination or retaliation was the real reason for his non-selection. Accordingly, DOJ is entitled to summary judgment as to the plaintiff's discrimination and retaliation claims arising out of his non-selection for the Supervisory Grants Management Specialist position.[21]

### 6.    Sixth Non-Selection

Next, the plaintiff alleges that he was discriminated and retaliated against when he was not selected for the Senior Policy Advisor for Byrne Criminal Justice Innovation/Building Neighborhood Capacity Programs ("BCJI/BNCP") opening. Compl. ¶ 36. Again, the plaintiff claims, without elaboration, that he is more qualified than the selectee, Alissa Huntoon. *Id.* ¶ 38. He further claims that Ms. Huntoon was "invited to attend meetings about the anticipated work of the position in advance of the interviewing for the position even though her existing GS-13 position would not have indicated that she should attend such meetings, which are normally attended by persons at the GS-14 level or higher." *Id.* ¶ 37. DOJ asserts that the plaintiff was not chosen for the position because "the selectee was deemed more qualified by the interview panel and performed better in the interview process." Def.'s Mem. at 37. As described by Elizabeth Griffith, who helped oversee the interview process, "the management team concluded that [Ms. Huntoon] stood out" due to her subject matter expertise and her strong policy

---

[21]    The plaintiff's Rule 56(d) motion seeks to depose the panelists for this position in addition to several other colleagues in order to understand better the "irregularities" surrounding this selection. Pl.'s Mot. at 9. The plaintiff's motion falls short in that it is merely repeats his arguments in opposition to summary judgment without explaining what particular facts he hopes to uncover if given an opportunity for additional discovery and how those facts would help defeat DOJ's summary judgment motion. *See id.* (summarily concluding that, "[b]ased upon these irregularities, the panelists, as well as Cory Randolph, Anthony Burley, Tracey Trautman, and Denise O'Donnell need to be deposed"). Thus, the plaintiff's motion seeking to depose several of his colleagues concerning his non-selection for the Supervisory Grants Management Specialist position is denied. *See U.S. ex rel Folliard*, 764 F.3d at 29 (explaining that a "boilerplate discovery request" is insufficient for purposes of Rule 56(d)); *SEIU Nat'l Indus. Pension Fund*, 312 F.R.D. at 685 ("Defendants assert that the 'spreadsheet is meaningless without more information regarding how the alleged deficiencies were determined,' but nowhere do they explain *why* the spreadsheet is 'meaningless' or *what facts* they hope to obtain in discovery that would enable them to dispute Plaintiffs' calculations. A conclusory demand for discovery, such as that made by Defendants here, does not satisfy the first criteria [sic] of *Convertino*." (internal citations omitted)).

orientation and project leadership.  Def.'s Mot., Ex. 40 at 2, ECF No. 7-4.  Ms. Griffith noted

Ms. Huntoon's "lengthy experience with law enforcement, overseeing projects that can be

critical to the core projects of BCJI and BNCP," and her "ability to effectively communicate; to

proactively manage projects; and to collaborate and lead projects with partners and colleagues."

*Id.*

       The plaintiff advances several arguments in an effort to defeat summary judgment as to

his claims arising out of his non-selection for the Senior Policy Advisor for BCJI/BNCP

position.  He focuses in particular on alleged "anomalies in the selection process."  Pl.'s Opp'n at

39.  First, the plaintiff notes that the KSAs for the position were altered before the opening was

advertised, which, according to the plaintiff, evidences tailoring and pre-selection.  *Id.*  Yet the

plaintiff has not alleged, let alone suggested the availability of evidence to show, anything

unusual about DOJ updating a position's KSAs before posting a vacancy.  Likewise, the plaintiff

has not argued that the changes map onto the selectee's qualifications.  Accordingly, the plaintiff

has failed to show that the position was tailored for Ms. Huntoon.

       The plaintiff next argues that the vacancy announcement is missing.  *Id.*  While certain

pages of the vacancy announcement may be missing, at least the first page, which sets out the

responsibilities of the position, is in the record.  *See* Def.'s SMF ¶ 80 (citing Def.'s Mot., Ex. 61,

ECF No. 7-4).  In any event, the allegedly missing vacancy announcement is not an "anomaly"

in the relevant sense, *i.e.*, it does not represent an irregularity in the *selection process*.

       Third, the plaintiff claims some lack of clarity in how the applicants' total scores were

tallied and cites the hearsay statement of Shanetta Cutlar, one of the first-round interview

panelists (on the panel that did *not* interview the plaintiff or Ms. Huntoon), who "complained to

one of the interviewees [Danica Binkley] that the panelists received no scoring guidance and did

39

not know how . . . to score applicants." Pl.'s Opp'n at 39.  The former point mischaracterizes the evidence since the record shows clearly how the total scores were computed.  A lengthy email from one of the first-round interviewers to the second-round interviewers providing an overview of the candidates states plainly that: "[t]he panelists scored each candidate on [four] criteria: Interview (35%), Resume (10%), Experience (35%), and Work History (20%)."  Pl.'s Opp'n, Ex. 53, ECF No. 9-17.  The email contains a chart with each first-round interviewer's score in each of the four categories and the resultant overall score.  *Id.*  As to Ms. Cutlar's purported confusion, Ms. Binkley stated in her affidavit that Ms. Cutlar "said the interviewing process was very frustrating because there was no scoring guidance and no sort of meetings between the interviewers to ensure a consensus.  Ms. Cutlar said she did not know how to she [sic] was supposed to score."  Pl.'s Opp'n, Ex. 52 at 3, ECF No. 9-17.  Ms. Cutlar's purported statement is significantly undermined by the documentary evidence of a scoring guide listed at the top of each interviewer's note-taking sheet for the interviews.  *See* Def.'s Mot., Ex. 38 at 1, ECF No. 7-4 (instructing interviewers to "rate the response to each question on a proficiency scale from 1–5" and noting that a rating of 5 means "expert," a rating of 3 means "intermediate," and a rating of 1 means "awareness").  The interview form also sets out paragraph-long explanations of each score (1, 3, and 5) for each question.  *Id.* at 2–6.  Moreover, even if true, this statement by a panelist who did not interview the plaintiff, while understandably frustrating to applicants, shows nothing more than a poorly managed interview process rather than suggests that because the panelists were not given sufficiently specific instructions for scoring, they resorted to some impermissible basis for rating applicants.

Fourth, the plaintiff cites his own affidavit to argue that one of the second-round interviewers, Ms. O'Donnell, arrived 15 minutes late to his interview and rushed through it "as if

40

she had already determined who she was going to select, or did not want to selected him."[22]
Pl.'s Opp'n at 39.  While a harried interview may be frustrating for a job applicant, without more, a reasonable jury could not conclude—in light of all the contrary evidence—that the plaintiff was passed over for the position due to his race, sex, or protected activity.  *See Hairston*, 773 F.3d at 272 ("Even if a plaintiff 'was victimized by poor selection procedures,' we may not 'second-guess an employer's personnel decision absent demonstrably discriminatory motive.'" (quoting *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996))).

Finally, the plaintiff contends that his FOIA request "produced evidence (a) that the selectee was invited to attend meetings about the anticipated work of the position in advance of her and [the plaintiff's] interviews, even though as a GS-13 she should not have attended such meetings, . . . and (b) that persons outside of BJA with whom the selectee . . . would interact may have participated in [her] interview," whereas they did not participate in the plaintiff's interview.  Pl.'s Opp'n at 39–40.  The plaintiff thus believes that Ms. Huntoon was pre-selected for the position.  The only evidence that the plaintiff cites to show some impropriety in Ms. Huntoon's attendance at the relevant meeting is his own assertion in his affidavit that GS-13 level employees "normally" do not attend such meetings.  *See* Jeffries Decl. at 7.  DOJ points out, however, that the documentary evidence—an email discussing the purpose of the meeting to "share information with NIJ about areas of activity where [BJA and NIJ] may have mutual interests and want to collaborate"—shows that Ms. Huntoon was present at the meeting "to talk about [her] work."  Pl.'s Opp'n, Ex. 55, ECF No. 9-18.  Furthermore, other employees referred to in the email as "staff" (along with Ms. Huntoon) were asked to attend the meeting to discuss their work.  *Id.*  Finally, even if true, no reasonably jury could find, based on the plaintiff's

---

[22]     The plaintiff also notes, without any elaboration or citation, that Ms. O'Donnell's affidavit is missing from the ROI.  Pl.'s Opp'n at 39.  It is unclear how this allegation helps prove discrimination or retaliation.

assertion, that the plaintiff was discriminated or retaliated against because certain people participated in Ms. Huntoon's interview who did not participate in his interview.

Accordingly, the plaintiff has failed to create a genuine issue of fact as to whether DOJ's proffered reason for selecting Ms. Huntoon was pretextual, and DOJ is entitled to summary judgment as to the plaintiff's discrimination and retaliation claims arising out of the plaintiff's non-selection for the Senior Policy Advisor of BCJI/BNCP position.[23]

### 7.    Seventh Non-Selection

The final non-selection for which the plaintiff asserts discrimination and retaliation claims was for the position of Senior Policy Advisor for Health and Criminal Justice.  Compl. ¶ 39.  The plaintiff claims that he had superior qualifications to the selectee, Ms. Binkley.  *Id.* ¶ 41.  He notes that he had "successfully" served as the Acting Senior Policy Advisor for Substance Abuse and Mental Health, and that the position at issue in this non-selection underwent a title change from Senior Policy Advisor for Substance Abuse and Mental Health to Senior Policy Advisor for Health and Criminal Justice shortly before interviews occurred.  Pl.'s Mem. at 41–42.  DOJ asserts that Ms. Binkley was selected because the interviewers were "more impressed by [her]."  Def.'s Reply at 16; *accord* Def.'s Mem. at 38–39 (explaining that Ms. Binkley was better qualified than the plaintiff and performed better during the interview).

The plaintiff contends that his claims arising out of this non-selection are unique in that "[t]here has been no discovery at all with respect to this selection because it arose after . . . discovery was conducted" at the administrative level.  Pl.'s Opp'n at 41.  Nevertheless, the

_____

[23]    In his Rule 56(d) motion, the plaintiff argues that "there are irregularities in the selection process that need to be explored in discovery" and that depositions of the panelists, Ms. Griffith, Ms. O'Donnell, and Ms. Huntoon are necessary to explore those irregularities.  Pl.'s Mot. at 9–10.  Again, the plaintiff's motion simply restates alleged irregularities in the selection process without actually explicating what facts he hopes to uncover during discovery and how such facts will advance his case.  Thus, the plaintiff's motion for additional discovery concerning his sixth non-selection will likewise be denied.

record contains documentation concerning his non-selection for the Senior Policy Advisor for

Health and Criminal Justice position, including (1) the position description, (2) affidavits in a

question-and-answer format by the second-round interviewers, Denise O'Donnell, Kristen

Mahoney, and Ruby Qazilbash, Def.'s Mot., Exs. 41–43, ECF No. 7-4; (3) a memorandum from

Ms. Qazilbash to Ms. O'Donnell explaining the selection decision, Def.'s Mot., Ex. 44; and (4)

the plaintiff's rebuttal to the aforementioned affidavits, Pl.'s Opp'n, Ex. 58 ("Pl.'s Rebuttal"),

ECF No. 9-19.

The interviewers' affidavits and the selection memorandum show that Ms. Binkley was

selected because she was a former prosecutor, had greater substantive expertise in the relevant

areas, and, unlike the plaintiff, was able to articulate a vision for the role.  *See, e.g.*, Def.'s Mot.,

Ex. 41 ("O'Donnell Aff.") at 4–5; Def.'s Mot., Ex. 42 ("Mahoney Aff.") at 4 ("Ms. Binkley is an

attorney who demonstrated a vision and clear understanding of the intersection between criminal

justice and health especially in the area of the Affordable Health Care Act.  She has practiced

law as a criminal prosecutor and directly handled cases in mental health courts.  This practical

experience is directly relevant to this portfolio."); Def.'s Mot., Ex. 43 (Qazilbash Aff. II") at 5

("The [plaintiff] explained the process he would use to identify priorities and develop a vision,

but did not articulate his own ideas or vision . . . .  [Ms. Binkley] communicated with energy and

creativity some broad and specific areas in which she intended to focus."); Def.'s Mot., Ex. 44

("Selection Memo") at 1–2 ("Ms. Binkley has experience with each major aspect of the portfolio,

including experience with substance abuse, mental health and healthcare coverage as they pertain

to the justice-involved population.").  Ms. Qazilbash described Ms. Binkley has having

"performed [at] a very high level in her work as a policy advisor within the Substance Abuse and

Mental Health portfolio including meeting significant challenges in managing difficult projects,

developing communication materials at an advanced policy level and prov[ing] her skills to develop new ideas and programming."  Selection Memo at 2.

In contrast, Ms. O'Donnell explained that during his interview, the plaintiff "acknowledged having limited knowledge and experience in the mental health field" and "did not discuss his understanding of the complex problems involving mentally ill offenders in prisons or jails, police response to persons with mental illness, or related topics."  O'Donnell Aff. at 4; Qazilbash Aff. II at 6 ("The [plaintiff] indicated in the interview that he ha[d] 15 years of experience working with the drug court field, but indicated that he d[id] not have an understanding of priority work in the mental health side of the portfolio, and has a limited understanding of the healthcare coverage priority area."); Mahoney Aff. at 4 ("[The plaintiff] focused on the mechanics of grants management, managing technical assistance providers and the various stakeholders in the drug court/veteran's court, [and] mental health courts . . . .  He left the impression during the interview that his focus or policy perspective is one dimensional and I was not left with the confidence that he would be able to lead a broader conversation on justice and mental health.").

In his rebuttal affidavit, the plaintiff attests that (1) Ms. Qazilbash told the plaintiff that "she spent significantly more one-on-one time with Ms. Binkley because of her inexperience with the subject matter;" (2) Ms. Qazilbash had to remove Ms. Binkley from the Prescription Drug Monitoring Program and reassign it to someone else because Ms. Binkley had a strained relationship with the private partners in the program; (3)  Ms. Binkley had previously "cried at work repeatedly and stated that she no longer wanted to pursue the Senior Policy Advisor position because 'the job was too demanding and the subject matter was outside of her Adjudications experience;'" and (4) Ms. Binkley erroneously permitted jurisdictions to receive

repetitive funding for multiple years, which is contrary to a major audit recommendation. *See* Pl.'s Rebuttal at 3. Even viewing these attestations in the light most favorable to the plaintiff and drawing all reasonable inferences in his favor, they do not meaningfully undercut Ms. Binkley's qualifications and interview performance attested to by the interviewers or demonstrate pretext.

As to the first of the plaintiff's attestations, it appears that, even if true, Ms. Qazilbash told the plaintiff of Ms. Binkley's inexperience in 2012—two years before the selection for this position. *Id.* Ms. Binkley's alleged inexperience at that time does not speak to her qualifications at the time of the selection. As for the second and fourth attestations, one-off mistakes do not undercut Ms. Binkley's strong qualifications, clear vision for the position, and record of achievement. Finally, regarding the third attestation, the fact that Ms. Binkley cried at work says nothing about DOJ's assessment of Ms. Binkley—the only relevant assessment for purposes of the plaintiff's claims that DOJ's real motivation in not selecting the plaintiff for the Senior Policy Advisor position was discrimination or retaliation. In any event, the alleged crying also occurred two years before Ms. Binkley's selection for the position and is thus not particularly probative of whether she appeared to be the most qualified at the time of her selection.

The plaintiff also attests that Ms. Binkley had told him that Ms. Qazilbash transferred Ms. Binkley from the Adjudication Division of the BJA to the Substance Abuse and Mental Health Division prior to the selection at issue and that Ms. Binkley "was under the distinct impression that she was asked to transfer . . . because of the upcoming promotion potential," and that Ms. Qazilbash "wanted no one to know about this secret transfer" because other candidates had already been interviewed for the position. *Id.* at 2. Even assuming this hearsay statement to be true, it undermines the plaintiff's argument that he was not selected based on his race, age,

and protected activity because the statement suggests that Ms. Binkley was singled out of a large pool of people—not just in comparison to the plaintiff.

The extant record makes clear that Ms. Binkley was the more qualified candidate and that she performed significantly better during the interview.  A reasonable juror could not infer that the real reason that the plaintiff was not selected for the Senior Policy Advisor for Health and Criminal Justice position was discrimination or retaliation.  Accordingly, DOJ is entitled to summary judgment as to the plaintiff's claims arising out of his non-selection for the Senior Policy Advisor position.[24]

### C.      The Plaintiff's Awards-Based Claims

Finally, the plaintiff alleges that he was denied certain awards on the basis of his race, sex, and protected activity, including a performance cash award in 2011 and special act time-off awards in 2011 and 2012.[25]  Compl. ¶ 42; Pl.'s Opp'n at 43–44.  The alleged award denials are addressed *seriatim* below.

### 1.      2011 Cash Award

The plaintiff's discrimination and retaliation claims predicated on the denial of a 2011 cash award claim appears baseless and will be dismissed.  A pay stub shows that the plaintiff was paid a performance-based cash award for 2011, reflected in the amount of $1,632, on February

---

[24]      The plaintiff's Rule 56(d) motion seeks additional discovery concerning his non-selection for the Senior Policy Advisor for Health and Criminal Justice position.  Pl.'s Mot. at 11–13.  In particular, he seeks discovery concerning why the position title was changed and Ms. Binkley's alleged shortcomings.  As explained, however, even assuming each of the plaintiff's attestations to be true, he still would not prevail on his claim given all the evidence he does not seek to refute that shows that Ms. Binkley demonstrated both a broader and deeper understanding of the relevant subject matter and was able to articulate a vision for the role.  Thus, the plaintiff's requested discovery would not alter the grant of summary judgment in favor of DOJ.  The plaintiff's request is therefore denied.  *See Graham v. Mukasey*, 608 F. Supp. 2d 50, 54 (D.D.C. 2009) (explaining that a "motion for additional discovery is not designed to allow fishing expeditions, and plaintiffs must specifically explain what their proposed discovery would likely reveal and why that revelation would advance the plaintiffs' case" (internal quotation marks omitted)).

[25]      The plaintiff's complaint also alleged that he was denied a cash award in 2012, Compl. ¶ 42, but the plaintiff has withdrawn this claim, Pl.'s Opp'n at 44.

14, 2012.  Def.'s Reply at 17; Def.'s Reply, Ex. 70, ECF No. 16.  Despite the direct proof in his

pay stub, the plaintiff persists in denying that he received the award by pointing to a document

purporting to catalogue "cash performance awards from October 1, 2010 to September 30,

2011," Pl.'s Opp'n, Ex. 62, ECF No. 9-20, which document does not reflect the plaintiff's name,

*see* Pl.'s Opp'n at 44 (referring to Exhibit 62 and stating, "[a]s reflected in the list of cash

performance awards for FY 2011, others who reported to [Ms.] Qazilbash at the time . . . all got

$4,000, but [the plaintiff] did not").  DOJ explains that Exhibit 62, which is relied upon by the

plaintiff for his position, "captures cash awards to BJA staff members for FY 2010 performance,

with payment occurring within the dates of Oct. 1, 2010 to Sept. 30, 2011," and that the plaintiff

"does not appear on that list because he was not eligible for a cash award in FY 2010."  Def.'s

Reply at 18.  Notwithstanding this explanation, corroborated by the document's title, the plaintiff

urges that, "without discovery, [he] [cannot] know where the fault lies with respect to this

award."  Pl.'s Opp'n at 44; *see also* Pl.'s Mot. at 14 (arguing that depositions of Ms. Qazilbash

and Ms. O'Donnell are necessary to fully understand the rationale behind their award decisions).

Yet, he offers no explanation for the proof in his own pay stub that he received a cash award in

early 2012 and that this award covered the period of fiscal year 2011.  Accordingly, the

plaintiff's claims that he was discriminatorily and retaliatorily denied a cash award in 2011 is

dismissed.[26]

## 2.      2011 and 2012 Special Act Time-Off Awards

Special act time-off awards "are used to recognize work contributions such as:

[p]erformance that involves overcoming unusual difficulties; [c]reative efforts that contribute to

science or research; [s]pecial efforts or innovations in the performance of assigned duties,

---

[26]      The Court therefore need not address DOJ's alternative argument that the plaintiff failed to exhaust his
administrative remedies with respect to his claims arising out of the 2011 cash award.  *See* Def.'s Reply at 18.

resulting in increased productivity, economy, or other highly desirable benefits; or [e]xemplary or courageous handling of an emergency situation related to official employment." Pl.'s Opp'n, Ex. 60 ("McCarthy Aff.") at 7, ECF No. 9-19. "Awards [are] normally . . . recommended by the employee's first or second line supervisor." *Id.*

DOJ argues that the "denial of a 'time-off' award does not constitute an adverse action for a discrimination claim." Def.'s Reply at 17. The Court agrees. In short, denying the plaintiff several hours of time-off does not amount to "a significant change in [his] employment status,' on the order of a 'hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits.'" *Walker v. McCarthy*, ___ F. Supp. 3d ___, 2016 WL 1118252, at *7 (D.D.C. 2016) (alteration in original) (quoting *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003)); *accord McLaughlin v. Holder*, 828 F. Supp. 2d 230, 244 (D.D.C. 2011) ("[T]he [defendant's] failure to give [the plaintiff] a time-off award . . . was not an adverse action because there was not 'tangible change in the duties or working conditions constituting a material employment disadvantage." (quoting *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002))). Accordingly, these claims of allegedly discriminatory denial of time-off awards will be dismissed.

As DOJ implicitly concedes, however, the plaintiff's *retaliation* claims arising out of his denials for special act time-off awards *may* survive because an adverse action for purposes of a retaliation claim requires only that "the employer's actions . . . be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co.*, 548 U.S. 53, 57 (2006); *see also Baloch*, 550 F.3d at 1198 n.4 ("'Adverse actions' in the retaliation context encompass a broader sweep of actions than those in a pure discrimination claim."). As the D.C. Circuit has previously held, a

48

diminished performance evaluation qualifies as an adverse action for purposes of a retaliation

claim insofar as it results in the plaintiff losing a "financial award *or an award of leave*[] because

a reasonable jury could conclude that such a loss 'could well dissuade a reasonable worker from

making or supporting a charge of discrimination.'" *Weber v. Battista*, 494 F.3d 179, 185–86

(D.C. Cir. 2007) (emphasis added) (quoting *Burlington Northern*, 548 U.S. at 57); *cf. Taylor v.*

*Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (holding that issuance of negative performance

evaluations was not a materially adverse actions for purposes of a Title VII retaliation claim

because the plaintiff had failed to show that the evaluations were "attached to *financial* harms,"

though not commenting on other types of concrete harm, such as denial of a time-off award

(emphasis added) (quoting *Baloch*, 550 F.3d at 1199)).  Thus, denial of time-off awards may

amount to an adverse action for purposes of a retaliation claim under Title VII.  The question

here, however, is whether the plaintiff has raised a genuine issue of material fact as to retaliation,

to defeat summary judgment in favor of DOJ.

The plaintiff claims that he was retaliated against when he was "the only member of the

Justice Systems Team supervised by [Ms.] Qazilbash (Thurston Bryant, Julius Dupree, Rebecca

Rose, Margit Thackston, Kim Norris, [and] Gary Dennis) who didn't receive [a special-act time-

off] award in 2011," despite the fact that, in his view, he "had to perform many additional duties

(due to lack of staff help) including those of the vacant Senior Policy Advisor position, and had a

lengthy list of accomplishments."  Pl.'s Opp'n at 43 (citing the plaintiff's Exhibit 59, a document

obtained via a FOIA request indicating that he was the only member of Ms. Qazilbash's team not

to receive a special-act time-off award).  The plaintiff notes that he was the only member of the

team who had filed EEO complaints.  *Id.*  As for 2012, the plaintiff claims that he was

retaliatorily awarded a 6-hour time-off award for the first and second quarters of 2012 when

many of his colleagues received a 10-hour time-off award.[27]  *See* Pl.'s Opp'n at 44 (citing Pl.'s

Opp'n, Ex. 64).  In other words, this claim amounts to a dispute over the alleged denial of four

hours of time off.  The plaintiff's claims based on his time-off awards are strongly undercut by

the fact that he received numerous cash and time-off awards during the relevant period, while his

administrative proceedings were ongoing.  For example, he received a retroactive time-off award

in 2011 because he was able to convince his supervisors to change his "Meets Expectations"

performance evaluation to an "Exceeds Expectations" evaluation.  Def.'s Mot., Ex. 18 at 7.  He

also elected to receive a cash (rather than time-off) award based on his FY 2011 performance

rating.  *See* Def.'s SMF ¶ 106–07.  Further undercutting the plaintiff's claims is that two

affidavits prepared during the administrative proceeding indicate that, contrary to what the

plaintiff says regarding the 2011 time-off award, he was not the only member of the team who

did not receive an award.  Def.'s Mot., Ex. 18 at 6 ("I also did not recommend time-off awards

for team members Kim Ball and Gary Dennis in FY 2011."); Pl.'s Opp'n, Ex. 60 at 6 ("Mr.

Jeffries was not the only staff member who did not receive a time off award for FY 2011.").

Thus, the totality of the evidence shows that no reasonable jury could conclude that DOJ

retaliated against the plaintiff in denying him special act time-off awards in 2011 and 2012.

Accordingly, DOJ is entitled to summary judgment as to the plaintiff's time-off award claims.[28]

---

[27]      The plaintiff also appears to argue that he was retaliatorily denied a special act time-off award for the first
quarter of 2012 based on awards that were issued to his colleagues on February 26, 2012.  *See* Pl.'s Opp'n at 44
("[The plaintiff] did not receive a time-off award for the first quarter of FY 2012 on February 26, 2012, like some of
his coworkers.").  To the extent that awards were issued on February 26, 2012, *see* Pl.'s Opp'n, Ex. 63, ECF No. 9-
21, those awards could not have covered the first quarter of 2012, since the quarter had not yet ended.  In any event,
the record makes clear that the plaintiff *did* receive a time-off award for the first two quarters of 2012.  *See* Pl.'s
Opp'n, Ex. 64, ECF No. 9-21.

[28]      The plaintiff's Rule 56(d) motion summarily states that there is a need to depose Ms. Qazilbash and Ms.
O'Donnell about the plaintiff's alleged award denials.  Pl.'s Mot. at 14.  The plaintiff's "boilerplate," one-sentence
request for depositions is denied, as he has failed to explain what facts he hopes to find and how such facts would
advance his case.  *U.S. ex rel Folliard*, 764 F.3d at 29.

**IV.      CONCLUSION**

For the foregoing reasons, DOJ's motion for summary judgment is granted in full, and

the plaintiff's motion is denied.  An appropriate Order accompanies this Memorandum Opinion.

Date: November 15, 2016.

_____
BERYL A. HOWELL
Chief Judge