**EXHIBIT A**

| | |
|---|---|
| Subj: | **CONFIDENTIAL -- Timothy E. Jeffries v. Loretta Lynch, US District Court/DC – Civil Action # 15-1007 (BAH) [Gender Discrimination, inter alia] and Ms. A's Sexual Harassment Claim** |
| Date: | 5/10/2017 10:02:47 P.M. Eastern Daylight Time |
| From: | Marilyn.Moses@usdoj.gov |
| To: | Wendy.S.Wingers@usdoj.gov, Kristopher.A.Brambila@usdoj.gov, jrg4law@aol.com, Matthew.Scodellaro@usdoj.gov |
| CC: | Nicole.Morgan@usdoj.gov, William.B.Newton@usdoj.gov |

(Note: Wendy Wingers/OIG investigating Ms.A's allegation against Aponte and OJP management's handling of sexual harassment claims against Aponte; Kristopher Brambila and Matthew Scodellaro/OGC representing OJP in the Jeffries federal court case; Jerry Goldstein represents Jeffries in his federal court case; and Nicole Morgan and William Newton/OGC represent OJP in Ms. A's sexual harassment claim against Aponte; and this Union represents Ms. A in her sexual harassment claim.)


Messrs. Brambila, Scodellaro, and Goldstein and Ms. Wingers:

Timothy E. Jeffries is a member of AFSCME Local 2830 – this union local is the legal representative for Office of Justice Programs (OJP) employees within the U.S. Department of Justice (DOJ). Jeffries has made me aware of his prior EEOC claims and his current action in the US District Court for the District of Columbia (Civil Acton No. 15-1007 (BAH)). In this case, Jeffries alleges that he applied for various promotional opportunities during his tenure at the Bureau of Justice Assistance (BJA or the Agency) and was unsuccessful on account of his race and gender. He also claims his attempts at promotion were unsuccessful, in part, due to retaliation for filing claims alleging that the Agency had violated Title VII (Equal Employment Opportunity). It is worthy of note that Jeffries has since been promoted to a GS-14 but he continues to pursue this claim and hopes that DOJ will settle with him.

As background principally for Ms. Wingers, as Messrs. Brambila, Scodellaro, and Goldstein are involved in the instant case, in the early to mid-2000s, Jeffries filed three separate EEOC claims alleging discrimination on the basis of race and sex as well as retaliation. The three cases were consolidated. In response to these claims, but prior to settlement of same, on July 30, 2007, the Agency granted Jeffries a "Priority Consideration" (PC). Said PC letter advised Jeffries that he would "receive priority consideration for the next open position similar and in the same geographic area to the one proper consideration was missed. This priority consideration will be granted to you prior issuing (sic) public notice of the vacancy. You will be notified in writing when this consideration has taken place." Later, and separate and apart from the "Priority Consideration," the Agency settled with Jeffries. The settlement involved monetary considerations, a transfer from the BJA's Program Division to its Policy Division, and a three-step pay increase. Moreover, the settlement agreement specifically addressed the PC that had already been issued to Jeffries and indicated that nothing "in this Agreement would affect the priority consideration given to the Complainant…" Subsequent to the issuance of the PC, the Agency nor Jennifer McCarthy, OJP's Human Resources (HR) Director, ever extended the "Priority Consideration" to Jeffries with respect to promotional positions that subsequently became open. Jeffries waited for four years but never heard from McCarthy or the Agency regarding same. The Agency now contends that this was due to a hiring freeze. However in late January 2011, Jeffries inquired of McCarthy as to the status of the PC. She claimed that she could not locate the HR copy of the PC. In response, Jeffries advised McCarthy that he would contact his attorney regarding the matter. Shortly thereafter (February 25, 2011), McCarthy located HR's copy of the PC and advised Jeffries that a meeting had been scheduled to discuss BJA's recruiting efforts and that she would get back to him. Subsequently, various promotional vacancies became open, but McCarthy did not notify Jeffries with respect to the promotional vacancies nor was he given priority consideration, the vacancies were publically posted, and Jeffries applied but was not selected. The instant case now pending in the U.S. District Court for the District of Columbia, arose from Jeffries non-selection for these post-settlement positions. Jeffries claims that he was not given PC and his non-selection was due to gender and race discrimination as well as retaliation. **Specifically, Jeffries claims that in almost all cases women were selected for these promotional positions. Edison Aponte played a known role in three out of the five promotions.**

It is likely that Messrs. Brambila and Scodellaro of OJP's Office of General Counsel (OGC) are aware that there are old and new developments that may prove to be of evidentiary value in Jeffries' federal court case. Recall that Jeffries claims that in the promotion opportunities that he competed for women, particularly Caucasian women, were preferred over men. Thus, he was the victim of discrimination. And as OJP's OGC is well aware, Jeffries once worked in BJA's Program Division and, in fact, he worked for Aponte when he competed for the positions that were the subject of his early EEOC claims; as noted above, these claims were settled to Jeffries' advantage. OGC, and OJP leadership, are well aware that Aponte was rumored to be sexually

involved with at least one woman in his chain of command – Angela Antoniewicz (now Halverson; no longer employed by DOJ). Additionally another woman in Aponte's chain of command, Shauna Connolly, notified Phil Merkle (OJP's Director of Administration) and Jennifer McCarthy (HR Director), that he had sexually harassed her as well. Connolly reports that Merkle advised her that unless she "went on the record"/filed a formal EEO complaint, that nothing could be done regarding her claim of sexual harassment against Aponte. Merkle's advice to Connolly was in contravention to OJP's existing sexual harassment policy. The OJP Sexual Harassment Policy, in fact, explicitly did *not* require the aggrieved to file a formal EEO complaint ("on the record" EEO complaint). The policy permits the election of an informal EEO resolution process over filing a formal EEO complaint. Connolly did not want to file a formal complaint because she knew Aponte's wife (she had worked at BJA) and their children. Connolly did not want to file a formal complaint that had the potential to become public and may cause marital and family strife in the Aponte home. Connolly was not seeking compensation or monetary damages. Her request of Merkle and McCarthy was simple - she wanted to be removed from Aponte's chain of command. More specifically, she wanted to be transferred to another OJP component. Merkle and McCarthy did nothing to effectuate her request. Instead, several months later, management served on Connolly a proposed notice of removal and was ultimately terminated due to a "violation" of a last chance agreement. Connolly alleged that after an unblemished work history at BJA, that these actions were, inter alia, in retaliation for reporting that Aponte had sexually harassed her. Merkle and McCarthy reported to this Union that they notified Aponte of Connolly's claim and asked him if her claim was true. Aponte he denied it. Hence, Aponte was made aware that Connolly had reported him. Long after Connolly had been terminated, a hard copy of an email from Aponte to Connolly surfaced. In it, Aponte asked Connolly out for dinner, dancing and golf ("golf" as it turns out is a sexual innuendo for "hole in one"). After this email surfaced, this Union did all that it could do to address "the Aponte issue" – including communiques to Assistant Attorney General Karol Mason and Attorney General (AG) Loretta Lynch. Approximately 30 days after the Union's letter to the AG, Lynch announced a revised DOJ harassment policy. To wit, the revised harassment policy made it clear that if a management official, such as Phil Merkle or Jennifer McCarthy, receives a sexual harassment complaint and does not take appropriate action, the inaction or lack of appropriate response will be considered managerial misconduct – and presumably appropriate disciplinary steps will be taken. All of this is old but relevant news. However, there have be recent developments that provide further evidence supporting Jeffries' claim that BJA management favored women over men when it came to promotions.

Comes now, Ms. Anonymous (Ms. A). Ms. A is a BJA employee, a member of Local 2830, and has she recently filed an EEO claim against Aponte alleging sexual harassment. Due to communications that the Union had with Main Justice once Ms. A came forward, an EEO and an OIG investigation are now underway. To the extent possible, Ms. A would like this matter to remain confidential and her privacy respected given the sensitive nature of her claims. Ms. A has provided a written statement to the EEO Director and to the OIG that addresses the specifics with regard to the nature of the sexual harassment that she endured. In addition, she has been interviewed by both the EEO Director and by OIG investigators. While she wants her identity to remain confidential to the extent possible given that her allegations must be investigated, she also realizes that the nature of her testimony supports Jeffries' claim that gender discrimination exists in BJA, favoritism plays a role in promotional selections, and that managers such as Aponte, have deliberately subverted the merit protection system and its guarantees to serve their own personal agendas. To this end, she believes that her experience corroborates Jeffries' discrimination claim.

Ms. A has granted permission to the union president to reveal the nature of her allegations with regard to Aponte as it relates to Jeffries' claim as to bias/discrimination in BJA's promotional selection process. In an effort to maintain her privacy, it will not transmit her statement. However the Union, OJP's EEO Director and the OIG are in possession of her statement and can confirm that the representations made here comport with her statement and testimony; she has not granted permission to disseminate her statement beyond the aforementioned individuals or entities.

Make no mistake, Ms. A. never went "head-to-head" against Jeffries for any promotional position. To assert this as a defense to Jeffries' claim that Ms. A's testimony evinces discrimination, demonstrates either ignorance or a deliberate attempt to divert attention and focus from its obvious implication – BJA management can, and has, subverted the Merit Protection System to achieve personal discriminatory goals. The value of Ms. A's testimony is that it illuminates that Aponte subverted the promotional process to achieve personal goals via a rigged promotional process; as a result, at a minimum, *all promotions in which Aponte was involved are in question*. Not only are the promotions in which Aponte was directly involved in question, his actions are yet one more indicia of a discriminatory culture that exists among BJA management with respect to promotions. His corruption of the promotion process – sex for promotion – quid pro quo -- was brazen and demonstrates an obvious belief on Aponte's part, that he could pull strings, stack promotion panels, influence ratings, promote favorites, discriminate against qualified candidates and he would never be held accountable. Moreover, not only was Aponte's belief that he could do

whatever he wanted with respect to promotions, but it is also true that BJA and OJP management were "missing in action" and thus created an enabling and supportive organizational structure that accommodated this type of abuse. No one is in charge. No one, including HR, assures that promotions are on the "up and up." There is no effective BJA or OJP leadership review of promotional decisions. There are no checks to ensure that the management participation and the process has not been corrupted. No one questions. No one looks "under the hood." There is a commitment to "keeping management happy" and ensuring that they get what they want but there is no commitment to a process and an end result that is fair and above board. BJA management has used promotions to reward those who do not complain, those who will look the other way when management needs them to do so, those who will not report violations of law, and to reward those who can be manipulated into providing sexual favors. Finally, how many more "Apontes" are there within BJA? Are there other additional unknown victims of Aponte? If so, how many victims have there been? Were they all offered promotions in exchange for sex or other considerations?

To wit, Ms. A has made the following claims that are relevant to Jeffries' claim of BJA managerial bias and discrimination in promotions:

- When Ms. A came to BJA she was and remained in financial difficulty for a number of years; she had experienced a financially adverse divorce and had also been unemployed for a long period of time. Aponte, Ms. A's supervisor, was aware of her financial condition. (Antoniewicz [law school debt], Connolly [legal bills due to custody dispute, medical bills, legal fees related to the defense of her daughter who has a drug addiction and had been arrested and jailed for same], and Ms. A all had significant financial issues.)

- Shortly after Ms. A's employment began at BJA, Aponte began calling her into his office frequently. Each time he asked her to close the door. In the beginning his conversations were on a wide range of topics but frequently he told her that he could help her to rise quickly within BJA's grant management division (Program Division). "He assured me that if grant management was really what I was interested in, that he could help me advance to a State Policy Advisor (SPA) rapidly. He told me that there would be a lot of advancement opportunities in the future at BJA and that I could be promoted to a GS-13 (GS level of BJA's SPAs) rapidly.

- As time went on, Aponte began to ask Ms. A out for drinks after work. Many times Ms. A declined Aponte's invitations but she indicates that he persisted in asking her out and became more aggressive with these invitations.

- Eventually Ms. A reports that she agreed to go out for drinks with him and did so on more than on occasion. After work hours, she went out for drinks with Aponte: "He told me that he thought that he would get funding to support the creation of four (4) to six (6) new SPA positions. He told me that if he got the new SPA positions that it would be my ticket to promotion to a GS-13. He continued to praise my work performance. In addition, he told me that the SPA positions and promotion to a GS-13 would be my ticket to financial recovery – if I only played my cards right.

- "I felt that my job performance merited promotion to the SPA career ladder. I felt that I had demonstrated the skill and ability for the promotion and that I deserved the opportunity. I even felt as though I could successfully compete for the SPA openings if they became available. However, I also felt cornered by Aponte. By this time, I realized that Aponte would either be the selecting official for these positions and/or be on the selection (interview) panel that would recommend the successful applicants for the positions. As the pressure to go out for drinks continued, he also continued to make it clear that he was my ticket to promotion – or remaining a grant technician for the rest of my life. As time went on, I realized that he was telling me that he could make or break me – and if I did[n't] agree to go out with him for drinks, he would be offended, and I would never be promoted and may go (sic) into bankruptcy…. I thought giving into his pressure on this would keep me in his good graces and therefore keep the opportunity for promotion an open possibility. I felt trapped and as if I had no choice or options."

- "At Aponte's insistence, I went out for drinks with him a couple of times. After I met him a few times after work for drinks, his conversation with me became sexually explicit and very direct. For example, over drinks he asked me what sexual positions that I enjoyed."

- "After this incident…he started calling me into his office more frequently and questioned the quality of my work and whether or not I was going to be good enough to handle a SPA position. He was clearly linking sexual favors and keeping

him entertained with the likelihood of being appointed to one of the upcoming SPA positions. I felt trapped or cornered at this point. No matter how hard I worked during that period, I realized that I put myself in an impossible position with a sexual harasser. In addition, because he knew about my precarious financial position, he used that to trap me in an unwanted relationship. He was constantly hinting that I had [to] go out with him and/or engage in sexual relations with him if I really wanted the SPA position."

- Ms. A described three separate events involving unwanted sexual advances.

- "After the incident described above, he started telling me how I could secure the SPA position and **he showed me the "top secret" questions that would be asked during the interview. He said he would be selecting the people on the interview panel and that would be in my favor.** After the interview, I asked how I did and [he] told me that I did okay, not great. He also said that he knew that I was nervous. I thought he might be trying to manipulate me further or try to continue forcing me into a compromised position in order to finally get the position." Ms. A got this promotion.

- "After I received the promotion, he kept telling me how much he liked me and that I could be his girlfriend…It was also around this time, after drinks, that he offered to drive me home when the weather was bad and he asked me to go [to] a strip bar on Route 1 in Springfield with him. I flatly refused. He suggested that I was a prude. I seem to recall that he indicated that he had taken Shauna Connolly to a strip club and that she really enjoyed it and that she was fun to be with."

- "After I was promoted, I was able to avoid doing anything with him other than having drinks with him occasionally on his request. I told him that I was sickened by what he did, and that I was having physical symptoms as a result. However, he still found ways to manipulate my behavior. Notably, at the time, my supervisor was *Tammy Reid*, who was abusive and created an intolerable environment for me and other employees. Other employees repeatedly complained about her to Aponte and Trautman but nothing was ever done with her – her abuse of my co-workers and me was unrelenting. Neither Aponte nor Trautman did anything to stop her behavior. While some employees were ultimately moved, myself and Shauna Connolly remained under her. The only way that I was able to get Aponte to intervene to stop her abuse was by agreeing to go out for a drink with him or flatter him. On occasions when Tammy Reid became completely intolerable with me, I [sic] if I flattered Aponte or agreed to go for a drink, he, in turn, would get Tammy to back off of me for a time. Otherwise, Aponte would not intercede with Tammy to stop her abusive behavior."

- "By the time that I was about to be promoted to a GS-11….Aponte started moving on me again and he implied that if I were to 'do' him again, he could ensure that I would get the grade promotion. I told him under no circumstances would I do that again…"

- "This started a weird back and forth period where he began showing me pictures of dozens of women that he was interested in and making inappropriate sexual comments that made me very uncomfortable. He referred to them as MILFs. I had to google that acronym to understand, but it refers to "mothers I would love to fuck." He would meet these women at adult soccer and some of them were mothers of kids he coached at soccer. He had these pictures so that his wife would not find them. One in particular that he seemed interest in was the "math teacher." He had a picture of this very athletic, 40 something year old woman on a stand up paddle board. Her distinctive feature was her washboard abs. I think she was an acquaintance of his wife or had been his kids' math teacher. I know she was recently divorced and he claimed she was dying to be with him. He also told me that he was going to his son's championship soccer tournament in Sarasota and Dawn, his wife, wouldn't be there, so he planned on taking more photos of MILFs and there would be some really attractive women there with their children.

    In addition, during this time he also made inappropriate comments all the time. For example, he told me that *Shauna Connolly* had become "fat and unattractive." He was also obsessed with two other BJA female staffers – *Esmeralda Womack and Tarasa Yates*. *He told me that he thought Esmeralda was a virgin, but she was so eager to please, that she could maybe 'please her man."* In addition, *he would talk a lot about how attractive Tarasa was and how he liked her athletic build and her sense of humor. He would comment that he liked her scoop neck blouses and her short skirts*. He suggested that I wear high heels like her and I could update my matronly wardrobe. Around this time, he

was also calling Tarasa into his office and shutting the door, but I seriously doubt there was anything between him [sic], because she had a fiancé who she later married. Around this time, **he also told me that he would leave his wife if could get Tarasa Yates interested in him.**"

- "After I received the promotion, he kept telling me how much he liked me and that I could be his girlfriend...He pointed out that being the girlfriend of the Associate Director had its advantages..."

- Note: Either in this context or in another setting, **Ms. A also claimed that Aponte expressed his sexual interest in an OJJDP manager – *Kellie Dressler Blue*.**

The above-referenced remarks or summary of events are only those remarks that directly relate to or support Jeffries' claim that within BJA there existed a sexual bias on the part of at least one management individual that was involved in promotional decisions. It also speaks to the allegation that Aponte rigged one or more promotional decisions involving Ms. A. The question is—were these the only promotional outcomes that he "fixed"? Again, while Jeffries did not compete "head to head" with Ms. A on any promotional position --- that is not the point. Ms. A's testimony and the allegations of prior female sexual harassment victims -- **calls into question all promotions that Aponte was in any way involved in.** Did Aponte only "fix" promotions for Ms. A? Did he "fix" promotions for other women, other paramours, or other women about whom he had sexual fantasies? Moreover, it raises the question of the managerial culture that existed within BJA, the managerial belief that it was the "wild wild west" and that they could get away with anything – fix promotions – fix terminations – no one above them or in HR would question them or hold them accountable. There was no "sheriff in town." Where was the BJA Director, the BJA Chief of Staff, Tracie Trautman, Phil Merkle, Jennifer McCarthy, AAG Mason and OJP leadership, his managerial peers, and BJA program staff; I have interviewed quite a number of BJA staff persons – staff persons report that just about everyone was aware that Aponte engaged in inappropriate relationships with Caucasian women in his chain of command but were afraid to report it – most reported that they were afraid of retaliation – that Trautman, Aponte, Reid, Merkle, and McCarthy would do to them what they believe they did to Shauna Connolly.

It is my understanding that in Jeffries' case now pending in the federal court, he alleges that discrimination played a role in five non-selections. Aponte directly participated in three out of the five non-selections included in his complaint:

1. **Supervisory Grants Program Manager**. Jonathan Faley,* **Tammy Reid, and Aponte were on the selection panel**. **Esmeralda Womack** and Naydine Fulton-Jones **were selected for the two vacancies**. In this promotion round, Aponte and Reid were on the selection panel. There has been a suggestion that Aponte may have exerted a level of inappropriate or unlawful power over Reid – and that she would follow through on his commands – whether she agreed with him or not – whether they were legal or not. **Ms. A has alleged that Aponte had sexual fantasies about Esmeralda Womack and she was promoted over Jeffries in this instance** – we do not know whether Aponte tried to pursue a relationship with Womack – maybe he hoped that he could do so if he rewarded her with a promotion. In any event, he likely gave her unfair advantage or otherwise influenced her selection over Jeffries. This is not to say that Womack was not, and is not, a hard worker deserving promotion. Moreover, this is not to say that Womack has since proven to be a good selection for the supervisory position. Womack is thin and a very fair-skinned Caucasian woman – fitting the same profile as Aponte's other victims – Antoniewicz, Connolly, and Ms. A. Nadine Fulton-Jones is African American. She retired after the Union filed a grievance on behalf of a number of employees who alleged that they had been abused by and discriminated against by Tammy Reid and Naydine Fulton-Jones. OJP management settled with the Union on this grievance. As a result, Tammy Reid was permanently removed from supervisory status and Naydine Fulton-Jones retired.

2. **Senior Policy Advisor for Evidence Integration**. This selection panel consisted of **Aponte**, Elizabeth Griffith, and Kristina Rose. Here an African American male got the position but it was after specific complaints were made to the AG's office regarding the lack of promotion of African American men in BJA.

3. **Supervisory Grants Program Manager**. **Aponte**, Jonathan Faley,* and **Kellie Dressler Blue** were on the selection panel. Pursuant to Ms. A's testimony, **Aponte had sexual fantasies about Kellie Dressler Blue**. Blue is not employed by BJA; she is a manager inanother OJP component – the Office of Juvenile Justice and Delinquency Prevention.

Blue also fits the Aponte's apparent preferred profile – she is a very attractive fair-skinned Caucasian woman. Perhaps Aponte put her on the this selection panel because he was trolling for her – trying to gain access to her to determine whether she was vulnerable and could be taken advantage of – or perhaps he already had a relationship with her and could influence her decisions or ratings of promotional applicants. Note: a review of the copies of the interview scoring sheets provided by OJP to Jeffries, marks on said sheets completed by Blue indicated that she changed her interview scores for Jeffries – she significantly downgraded her scores for him. In this round, **Brenda Worthington** (Caucasian woman) and Cory Randolph (African American male) were promoted. Shauna Connolly alleges that Aponte socialized with Worthington – they went to Washington Caps games together, etc. In fact, allegedly **Worthington and Connolly, along with others attended the Washington Caps game together on the night that Connolly alleges that Aponte followed her home and raped her.** Again, we do not know the nature or extent of the relationship between Worthington and Aponte. However, *we do know that once Shauna Connolly was finally removed from Tammy Reid's supervision, they assigned her to Worthington and she was fired shortly after that for a violation of the Last Chance Agreement.*

*Shauna Connolly reports that Jonathan Faley, a BJA program division deputy director, tried to date her before he married.

Finally, one last observation --- in a promotion that took place a year or two ago at the National Institute of Justice, a sister agency of BJA within OJP, the NIJ deputy director wrote a letter of recommendation or agreed to be a reference for an internal candidate competing for a promotion; this candidate was selected for the promotion. Hence, the NIJ deputy director recused himself from sitting on the selection panel because he had an obvious bias or there could be an appearance of bias – as he was willing to recommend this candidate and not the others who competed for the position. In the instant case, Jeffries had at one time or another filed an EEO claim alleging discrimination against a number of the individuals who were on the various selection panels for positions outlined in his suit now pending in the federal court – such as Elizabeth Griffith. Why were these individuals allowed to participate on selection panels involving Jeffries? Why weren't they disqualified as having a bias, a potential bias, or the potential appearance of bias against Jeffries due to prior EEO claims of discrimination? Why didn't these individuals recuse themselves from participating on a selection panel in which Jeffries was a candidate? The NIJ Deputy Director recognized that he had a bias in favor of the candidate that ultimately was selected for promotion – or that there could be an appearance of bias – so he recused himself. I am also aware of another OJP manager who, when asked, declined to participate on a promotion selection panel. His/her reason was that s/he had worked with one of the candidates for years and s/he had already formed an opinion that this particular candidate should not be selected for the promotional vacancy. Hence, s/he did the honorable thing and declined to participate on the panel because s/he had a bias against one of the candidates.

In any event, it is my hope that all the parties involved in the Jeffries litigation are seeking truth and equity – after all *as this is the Justice Department*. It is Ms. A's hope, as it is mine, that her testimony will assist the parties in coming to a mutually agreeable and just resolution to Jeffries' claim – it would represent a small step toward accountability and toward the restoration of honor and integrity to OJP.

Sincerely,


Marilyn C. Moses
President, AFSCME Local 2830