# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| TIMOTHY JEFFRIES,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>MERRICK GARLAND,<br>ATTORNEY GENERAL,<br>U.S. DEPARTMENT OF JUSTICE,<br><br>　　　　Defendant. | Civil Action No. 15-cv-1007 (BAH)<br><br>Chief Judge Beryl A. Howell |

## MEMORANDUM OPINION

Plaintiff Timothy Jeffries claims that his employer, the Bureau of Justice Assistance ("BJA"), within the Office of Justice Programs ("OJP") of the U.S. Department of Justice ("DOJ"), did not select him for seven GS-14 positions between 2011 and 2014 due to intentional discrimination—based on his being an African-American man—and in retaliation against him for his former complaints to the Equal Employment Opportunity Division ("EEOC"), in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.* *See* Compl. & Demand Jury Trial ("Compl.") ¶¶ 4–42, 44, 47, ECF No. 1.[1]  In 2016, this Court granted summary judgment on all counts for defendant, but the D.C. Circuit remanded for further discovery regarding only the first of the seven challenged non-selections, namely, plaintiff's unsuccessful 2011 application for a GS-14 Supervisory Grants Program Manager ("SGP") position in the BJA.  *Jeffries v. Lynch*, 217 F. Supp. 3d 214, 249 (D.D.C. 2016), *aff'd in part, rev'd in part sub nom. Jeffries v. Barr*, 965 F.3d 843, 848–49 (D.C. Cir. 2020).  Following

---

[1]　　　The named defendant is the current Attorney General, Merrick Garland, who is sued in his official capacity, and is substituted for former Attorneys General Loretta Lynch, Jeffrey Sessions, and William Barr.  *See* FED. R. CIV. P. 25(d).

additional discovery on remand, defendant again seeks summary judgment, pursuant to Federal Rule of Civil Procedure 56(a).  Def.'s Mot. J. Pleadings or, Alternatively, Summ. J. ("Def.'s Mot."), ECF No. 43.  For the reasons explained below, defendant's motion is, again, GRANTED.

## I.    BACKGROUND

The factual background underlying the instant motion falls into four categories: (1) plaintiff's previous Equal Employment Opportunity ("EEO") activity resulting in issuance to him of a priority consideration letter; (2) plaintiff's unsuccessful application and interview for the 2011 SGP position, which is the only remaining issue in this litigation; (3) the selection of E.W. and N.F. for that 2011 position; and (4) the procedural history of this litigation.  These topics are addressed *seriatim*.  The facts that follow are undisputed except as noted.[2]

Plaintiff, at all times relevant to this case a GS-13 Policy Advisor in the BJA, has been an OJP employee since 2000 and a BJA employee since 2002.  Def.'s Statement of Material Facts ("Def.'s SMF") ¶¶ 1–2, ECF No. 43-2.[3]  He was promoted to a GS-14 position in 2016, during the pendency of this litigation.  Def.'s SMF at 1 n.1; Def.'s Mem. Supp. Mot. J. Pleadings or Summ. J. ("Def.'s Mem.") Def.'s Mem. at 1 n.1, ECF No. 43-1; Pl.'s Opp'n Def.'s Mot. J.

---

[2]    Plaintiff's submissions are noticeably ill-suited to the essential task of identifying the issues on which he asserts there exist genuine disputes of material fact.  This Court's Local Civil Rule 7(h)(1) requires that an "opposition to [a motion for summary judgment] shall be accompanied by a separate concise statement of genuine issues setting forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated."  Plaintiff's Statement of Material Facts as to Which There Is a Genuine Dispute, ECF No. 44-1, however, is neither "concise" nor "set[s] forth all material facts" as to which there is a genuine dispute.  Instead, plaintiff's "statement" is a 22-page argumentative rebuttal to defendant's 9-page Statement of Material Facts as to Which There Is No Genuine Dispute, ECF No 43-2.  In remarkably few places does plaintiff expressly refer to one of defendant's facts and indicate precisely what fact is disputed.  Instead, plaintiff uses this document mostly to argue, verbosely, about the significance or context of defendant's facts, or to offer sundry additional facts without indicating whether they are disputed.  All told, plaintiff's "statement" reads more like an inappropriate mechanism to introduce disorganized *argument* in excess of the 45-page limit already fully consumed by his opposition memorandum, than a *bona fide* attempt to adhere to LCvR 7(h)(1).

[3]    "GS-13" refers to the thirteenth pay grade on the General Schedule pay scale for government employees.

Pleadings or, Alternatively, Summ. J. ("Pl.'s Opp'n") at 4, ECF No. 44.  During his tenure, plaintiff has received mostly satisfactory reviews for his performance and has won various awards for his work.  Compl. ¶ 13. Despite plaintiff's generally positive history at the BJA, since 2011 he has applied for eight GS-14 positions but, at the time of the Complaint filing, had not been selected for any.  Def.'s SMF ¶ 3; Compl. ¶ 14.  In the course of evaluating these various applications, "[o]ver a dozen Department staff members, of various backgrounds and from both inside and outside of the Bureau, served on various panels" interviewing him and "[n]*one* recommended [him] as the most qualified candidate."  Def.'s Mem. at 4 n.6 (emphasis in original).

A.      **Plaintiff's Previous EEO Activity and Priority Consideration Letter**

Plaintiff "previously filed three cases against [DOJ] alleging discrimination on the basis of race and sex and retaliation in connection with several [other] non-selections, which were consolidated and settled in 2008."  Compl. ¶ 7.  Plaintiff listed Jonathan Faley and Ed Aponte as "responsible management officials" in this EEO activity, with their involvement dated back to 2006, about five years before the non-selection at issue in this case.  Def.'s SMF ¶ 23; Decl. of Timothy E. Jeffries ("Pl.'s Decl."), Pl.'s Ex. 1 ¶ 13, ECF No. 9-3; Def.'s Mem. at 22; Def.'s Reply Pl.'s Opp'n Def.'s Mot. J. Pleadings or, Alternatively, Summ. J. ("Def.'s Reply") at 11, ECF No. 47; Def.'s Ex. 78 at 5, ECF No. 43-10.  Aponte thereafter gave plaintiff a favorable performance review in 2007 and signed off on a within-grade increase in 2008.  Def.'s Ex. 88, ECF No. 47-1; Def.'s Ex. 89, ECF No. 47-1; Def.'s Reply at 11.[4]

---

[4]      Both parties have submitted copious exhibits in connection with the briefing on defendant's original motion for summary judgment filed in 2015 and now on the instant motion.  The parties' exhibits span six filings, as every submission in both rounds of briefing included new materials for the record.  Fortunately, each party has maintained sequential and globally unique exhibit numbering such that, collectively, plaintiff's exhibits are numbered 1 through 92, where exhibits 67 and up are new to the instant motion, and defendant's exhibits are numbered 1 through 114, where exhibits 71 and up are new to the instant motion.  For clarity, this opinion will refer to exhibits using these

Separately, in 2007, plaintiff was passed over for a GS-14 Program Analyst position in the BJA for which he had applied.  Def.'s SMF ¶ 5; Compl. ¶ 15; Pl.'s Decl. ¶ 10.  Due to a data entry error by plaintiff that went unnoticed by defendant, plaintiff was not considered.  Def.'s SMF ¶ 6.  Acknowledging that plaintiff had mistakenly not been interviewed for the position, on July 30, 2007, the DOJ gave plaintiff a one-time "priority consideration letter" to be used "for the next open position similar and in the same geographical area to the one which proper consideration was missed," specifically, a Program Analyst position in the Substance Abuse and Mental Health Division.  Def.'s SMF ¶ 12; Compl. ¶¶ 15, 18.  The letter further indicated that plaintiff would be considered for any such position before the issuance of public notice of the vacancy and that he would be notified in writing when he had received priority consideration for a position.  Compl. ¶ 18.

"For four years after [he] received the priority consideration letter, [plaintiff] was never notified that [his priority consideration letter] had been used."  Pl.'s Decl. ¶ 11; *see* Def.'s SMF ¶ 8 (noting that "OJP ha[d] no record of Plaintiff requesting to use the . . . priority consideration letter before March 29, 2011," implying that the entitlement was not automatically applied because of an "OJP-wide hiring freeze").  Consequently, in January or February 2011, plaintiff inquired with the Deputy Director of OJP Human Resources ("HR"), Jennifer McCarthy, as to the status of the letter. Def.'s SMF ¶ 9; Pl.'s Decl. ¶ 11.  Initially, McCarthy was unable to locate the letter, but in late February 2011, after plaintiff furnished a copy and stated that he would contact his attorney, McCarthy found HR's copy.  Pl.'s Decl. ¶ 11.

---

two complete numbering sequences as "Pl.'s Ex. 1" and "Def.'s Ex. 1," and so on, rather than viewing exhibits as associated with specific briefing submissions.

**B.      Plaintiff's Application and Interview for the SGP Position**

In early 2011, DOJ posted a vacancy for a GS-14 Supervisory Grants Program ("SGP")
Manager position within BJA.  Def.'s SMF ¶¶ 10–11.  The vacancy notice indicated that the
selected candidate would be required to "[s]upervise a group of employees performing work at
the GS-7 through GS-13 level . . . , [e]valuate [grant] applications before award . . . , and
[p]erform duties related to ensuring grantee compliance with the terms and conditions of the
grant award or agreement."  Def.'s SMF ¶ 11 (alterations in original); Def.'s Ex. 56, ECF No.
7-4.  The parties do not dispute that neither this position, nor any others posted by BJA after it
issued the priority consideration letter to plaintiff in 2007, matched the description of the types of
positions to which plaintiff was entitled to receive advance notice and the opportunity to apply
and be evaluated in a separate process.  Def.'s Reply at 7.  Applications for the SGP Manager
position were accepted during a window beginning on March 22, 2011, and ending on March 31,
2011.  Def.'s Ex. 80.

On March 29, 2011, plaintiff requested that his outstanding priority consideration
entitlement be used in conjunction with his application for the position, Def.'s SMF ¶ 10, which
request McCarthy granted even though the position was not "similar" to the Program Analyst
position for which the letter had been intended, *id.* ¶ 14; Compl. ¶ 19; Def.'s Ex. 3 at 5, ECF No.
7-3.  Thus began an *ad hoc* variant of the normal priority consideration process, in which BJA
paused the already-in-motion normal process of considering the applicants who responded to the
posting, so as to afford plaintiff the opportunity to receive priority consideration notwithstanding
the mismatch in job description and his late entry into the applicant pool.

Plaintiff was interviewed for the position on or about May 11, 2011, by three panelists:
Edison Aponte (a Hispanic male), Tammy Reid (an African-American female), and Jonathan
Faley (a Caucasian male).  Def.'s SMF ¶ 15.  Tracey Trautman, the Deputy Director of BJA, was

the "selecting official" for the position.  Pl.'s Opp'n at 23.  Faley and Aponte had been listed as

"responsible management officials" in some of plaintiff's prior EEO activity.  Def.'s SMF ¶ 23;

Pl.'s Decl. ¶ 13.  Neither Reid nor Trautman was at the time aware of this prior EEO activity.

Def.'s SMF ¶¶ 22, 24; Def.'s Reply at 11.[5]  The panelists did not evaluate plaintiff based on the

rating and scoring sheet used for the candidates interviewed later in the process, instead

evaluating him more qualitatively, taking notes in response to pre-written prompts.  Pl.'s Exs.

85–87, ECF Nos. 44-22, 44-23, 44-24; Pl.'s Statement of Material Facts ("Pl.'s SMF") ¶ 30,

ECF No. 44-1.

The panelists "unanimously" concluded that plaintiff either lacked the necessary

qualifications or experience or failed adequately to articulate those credentials, and did not

recommend him for the position.  Def.'s SMF ¶¶ 16–21.  As Faley explained, plaintiff "was not

suitable for the position because he did not adequately articulate the qualities, skills, and

knowledge that would prepare him for the position, such as explaining or demonstrating what

experience or skill sets have prepared him for staff supervision and oversight of a grant

management team."  Def.'s SMF ¶ 20; Def.'s Ex. 6 ¶ 10, ECF No. 7-3.  The panelists also

expressed some concerns beyond plaintiff's ineffective portrayal of his experience.  First, as

panelists understood the situation, plaintiff submitted a "writing sample with several obvious

errors."  Def.'s SMF ¶ 21.  Plaintiff contends that the document in question was not in fact a

---

[5] Plaintiff suggests that a 2013 "joke" email thread between Faley and Trautman somehow supports an "infer[ence]" that Reid "[was] aware of Jeffries' EEO complaints," Pl.'s Opp'n at 45 (citing Pl.'s Ex. 19, ECF No. 9-8), but the email on its face makes no such reference and in any event is silent on Reid's knowledge at the relevant time in 2011.  As to Trautman, while plaintiff asserts that "Troutman [sic] was aware of Jeffries' prior EEO case," Pl.'s Opp'n at 29 (citing Pl.'s Ex. 69 at 29, ECF No. 44-6), the deposition transcript cited states only that Trautman "*became aware* of some previous activity," Pl.'s Ex. 69 at 29:20–22 (emphasis added), the timing of which awareness Trautman elsewhere describes as "late fall or winter of 2011," Def.'s Ex. 4 ¶ 5, ECF No. 7-3.  Put simply, nothing in the record cited by plaintiff or brought to the Court's attention supports plaintiff's suggested factual dispute over Reid and Trautman not being aware of plaintiff's prior EEO activity at the time he was not selected for the SGP position.

writing sample but rather "a list of talking points he used for himself in a conference call that he gave the panelists when he was asked to identify a situation where he had used critical thinking to solve a complex problem." Pl.'s SMF at 9.  Second, according to the panelists, plaintiff failed to conduct himself professionally during the interview: he did not dress or act professionally, Def.'s SMF ¶¶ 17, 19, took his suit jacket off and hung it on the coat rack during the interview, *id.* ¶ 18, and "relaxed like he knew [the panelists], like [they] were his buddies," *id.* ¶ 19; Def.'s Ex. 9, ECF No. 7-3.[6]  As Reid put it three times in her answer to a question at deposition, "[i]t was just weird."  Def.'s Mem. at 24–25 (quoting Def.'s Ex. 71 at 44, ECF No. 43-3).

Following plaintiff's interview, Tracey Trautman, the Deputy Director of BJA and the selecting official for the position, Pl.'s Opp'n at 23, neither interviewed plaintiff herself nor personally reviewed his application before rejecting him.  Pl.'s Ex. 69 at 26, ECF No. 44-6. Instead, she relied solely on Aponte's recommendation not to proceed.  Pl.'s Opp'n at 23.[7]  Two and a half months after plaintiff's interview, Human Resources notified plaintiff of his non-selection by letter, dated July 29, 2011, citing deficiencies in plaintiff's explanations of his experience and skill set.  *See* Def.'s SMF ¶ 25; Def.'s Ex. 2, ECF No. 7-3.

The parties disagree as to whether plaintiff was interviewed before and considered separately from the other candidates as required by the priority consideration letter.  Def.'s SMF ¶¶ 15–16; Pl.'s SMF at 5; *see also Jeffries*, 965 F.3d at 850.  On April 1, 2011, after the

---

[6]    Plaintiff does not dispute the accuracy of the suit jacket anecdote but rather points out "that comment does not appear in [Reid's] interview notes," and in the same breath justifies the behavior, noting "it hardly seems unprofessional for a man to hang up his suit jacket on a hot day.  After all, that's what the coat rack in the room was for."  Pl.'s SMF at 8.

[7]    Defendant asserts that Trautman's approach did not violate the guarantee of priority consideration, pointing to language in OJP's policy explaining that the entitlement "does not place conditions on the selecting official's right to select or not to select from any appropriate source at any point in the recruitment and staffing process" and that there is no guarantee of an interview with the selecting official herself.  Def.'s SMF ¶ 37; Def.'s Ex. 11 at 4–5, ECF No. 7-3.

application window closed but before plaintiff's completed application was submitted, Aponte reviewed the list of candidates in the HR database and shared that list with Trautman.  Def.'s Reply at 9.  Despite over a year of additional discovery in this litigation, *see* Part I.D, *infra*, no admissible record evidence has been presented, however, disputing that the panelists did not interview the other applicants until late summer, well after plaintiff's May 11, 2011 interview and after HR notified plaintiff on July 29, 2011 of his non-selection.  Def.'s SMF ¶¶ 15–16; *see* Def.'s Ex. 2, ECF No. 7-3; Def.'s Ex. 33 ¶¶ 2–3, ECF No. 7-3; Def.'s Ex. 54 ¶¶ 2–3, ECF No. 7-4; Def.'s Ex. 55 ¶¶ 2–3, ECF No. 7-4; Def.'s Ex. 77 at 7, ECF No. 43-9.[8]  Similarly, there is no record evidence suggesting that Aponte or Trautman were aware of plaintiff's then-future application at the time Aponte reviewed the initial list of candidates.

Plaintiff recalls that panelists told him at the end of his interview that they would have to interview other candidates, Pl.'s SMF at 5, and other OJP personnel had already compiled a list of "best qualified" candidates prior to his interview, *Jeffries*, 965 F.3d at 849.  The panelists acknowledged that they may have "compared" plaintiff's paper credentials to that of others to some extent, Pl.'s Opp'n at 21, but defendant maintains that no "assessment or interviews of the

---

[8]      Plaintiff repeatedly asserts that one of the selectees "told a coworker, Maria Berry, that she had been interviewed for the position before Jeffries' interview," citing an affidavit by Ms. Berry.  Pl.'s Opp'n at 21; Pl.'s SMF at 5; *id.* at 13 (all citing Aff. of Conversation ("Berry Aff."), Pl.'s Ex. 24, ECF No. 9-11).  This is a blatant mischaracterization of the Berry affidavit, which does not so state.  Instead, Berry states that she "had an in-person conversation with" a selectee, where the selectee "revealed to [Berry] that [the selectee] was interviewed for a BJA Supervisory Branch Chief Position at the GS-14 level," which conversation—and therefore the selectee's interview—"occurred *before* another interviewee and priority consideration candidate Tim Jeffries *was notified of the results* of his priority consideration for the same BJA position."  Berry Aff. (emphasis added).  Berry neither states nor implies that the other selectee was interviewed before plaintiff's *interview*, indicating only that the selectee's interview occurred at some time before issuance of the July 29, 2011 non-selection letter to plaintiff.  In any event, Berry's statement is textbook inadmissible hearsay in its present form and would fare no better were Berry to testify at trial.  FED. R. CIV. P. 56(c)(4) (requiring that "[a]n affidavit or declaration used to . . . oppose a motion [for summary judgment] must be made on personal knowledge [and] set out facts that would be admissible in evidence"); *Gilmore v. Palestinian Interim Self-Gov't Auth.*, 843 F.3d 958, 969 ("[S]heer hearsay . . . counts for nothing on summary judgment.  While a nonmovant is not required to produce evidence in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence." (emphasis and second alteration in original) (citation omitted)).  Defendant, meanwhile, provides multiple, admissible record citations for its version of the timeline.  Def.'s Reply at 9 n.3.

other candidates had occurred before the panel decided" not to recommend plaintiff, Def.'s Reply at 9.  Such a comparison, if it occurred, would have been a departure from normal priority consideration application procedures.  *Jeffries*, 965 F.3d at 850 (noting that defendant conceded at oral argument before the D.C. Circuit that simultaneously considering and making comparisons to other candidates would be "not kosher"); Pl.'s Decl. ¶ 15; Pl.'s Ex. 21 at 4, ECF No. 9-11; Pl.'s Ex. 68 at 55, ECF No. 44-5.

In addition, the parties dispute whether the 2011 non-selection was the first opportunity that panelists Faley and Aponte would have had to retaliate against plaintiff for naming them in his previous complaints.  Pl.'s Opp'n at 43 (arguing that, despite the three-year gap between complaint and non-selection, this was the first opportunity for retaliation); Def.'s Reply at 11, ECF No. 47 (citing Def.'s Ex. 88, ECF No. 47-1) (pointing to a positive performance appraisal of plaintiff by Aponte in 2007 as evidence of an earlier opportunity for retaliation).

### C.    Selection of E.W. and N.F.

After plaintiff was notified of his non-selection, the panelists arranged for and in September 2011 held interviews with the 12 other candidates for the SGP position.  Def.'s Mem. at 17; Def.'s Ex. 6 at 4, 7, ECF No. 7-3; Def.'s Ex. 77 at 7, ECF No. 43-9 (showing interview dates ranging from September 12 to September 15, 2011).  After interviewing the remaining candidates in September 2011, the panelists recommended E.W. (Caucasian female) and N.F. (African-American female) for the SGP position.  Def.'s SMF ¶ 28; Compl. ¶ 24.[9]  Neither selectee had been involved in prior EEO activity.  Compl. ¶ 24.  In depositions, panelists praised the selectees' qualifications and interview performances.  *See* Def.'s SMF ¶ 29–32; Def.'s Ex. 72

---

[9]     E.W. and N.F. have been identified by name in previous opinions in this matter.  *See, e.g.*, *Jeffries*, 217 F. Supp. 3d at 221; *Jeffries*, 965 F.3d at 850.  Given the nature of new allegations plaintiff has introduced concerning Aponte's conduct towards one of these selectees, however, this Memorandum Opinion refers to them only by initials.

at 98–100, ECF No. 43-4; Def.'s Ex. 71 at 51, 76, ECF No. 43-3.  Although the panelists were looking for someone who "had supervisory experience and could speak to it," E.W. admitted to having no experience in a supervisory role.  Pl.'s SMF at 16; Pl.'s Ex. 68 at 26–27, ECF No. 44-5; Pl.'s Ex. 82 at 10, 22, ECF No. 44-19.  Based on the scoring system used during the interviews (not employed during plaintiff's earlier priority consideration interview), E.W. was the top-ranked applicant while N.F. ranked third.  Def.'s Ex. 77 at 6, ECF No. 43-9.  Given that the second-ranked applicant was not selected, Trautman, shortly after accepting the panelists' recommendations, emailed Aponte and Faley directing them to come up with "unique skill sets" for the candidates to justify their selections.  Pl.'s SMF ¶ 30; Pl.'s Ex. 77, ECF No. 44-14; Pl.'s Ex. 69 at 43–44, 46–47, ECF No. 44-6.

Plaintiff asserts that Aponte, the lead panelist, asked E.W. to apply for the position on several occasions—though the record is unclear whether this purported encouragement occurred before or after plaintiff's interview—and E.W. testified that when she stepped into the role, Aponte occasionally flirted with her.  Pl.'s Opp'n at 26; Pl.'s Ex. 82 at 10, 12, 25, ECF No. 44-19.  Aponte has a history of sexual harassment at the OJP for, among other things, promising promotions to female subordinates in exchange for sex.  Pl.'s SMF at 6; *see generally* Pl.'s Ex. 72, ECF No. 44-9.  Aponte has since stepped down from his position in response to the initiation of removal proceedings against him. Pl.'s Ex. 72 at 2, ECF No. 44-9.[10]

---

[10]    Plaintiff proffers the affidavit of an unnamed witness, given on January 23, 2018 in connection with the investigation of a separate EEO complaint not involving plaintiff, in an apparent effort to link Aponte's alleged *quid pro quo* history with female subordinates to the hiring of E.W.  Pl.'s SMF at 6; Pl.'s Ex. 74¶ 24, ECF No. 44-11. The witness, who like plaintiff applied but was not selected for the 2011 SGP position, explains that after she expressed reservations about choosing E.W. for the position because she lacked "any manager experience," Aponte "just grinned and said she was nice to look at."  She continued, saying that "many times [she] would go to Ed and complain about [E.W.'s] lack of people skills and he would agree, but smile and say she would do anything he asked."  Pl.'s SMF at 6, ECF No. 44-1; Pl.'s Ex. 74 ¶ 24, ECF No. 44-11.  The identity of this declarant is not in the record, but defendant asserts that her affidavit is inadmissible hearsay not covered by any exception.  Def.'s Reply at 13–14; *see also* note 8, *supra*.  Defendant does not, however, offer any reason to conclude that it would be

### D.     Procedural Background

Plaintiff filed various EEO complaints in relation to the 2011 SGP non-selection as well as the six others between 2011 and 2014, which collectively form the basis of the Complaint. Pl.'s Opp'n at 4–5.  These EEO cases were initiated and processed at different times and ultimately assigned to three separate EEOC offices in Philadelphia, Dallas, and Washington.  *Id.* The EEOC "would not consolidate the cases," prompting plaintiff to pursue relief in federal court instead for the sake of practicality and expense.  *Id.* at 5.  Nevertheless, written discovery— to the tune of over 17,000 pages—took place during the pendency of the EEO cases.  *Jeffries*, 217 F. Supp. 3d at 228; *Jeffries*, 965 F.3d at 854.

Plaintiff filed this action on June 26, 2015 in the U.S. District Court for the District of Columbia.  Defendant moved for judgment on the pleadings or, in the alternative, summary judgment.  Def.'s Mot. J. Pleadings and, Alternatively, Summ. J., ECF No. 7.  Alongside plaintiff's opposition to defendant's motion, which opposition included 66 exhibits totaling over 600 pages, *see* Pl.'s Opp'n Def.'s Mot. J. Pleadings or, Alternatively, Summ. J., ECF No. 9, plaintiff filed a motion seeking additional discovery pursuant to Federal Rule of Civil Procedure 56(d), asserting that the "limited discovery which was conducted in the EEOC was incomplete," Pl.'s Mot. Relief Under Rule 56(d) at 3, ECF No. 10.  On November 15, 2016, the Court denied plaintiff's Rule 56(d) motion and granted summary judgment for defendant on all counts. *Jeffries v. Lynch*, 217 F. Supp. 3d 214 (D.D.C. 2016), *aff'd in part, rev'd in part sub nom. Jeffries v. Barr*, 965 F.3d 843 (D.C. Cir. 2020).

---

impossible for plaintiff to summon this witness to testify at trial as to her recollections of Aponte's statements, which might be deemed "not hearsay" as having been "made by [defendant's] agent or employee on a matter within the scope of that relationship and while it existed."  FED. R. EVID. 801(d)(2)(D).  For simplicity, this opinion assumes without deciding that this testimony could at trial be presented in admissible form, as it too fails to create a genuine issue of material fact precluding summary judgment for defendant.

Nearly four years later, the D.C. Circuit affirmed with respect to six out of the seven non-selections, but with respect to the counts associated with the 2011 SGP non-selection, reversed the denial of the Rule 56(d) motion and vacated summary judgment that had been entered in favor of defendant. *Jeffries v. Barr*, 965 F.3d at 848–49.[11]  In reaching its conclusion as to the 2011 SGP non-selection, the Circuit held that the additional discovery plaintiff sought about the priority consideration process as applied to his 2011 SGP application was relevant to the Title VII claims associated with the first non-selection. *Id.* at 856–58.  Plaintiff theorized that additional discovery could produce evidence to show that OJP deviated from procedure during his first non-selection, which would help not only discredit the hiring panelists but also support an inference of discriminatory motive.  The Circuit agreed with plaintiff, concluding that the DOJ's concessions at oral argument, most notably that "it is improper for the interview panelists to compare [the] candidate's qualifications with others'" when applying priority consideration, evidenced an "unexplained deviation from DOJ's standard practices" because the record indicated that the panelists made such comparisons. *Id.* at 857, 858.

On remand, the parties undertook additional discovery regarding the SGP non-selection, and this year-long period of discovery closed on November 1, 2021 after several extensions.  In

---

[11]     The protracted nature of the proceedings before the Circuit principally stems from a combination of motions for summary affirmance, summary reversal, and remand—all of which were denied—numerous extensions in briefing, and a postponement of oral argument.  Additionally, in late 2017 the Circuit held the matter in abeyance for approximately four months so that this Court could hear plaintiff's motion for relief from judgment pursuant to Rule 60(b)(2) "due to newly discovered information which indicates that he should be permitted to engage in discovery."  Pl.'s Renewed Mot. Relief J. at 1, ECF No. 25.  Specifically, plaintiff reported receiving an "unsolicited email" from a union president that described various instances of sexual harassment by Aponte and noted the potential relevance of Aponte's conduct to three of plaintiff's non-selections.  *See generally id.*  That motion was denied in January 2018 because the allegations in the union email were "sufficiently attenuated from the non-selections at issue that such evidence would not change the outcome by raising genuine issues of material fact about DOJ's legitimate, non-discriminatory reasons for the plaintiff's non-selection," and further concluding that even if the allegations could be proven, it would remain that "no reasonable jury could infer that the real reason that the plaintiff was not selected . . . was discrimination or retaliation."  *Jeffries v. Sessions*, 323 F.R.D. 437, 441, 442 (D.D.C. 2018).  Plaintiff did not appeal this Court's denial of his request for Rule 60(b) relief, *see* Order, *Jeffries v. Sessions*, No. 17-5008 (D.C. Cir. May 9, 2018), and the Circuit "d[id] not consider those of [plaintiff]'s arguments that are premised on the May 2017 email," *Jeffries*, 965 F.3d at 854 n.6.

discovery, defendant "provided Plaintiff with documents, answers to interrogatories, and produced six witnesses for deposition." Def.'s Mem. at 4. On January 14, 2022, defendant filed the instant renewed motion for summary judgment with respect to the Title VII claims stemming from the first non-selection. Def.'s Mot. Briefing completed on March 28, 2022, and the motion is now ripe for resolution.[12]

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).[13] "A genuine issue of material fact exists 'if the evidence, viewed in a light most favorable to the nonmoving party, could support a reasonable jury's verdict for the nonmoving party.'" *Figueroa v. Pompeo*, 923 F.3d 1078, 1085 (D.C. Cir. 2019) (quoting *Hairston v. Vance-Cooks*, 773 F.3d 266, 271 (D.C. Cir. 2014)). The moving party bears the burden to demonstrate the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts, supported by materials in the record, that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.* ("*Liberty Lobby*"), 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, the appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'"

---

[12]    On July 27, 2022, defendant filed a Notice of Supplemental Authority disclosing the D.C. Circuit's issuance of an en banc opinion in *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022) (en banc), and explaining why *Chambers* does not affect the outcome of the instant motion. *See* Def.'s Notice Suppl. Auth., ECF No. 48.

[13]    Defendant styles the instant motion as seeking "judgment on the pleadings [pursuant to Rule 12(c)], or, alternatively, for summary judgment." Def.'s Mem. at 2, 4. As discussed in Part III, *infra*, however, the motion properly is evaluated only as a motion for summary judgment pursuant to Rule 56.

(quoting *Liberty Lobby*, 477 U.S. at 248)); *see also Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) ("[S]heer hearsay . . . counts for nothing on summary judgment." (internal quotation marks and citation omitted)); FED. R. CIV. P. 56(c), (e)(2)–(3).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (alteration in original) (quoting *Liberty Lobby*, 477 U.S. at 255). Courts "may not make credibility determinations or weigh the evidence," *Iyoha v. Architect of the Capitol*, 927 F.3d 561, 565 (D.C. Cir. 2019) (internal quotation marks and citation omitted), since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge," *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000) (quoting *Liberty Lobby*, 477 U.S. at 255); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 296 (D.C. Cir. 2015).

The fact that a plaintiff's testimony is uncorroborated is immaterial for purposes of summary judgment, since "[c]orroboration goes to credibility, a question for the jury, not the district court." *Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016). Nonetheless, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rts. Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1141 n.3 (D.C. Cir. 2011) (citation omitted); *accord* FED. R. CIV. P. 56(e). If

"opposing parties tell two different stories, one of which is blatantly contradicted by the record,

so that no reasonable jury could believe it, a court should not adopt that version of the facts for

purposes of ruling on a motion for summary judgment." *Lash v. Lemke*, 786 F.3d 1, 6 (D.C. Cir.

2015) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).  The Court is only required to

consider the materials explicitly cited by the parties but may on its own accord consider "other

materials in the record."  FED. R. CIV. P. 56(c)(3).[14]

## III.   DISCUSSION

The parties have completed over a year of additional discovery, Joint Status Report ¶ 1,

ECF No. 42; Min. Order (Oct. 13, 2020), and thus have had ample "reasonable opportunity" to

present material outside of the pleadings "pertinent to the [12(c)] motion," so judgment on the

pleadings would be improper, and the motion must be analyzed as a motion for summary

judgment, FED. R. CIV. P. 12(d).  Even prior to discovery, the Court found that because "DOJ

produced over 17,000 pages of documents in response to [] plaintiff's various discovery requests

in the proceedings before the EEOC" and the parties both submitted "hundreds of pages of

documents and declarations . . . to support their positions," converting the 12(c) motion to a

56(a) motion was warranted, *Jeffries*, 217 F. Supp. 3d at 228, so, not surprisingly, after the

parties gathered and submitted *more* external evidence, summary judgment remains the proper

mode of analysis.  Defendant's invitation to resolve this motion pursuant to Rule 12(c) is

declined, again.

As an initial matter, the Circuit aptly commented, in an apparently unheeded admonition,

on plaintiff's "untraditional style of briefing," *Jeffries*, 965 F.3d at 860, which makes it unusually

---

[14]     Although all of the exhibits cited by the parties in support of and in opposition to the pending motion have
been reviewed, only those exhibits necessary or useful in resolving the instant motion are cited herein.

difficult to ascertain plaintiff's theory of the case or, more specifically, his argument as to why

sundry facts constitute evidence either of discrimination or that defendant's explanation for the

non-selection is pretextual.  Instead, in several of his main argument sections plaintiff presents a

buffet of assorted facts, in the form of a numbered list of verbose remarks, but without offering

synthesis of what conclusions should be reached or how the observations create issues of

material fact precluding summary judgment.  *See, e.g.*, Pl.'s Opp'n at 23 (proclaiming that an

enumerated list of 19 purportedly new facts ascertained in discovery somehow "demonstrates"

that plaintiff's "non-selection was based upon discriminatory reasons"); *see also Jeffries*, 965

F.3d at 860 (noting that plaintiff "frequently fails to develop arguments for his claims, often

choosing instead to simply state facts (inviting the Court, perhaps, to make of them what it

will)").  Like the Circuit, "[t]his Court is not in the habit of doing parties' lawyering for them,

and we decline to take up that task now."  *Id.* at 860–61; *see also Jones v. Kirchner*, 835 F.3d 74,

83 (D.C. Cir. 2016) ("[J]udges are not like pigs, hunting for truffles buried in briefs or the

record[.]" (citation omitted)).  The discussion that follows is therefore based on the Court's best

efforts to locate the needles of argument in plaintiff's haystack of musings.  Mere "potential

arguments that might have been constructed from the raw materials [plaintiff] includes or alludes

to in his briefing," *id.* at 861, are therefore deemed waived.[15]

---

[15]    Plaintiff observes that defendant, pursuant to its records retention policy, destroyed "some of the records with respect to this selection" in late 2013, despite EEO activity having commenced by that time which should have caused records to be retained notwithstanding the usual disposal schedule.  *See* Pl.'s Opp'n at 41.  If true, defendant's document handling in this regard is—at best—sloppy.  Plaintiff argues that he is therefore entitled to an adverse inference precluding summary judgment.  *Id.* at 41–43.  Defendant, however, offers a thorough and detailed enumeration of how the documents plaintiff suggests were missing—as well as the documents that would have been expected to be found in the centralized file in question—were actually produced, convincingly showing that the voluminous discovery produced in this case has been materially complete.  *See* Def.'s Reply at 23–25.  Indeed, defendant offers a record citation for each and every document plaintiff suggests ought to have been produced, including (*compare* Pl.'s Opp'n at 41–42, *with* Def.'s Reply at 24): "the Hiring Manager questionnaire," Def.'s Ex. 111, ECF No. 47-2; "various AVUE documentation," Def.'s Exs. 99–102, ECF No. 47-1; "emails and correspondence related to the vacancy and selection documents," Def.'s Exs. 106–109, ECF No. 47-1; "the crediting plan for the position, and KSA qualifications and ratings," Def.'s Reply at 24 (noting that produced emails "address

16

In the discussion that follows, first the applicable legal principles for evaluating a defendant's motion for summary judgment in the Title VII context are summarized. Those principles are then applied to plaintiff's discrimination and retaliation claims to show, first, that plaintiff has failed to present evidence generally undermining the validity of defendant's nondiscriminatory explanation for his 2011 non-selection; and, second, that plaintiff also fails to demonstrate a reasonable possibility that his non-selection was motivated at least in part by discrimination specifically based on race, sex, or his prior engagement in EEO activity.

### A.      Applicable Legal Principles and Analytical Framework

Plaintiff brings claims of discrimination and retaliation against the DOJ regarding his 2011 non-selection for the SGP position.  Title VII demands that federal employers make "personnel actions affecting employees or applicants for employment . . . free from any discrimination based on race, color, religion, sex, or national origin" and prohibits retaliation against any employee "because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing."  42 U.S.C. §§ 2000e-16(a), 2000e-3(a).[16]

Where, as here, plaintiff presents no direct evidence of discrimination or retaliation, such as "a statement that itself shows racial or gender bias in the [employment] decision," *Vatel v. All. of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011), a plaintiff may prove discrimination or

---

. . . the crediting plan for the position, and KSA qualifications and ratings"); "the scoring of all of the applicants by the panel," Def.'s Ex. 93, ECF No. 47-1; and "a log of changes made to the crediting plan," Def.'s Reply at 25 ("DOJ produced the *actual* e-mail back-and-forth about these documents." (emphasis in original)). To be entitled to an adverse inference, plaintiff would need to "make some showing that the destroyed evidence would have been relevant to the contested issue," *Gerlich v. U.S. Dep't of Justice*, 711 F.3d 161, 166 (D.C. Cir. 2013) (quotation marks and citation omitted)—not a high bar, but one that plaintiff nevertheless does not meet.

[16]      Although the text of Title VII prohibition on retaliation uses the term "employer," 42 U.S.C. § 2000e-3(a), which is elsewhere defined to expressly exclude "the United States," 42 U.S.C. § 2000e(b), courts including the D.C. Circuit regularly hold that the provisions of § 2000e-3(a) also apply to federal employers.  *See, e.g.*, *Panarello v. Bernhardt*, 788 F. App'x 18, 19 (D.C. Cir. 2019) (per curiam) ("Title VII prohibits . . . the federal government from discriminating against its employees . . . in retaliation for exercising rights under Title VII." (citing 42 U.S.C. § 2000e-3(a)); *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006) (holding that § 2000e-3(a) is not "to be read differently when applied to the Government").

retaliation through circumstantial evidence using the familiar three-part burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).  Further, "[w]here there has been an adverse employment action and the employer asserts a legitimate, non-discriminatory and non-retaliatory reason for the decision, we focus on pretext." *Oviedo v. Wash. Metro. Area Transit Auth.*, 948 F.3d 386, 395 (D.C. Cir. 2020) (citing *Brady v Off. of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).  Thus, where an employer asserts a legitimate, non-discriminatory reason for an adverse employment action, the central inquiry for a court evaluating a defendant's motion for summary judgment becomes whether "the trier of fact [could believe] that the defendant's proffered reason was not the actual or sole basis for the disputed action." *Thomas v. Nat'l Football League Players Ass'n*, 131 F.3d 198, 202 (D.C. Cir. 1997); *see also Hunter v. Wash. Metro. Area Transit Auth.*, 485 F. Supp. 3d 65, 73 (D.D.C. 2020).

In making this assessment at the summary judgment stage, courts may consider relevant evidence, including but not limited to: (1) evidence offered in support of the plaintiff's prima facie case; (2) "evidence the plaintiff presents to attack the employer's proffered explanation for its actions"; and (3) other "evidence of discrimination or retaliation that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer)".  *Hampton v. Vilsack*, 685 F.3d 1096, 1100 (D.C. Cir. 2012) (quoting *Waterhouse v. District of Columbia*, 298 F.3d 989, 992–93 (D.C. Cir. 2002)); *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009) (extending the list of qualifying probative evidence in discrimination claims to retaliation claims); *Carter v. Geo. Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).[17]

---

[17]     The elements of a prima facie case differ somewhat between discrimination and retaliation claims.  To bring a *prima facie* discrimination claim under Title VII, a plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse employment outcome; and (3) the unfavorable action gives rise to an inference of

The plaintiff need not "submit evidence over and above rebutting the employer's stated explanation in order to avoid summary judgment." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (citation omitted).  Nonetheless, the plaintiff's disagreement with, or disbelief of, the employer's explanation cannot, without more, "satisfy the burden of showing that a reasonable jury could find that the employer's asserted reason was not the actual reason and that the employer intentionally discriminated against the plaintiff on a prohibited basis." *Burton v. District of Columbia*, No. 10-cv-1750 (BAH), 153 F. Supp. 3d 13, 58 (D.D.C. 2015), *aff'd sub nom. Nelson v. District of Columbia*, 689 F. App'x 642 (D.C. Cir. 2017) (per curiam).  The proper threshold is whether a reasonable jury could "disbelieve the employer's reasons" and conclude that the adverse employment action stemmed "*at least in part* [from] a prohibited reason"—plaintiff need not prove that either discriminatory or retaliatory motive was the *sole* but-for cause to prevail.  *Walker v. Johnson*, 798 F.3d 1085, 1096 (D.C. Cir. 2015) (applying the proposition to a Title VII retaliation claim) (emphasis added); *Mayorga v. Merdon*, 928 F.3d 84, 90 (D.C. Cir. 2019) (applying the same proposition, *verbatim*, to a Title VII discrimination claim).

### B.      Plaintiff's Failure to Discredit the Non-Selection Generally

As previously recognized by this Court and by the Circuit, defendant proffers a nondiscriminatory justification for plaintiff's non-selection: "there were more qualified candidates."  Def.'s Mem. at 1; *see Jeffries*, 217 F. Supp. 3d at 230–31 (finding that defendant put forth enough evidence, even before discovery, to meet the bar of legitimacy in this context);

---

discrimination. *See, e.g.*, *Nurriddin v. Bolden*, 818 F.3d 751, 758 n.6 (D.C. Cir. 2016).  To make out a *prima facie* retaliation claim, a plaintiff must show "(1) that he engaged in a statutorily protected activity; (2) that he suffered a materially adverse action by his employer; and (3) that a causal link connects the two."  *Bernanke*, 557 F.3d at 677. The difference in elements between these legal frameworks makes good sense—while Title VII's prohibition on discrimination protects individuals with enumerated *attributes*, its preclusion of employer retaliation protects individuals who engage in protected *activity*.

*see also Jeffries*, 965 F.3d at 858 (implicitly recognizing that such an explanation was offered). Defendant's showing of nondiscriminatory reasons for plaintiff's first non-selection shifts back to plaintiff the burden to show that these reasons either should not be believed on their own terms or were a pretextual cover for discrimination based on plaintiff's race or sex, or retaliation for prior protected activity.

Plaintiff advances several arguments attempting to undermine defendant's nondiscriminatory explanations in a manner that does not differentiate between the possible invidious reasons at play (*i.e.*, race, sex, or prior EEO activity). None are ultimately convincing.

### 1.    *Plaintiff's Qualifications and Interview*

Throughout this case, defendant has consistently justified the 2011 non-selection of plaintiff for the SGP position, and the selection of E.W. and N.F. instead, by pointing to plaintiff's lack of qualifications and poor interview performance. The Court credited this explanation when first ruling on summary judgment back in 2016. *Jeffries*, 217 F. Supp. 3d at 229–32. Notably, the Circuit vacated the grant of summary judgment for defendant with respect to the 2011 non-selection on account of its reversal of this Court's denial of plaintiff's request for Rule 56(d) relief, *Jeffries*, 965 F.3d at 866, and as such did not reach the merits. Since then, after over a year of additional discovery, the reasons underlying this Court's conclusion on the merits in 2016 have remained unchanged and, indeed, confirmed. Plaintiff offers a grab bag of observations from discovery about the process by which candidates' qualifications were assessed, but articulates few cogent arguments, and many of his points cite to exhibits already in the record at the time of the first summary judgment briefing. Three of his observations based on new exhibits, however, suggest identifiable arguments that nonetheless are easily refuted.

First, plaintiff observes that, unlike the interviews for the later tranche of candidates, plaintiff's interview was not numerically scored and did not include an inquiry regarding his

written work product and writing style.  *See* Pl.'s Opp'n at 28, 35.  This grievance borders on the bizarre given that the central premise of plaintiff's priority consideration argument is that plaintiff should have received an isolated and distinct selection process yielding an up-or-down decision with no comparison to other candidates.  Defendant—and common sense—amply explains why scoring is not necessary in this circumstance, specifically that he "was not competing against anyone else for the position, only against himself," Def.'s Reply at 18, such that any score computed for plaintiff would be compared with nothing or, at most, with an arbitrary cutoff point.  *See* Def.'s Ex. 72 at 87, ECF No. 43-4 ("Tim was competing against Tim.").  Likewise of no consequence is that later candidates were asked a new question about written work—a request that is perhaps unsurprising given the panel's experience receiving an unsolicited, error-ridden writing sample from plaintiff in his interview.

Second, plaintiff latches onto defendant's choice to hire the first- and third-ranked candidates—but not the second—after interview scoring and subsequently to prepare some documentation explaining the "unique skill sets" of the winning applicants to help justify why the second-place candidate was passed over.  Pl.'s Opp'n at 33–34.  Plaintiff offers no explanation at all, however, for why this curiosity in a phase of the process that took place *after* his non-selection is in any way probative as to pretext or discrimination with respect to *his* non-selection.[18]

---

[18]     Defendant also notes that E.W. and N.F. outshined plaintiff in their interviews.  Def.'s Mem. at 25–27.  Plaintiff asserts that he was far more qualified than E.W. based on her admission that she did not have any supervisory experience whatsoever, Pl.'s Ex. 82 at 10, ECF No. 44-19.  Plaintiff's supervisory experience, however, was limited to filling in when supervisors are absent—not an uncommon practice for employees in the OJP, Def.'s Reply at 20—so a comparison between plaintiff and E.W. on this attribute alone would be a "close case" for which "the employer is more capable of assessing the significance of small differences in the qualifications of the candidates," *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998) (holding that a jury may make an inference of discrimination if the plaintiff is "*significantly* better qualified for the job" than the selected candidate (emphasis added)); *accord Jackson v. Gonzales*, 496 F.3d 703, 707 (D.C. Cir. 2007).

Finally, plaintiff seems to suggest that pretext is demonstrated by a June 4, 2011 email from Trautman to Aponte and Faley noting, in the course of exchanging iterations of a draft memorandum explaining plaintiff's non-selection, that she "ha[d] a feeling that this will not be easy, nor will this be the last step."  Pl.'s Opp'n at 33; Pl.'s Ex. 76 at 6, ECF No. 44-13.  While plaintiff does not articulate precisely why he finds this email probative, he describes the memorandum as "an attempt to justify [his] non-selection," Pl.'s SMF at 18–19, perhaps insinuating that Trautman sought to paper over an improper decision.  The full email exchange makes clear, however, that this is no smoking gun pointing to a grand cover-up but rather a diligent exercise in contemporaneously documenting the result in a process that at plaintiff's own request was tailor-made for him.[19]  Noting that after plaintiff's interview he was seeking updates "on a weekly basis," HR reached out to Trautman to inquire "if a justification memo [was] being prepared," Pl.'s Ex. 76 at 2, ECF No. 44-13, and drafts and follow-up questions were exchanged, *see id.* at 6–7.  In context, Trautman's observation that finalizing the document would not be "easy" and could involve multiple additional "step[s]" is nothing more than an accurate reflection on the iteration that had already occurred and that Trautman reasonably expected to continue.  Preparing this kind of documentation is eminently reasonable, especially given that (1) the very reason for the priority consideration letter was a process defect in an earlier selection; (2) priority consideration—even without the idiosyncrasies forced by plaintiff's application timing—was rare at the agency, having occurred only one other time during McCarthy's 12-year tenure in HR, Def.'s Mem. at 17 n.12 (citing Def.'s Ex. 75 at 27–28, ECF No. 43-7); and (3) defendant was tasked with making an up-or-down decision on plaintiff's

---

[19]      Indeed, plaintiff's perseveration on Trautman's lack of substantive engagement with the choice not to hire him, Pl.'s Opp'n at 23, undermines his sinister characterization of this email, since her relative lack of familiarity with plaintiff, his qualifications, and his interview should have given her no reason to believe the *substance* of the decision not to hire him would not be "easy" to justify.

application in isolation, where a decision not to hire could not be made or explained by identifying a superior selectee.  All told, the Court agrees with defendant that this email "does not evidence discrimination or retaliation, or pretext."  Def.'s Reply at 19.

Having dispensed with these unavailing new attacks, defendant continues convincingly to argue that plaintiff's lackluster, unprofessional, and even "weird" interview performance justified the outcome.  Plaintiff believes that his twelve years of general government experience and experience in a lower position at OJP qualified him for the position.  *See* Pl.'s Ex. 14, ECF No. 9-7.  Neither candidates nor courts define qualifications, however; employers do.  In determining whether a candidate qualifies for a role in this context, "courts must not second-guess an employer's initial choice of appropriate qualifications" as long as they are "nondiscriminatory."  *Jackson v. Gonzales*, 496 F.3d 703, 708–09 (D.C. Cir. 2007); *see also Hairston v. Vance-Cooks*, 773 F.3d at 272.  A panelist's description of the qualifications for the SGP position makes clear that the hiring committee sought a candidate who had "supervisory experience *and could speak to it*," Pl.'s Opp'n at 35 (emphasis added); Pl.'s Ex. 68 at 26–27, ECF No. 44-5.  Plaintiff argues that he did just that, but his attempted rebuttal merely regurgitates his resume and fails to bolster the sense that he conveyed his experience in his *interview performance*, *see* Pl.'s Opp'n at 36–37.  This panel's evaluation of plaintiff's interview performance "was not an outlier" given that none of the various panels that interviewed plaintiff from 2011 to 2013 ranked him as the most qualified, and some ranked him as the least.  Def.'s Reply at 12 n.7.

### 2.    *Priority Consideration*

Much of the new discovery and briefing since defendant's previous motion for summary judgment concerns the circumstances surrounding the priority consideration process employed with respect to plaintiff's 2011 SGP application.  Plaintiff's briefing is not especially clear as to

whether he asserts a stand-alone claim based on defendant's purported failure to afford him a perfect priority consideration process, or rather whether such failure is part of, or amounts to evidence probative of discriminatory or retaliatory action in, his overall non-selection.  In any event, plaintiff establishes neither that a failure to give priority consideration is alone sufficient to support a claim, nor that he was entitled to priority consideration or that defendant failed to give him priority consideration once that process was initiated.  To the contrary, the current record shows that defendant went out of its way to accommodate plaintiff's desire to receive priority consideration for the 2011 SGP position in as reasonable a manner possible under the circumstances, even though he was not entitled to such consideration in the first instance and submitted a complete application only after the posted window had closed.  Had defendant firmly enforced the limitations on plaintiff's priority consideration letter, this case would have ended some time ago.  It is ironic indeed that this courtesy extended to plaintiff has proven to be the significant reason for this litigation to extend through remand, additional discovery, and a new round of motions practice.  The sardonic adage that "no good deed goes unpunished" comes to mind.

The Court reiterates its prior finding, undisturbed on appeal, that a failure to afford a candidate priority consideration when it is due, standing alone, is not an adverse employment action adequate to support a Title VII claim.  *Jeffries*, 217 F. Supp. 3d at 230 n.10 (citing *Bridgeforth v. Jewell*, 721 F.3d 661 at 664 (D.C. Cir. 2013), for the proposition that the harm at issue is "too speculative to constitute materially adverse action").[20]  Plaintiff suggests that

---

[20]   As defendant volunteers in its Notice of Supplemental Authority, the D.C. Circuit, on rehearing *en banc*, rejected previous precedent that had limited Title VII claims to circumstances where an employee "suffered 'objectively tangible harm.'"  *Chambers v. District of Columbia*, 35 F.4th 870, 872 (D.C. Cir. 2022) (en banc) (quoting and overruling *Brown v. Brody*, 199 F.3d 446, 457 (D.C. Cir. 1999)); *see generally* Def.'s Notice Suppl. Auth.  *Chambers* specifically held that a discriminatory transfer of, or denial of a transfer requested by, an employee

*Bridgeforth* is inapposite because it "dealt with the failure to nominate an employee for a time-off award, not with a failure to follow priority consideration procedures," Pl.'s Opp'n at 30, but plaintiff's refusal to acknowledge the underlying logic in *Bridgeforth* and its applicability to other types of actions far removed from the end result of a recognizable adverse employment action is too narrow a reading.  Further, plaintiff's cases purportedly recognizing a priority consideration failure as an adverse action are unavailing.  In *Zervas v. District of Columbia*, No. 91-cv-117, 1992 WL 232089, at *2 (D.D.C. July 10, 1992), the court expressly declined to "resol[ve] the issue at this preliminary stage."  In *Singletary v. District of Columbia*, 225 F. Supp. 2d 43 (D.D.C. 2002), *aff'd in part and rev'd in part on other grounds*, 351 F.3d 519 (D.C. Cir. 2003), the court assumed without deciding that a "failure to grant plaintiff priority consideration and subsequent non-selection for a supervisory position" could support a prima facie case of retaliation, *id.* at 57.  Nevertheless, the district court entered judgment for defendant—rendering the priority consideration discussion surplusage—because, *inter alia*, it concluded that plaintiff's EEOC complaint was untimely.  *Id.* at 61, 66.  The Circuit reversed that untimeliness finding as clear error without addressing the priority consideration matter, 351 F.3d at 529–30, and proceedings on remand offer no insight as the parties then entered into a settlement.  Praecipe Noting Voluntary Dismissal with Prejudice, *Singletary*, No. 94-cv-419 (D.D.C. Aug. 2, 2004), ECF No. 131.

---

violates Title VII.  *Chambers*, 35 F.4th at 872.  *Chambers* did not address, however, issues such as priority consideration that are merely process components of, and thus lack any effect on a plaintiff independently from, the result of declining to select a candidate for a position.  Indeed, the en banc Circuit expressly declined to reach the question whether its elimination of the "objectively tangible harm" requirement allows "de minimis harms" to become actionable.  *Chambers*, 35 F.4th at 875.  In any event, even if *Chambers* has any bearing here—which plaintiff has not argued despite the passage of nearly two months since that opinion was released—it would have no effect on the outcome because, as discussed *infra*, plaintiff was neither entitled to priority consideration nor was he denied it.

To be sure, issues related to priority consideration are not altogether irrelevant to employment discrimination and retaliation claims.  A "failure to follow established procedures or criteria" can be probative in supporting an inference of pretext with respect to a non-selection. *Harris v. Trustees of the University of the District of Columbia*, 567 F. Supp. 3d 131, 149 (D.D.C. 2021) (quoting *Brady*, 520 F.3d at 495 n.3) (enumerating several ways a plaintiff can prove pretext).  The burden is on the defendant to justify such departures as reasonable.  *See Lathram v. Snow*, 336 F.3d 1085, 1093 (D.C. Cir. 2003).  Plaintiff succeeds in identifying aspects of the priority consideration process employed in his case that fall short of the ideal. Bona fide priority consideration requires "the recipient supervisor who is charged with filling the position [to] actually consider[] and evaluate[] the applicant's qualifications," *Pope v. FCC*, 311 F.3d 1379, 1382 (Fed. Cir. 2002) (per curiam) (quoting *Perry v. Dep't of the Army*, 992 F.2d 1575, 1579 (Fed. Cir. 1993)), and to "treat the priority candidate as 'first in line, up or down,'" *id.*  Defendant's execution presents questions on both fronts.

First, plaintiff argues that he did not receive the "bona fide" priority consideration to which he was entitled because Trautman, the selecting official, admitted that she neither interviewed plaintiff herself nor personally read any of plaintiff's application package, but rather based her decision to deny plaintiff's application for the SGP position principally on Aponte's recommendation.  Pl.'s Opp'n at 23; Pl.'s Ex. 69 at 26, 34, ECF No. 44-6.  Defendant counters that nothing about the priority consideration process demands that the selecting official be directly and immediately involved in the assessment of plaintiff's qualifications.  *See* Def.'s Mem. at 18 n.13.  Indeed, "Trautman normally relied on a panel for other selections (and, in fact, relied on the panel for the ultimate selections here)."  Def.'s Reply at 10.  Defendant has the better argument here because there is nothing inherently untoward—and certainly nothing

*discriminatory*—about an official tasked with a hiring decision electing to delegate the interview and detailed review of a candidate to subordinates, especially where the candidate is *not* selected. Plaintiff marshals no authority for the proposition that "bona fide consideration" is a nondelegable duty.[21]  Additionally, plaintiff has neither explained how, nor even alleged that, Trautman's failure directly to evaluate him had any impact *at all* on the likelihood he would win the position.  Finally, plaintiff presents absolutely no evidence, nor even a theory, that Trautman's election to delegate the decision making as to plaintiff's application was itself in any way motivated by race, sex, or plaintiff's prior EEO activity.

Second, plaintiff takes issue with the sequence of events surrounding his application and interview with respect to the identification and consideration of other potential candidates for the SGP position.  At oral argument before the Circuit, defendant conceded that priority consideration not only required the selecting official to afford the priority candidate the first interview and an "up or down" decision, but also that this process precluded the hiring committee from considering the relevant candidate in conjunction with other candidates, *Jeffries*, 965 F.3d at 849.  The timing of plaintiff's application stymied this process from being perfectly executed.  His decision to use the priority consideration letter occurred no earlier than March 29, 2011, Pl.'s Opp'n at 18, and "[b]y that time, the vacancy announcement had been made and others had already applied," *id.* at 19.[22]  The ship had thus already sailed on the

---

[21]    Plaintiff cites to *Pope* for the proposition that "[w]hen priority consideration is to be given, it *requires a referral* to the deciding officer who is to engage in the process embraced by the term."  Pl.'s Opp'n at 22–23 (quoting *Pope*, 311 F.3d at 1383 (emphasis in original)).  In *Pope*, the plaintiff argued and the Federal Circuit held that the FCC failed to afford him priority consideration because the selecting official did not make an up-or-down decision, instead proceeding directly to interviewing other candidates while keeping the plaintiff's candidacy alive.  *See* 311 F.3d at 1381, 1383–84.  Nothing in *Pope*, however, suggests that the deciding officer *herself* must interview and personally evaluate the candidate, nor that she cannot fulfill "the process embraced by the term" by deputizing other supervisors to perform the assessment.

[22]    Plaintiff claims that in a deposition, Michelle Sicat, Associate Director of Operations in HR at the time, indicated that the vacancy was posted *after* HR became aware of plaintiff's desire to use his priority consideration

prospect of plaintiff receiving an evaluation process hermetically sealed from any contemplation of other applicants. Indeed, Aponte accessed the HR database on April 1, 2011—before plaintiff's May 2011 interview and also before plaintiff's complete application was submitted— "to find out about the applicants." *Id.* at 19–20.[23] Plaintiff also proffers evidence that interview panelists may have compared plaintiff to other applicants in various ways, or even may have told plaintiff at the end of the interview that there were other candidates to interview before they could render an up-or-down decision. *See id.* at 20–21.

Defendant's failure to consider plaintiff's application in a total vacuum is not ideal and may even be "a clear violation of the Agency's priority consideration policy." Pl.'s Opp'n at 21. Yet, as defendant points out, one process irregularity begets another here because "the vacancy had already been publicly announced when [plaintiff] asked for priority consideration." Def.'s Mem. at 17.[24] Thus, the best the agency could do, defendant asserts, is "interview[] Plaintiff and [make] a decision on his application for this position before it interviewed any other applicants." *Id.* Notwithstanding the irregular sequencing of events, the Circuit observed that "nothing about the fact that [plaintiff] did not request to use the letter until after the vacancies had posted

letter for the position. Pl.'s Opp'n at 28 (citing, incorrectly, Pl.'s Ex. 70 at 19, ECF No. 44-7). As defendant points out, however, that characterization relies on words Sicat never said, because at deposition Sicat confirmed only that the "vacancy announcement was posted after HR knew about Mr. Jeffries' priority consideration," and *not* that HR at that point yet knew about plaintiff's desire to apply his priority consideration to *this* dissimilar vacancy. Def.'s Reply at 17 (quoting Pl.'s Ex. 70 at 19:1–3, ECF No. 44-7).

[23]    Defendant notes that "HR did not receive [plaintiff's] application documents in their entirety until April 7, 2011, and did not refer these to BJA until after that date." Def.'s Reply at 9 (citing Def.'s Ex. 84, ECF No. 47-1).

[24]    This irregular sequence of events would not have occurred had the vacancy at issue been for a "position similar and in the same geographic area to the one [for] which proper consideration was missed"—that is, a position covered by the priority consideration letter by its own terms—in which case "the Department would notify" plaintiff of the position "prior to issuing public notice of the vacancy" and afford plaintiff the opportunity to apply if he so chose. Def.'s Mem. at 19 (alteration in original). Here, however, defendant explains that plaintiff's priority consideration letter "applied only to the next open position similar to the Program Analyst (Substance Abuse and Mental Health) position," a description not encompassing the 2011 SGP vacancy. Def.'s Reply at 4–5. In this instance, "DOJ gave him priority consideration per his request even though the positions were dissimilar." *Id.* at 5.

compelled the panelists to make comparisons between [plaintiffs] and the other candidates."

*Jeffries*, 965 F.3d at 857–58.  Indeed, the timing of plaintiff's choice to invoke priority

consideration is a key reason this case is still pending, as this timing provided the basis for the

Circuit to order additional discovery to allow plaintiff to probe whether the process that followed

was motivated by unlawful factors.  *See id.* at 858.  The problem plaintiff faces now is that such

discovery has failed to yield any evidence suggesting that defendant's accounting of the priority

consideration process followed was pretextual or that any flaw in this process was motivated

even in part by discrimination on the basis of race, sex, or prior EEO activity, as discussed next.

### C.    Plaintiff's Failure to Show Any Specific Type of Discrimination

Given that plaintiff has not succeeded at generally discrediting defendant's reasons for

his non-selection, the analysis now must turn to whether plaintiff has provided adequate evidence

to allow a reasonable jury to conclude that either plaintiff's non-selection or the imperfect

priority consideration he received was motivated by his race, sex, or history of EEO activity.  He

has not.  Each type of alleged discrimination is examined in turn.

#### 1.    Race

Whatever flaws plaintiff has unearthed in discovery concerning the priority consideration

process, or his non-selection in general, he has failed to identify in his briefing any evidence that

supports an inference that any aspect of his non-selection for the 2011 SGP position was based

on race.  This failure is unsurprising, given that one of the two individuals ultimately selected for

the SGP role was an African-American woman, Def.'s SMF ¶ 28, which greatly undercuts any

contention that he was not selected on account of race.  *Accord Jeffries*, 965 F.3d at 863 (noting,

with respect to plaintiff's fifth non-selection in the Complaint, that "DOJ's selection of

Randolph—a biracial African-American/Caucasian male, arguably in the 'same protected class'

as plaintiff—'cuts strongly against any inference of discrimination' on the basis of Jeffries's race or sex" (citation omitted)).

In an effort to suggest a broader pattern of racial animus infecting BJA, plaintiff posits that a general lack of African-American leadership exists in the agency, citing some statistics about the demographics of GS-14, GS-15, and Senior Executive Service employees at a single point in time (January 2012). Pl.'s Opp'n at 40. Further, plaintiff alleges that there is "a regular practice in BJA of detailing Caucasian females to higher positions and then selecting them for those positions when they were advertised," resulting in a "history of a lack of promotions of African-American males." *Id.* To advance a discrimination argument, however, "plaintiffs must do more than simply 'show that there are statistical disparities in the employer's work force.' Rather, plaintiffs are responsible for 'isolating and identifying the specific employment practices that are allegedly responsible for any observed statistical disparities.'" *Campbell v. Nat'l R.R. Passenger Corp.*, 311 F. Supp. 3d 281, 308 (D.D.C. 2018) (quoting *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 994 (1988) (opinion of O'Connor, J.)). Plaintiff does not identify any such hiring or employment practice that would support an inference of discrimination, so the purported disparate impact of the BJA's employment practices—even if true—is not enough, as a matter of law, because "disparities may be explainable by other factors, such as . . . varying levels of qualifications among applicants." *Frazier v. Consolidated Rail Corp.*, 851 F.2d 1447, 1452 (D.C. Cir. 1988). Plaintiff's anecdotal observations of who has and has not been promoted in recent years are similarly unhelpful as they are not accompanied by any analysis of the various individuals' qualifications or fit for the promotion opportunities that became available. *See* Pl.'s Opp'n at 40.

2.      *Sex*

With respect to sex discrimination, plaintiff takes a more creative approach using evidence uncovered during discovery regarding Aponte's history of sexual harassment.  While the argument's exposition is fragmentary due to plaintiff's recitation-of-facts briefing approach, plaintiff explains that certain sexual harassment complaints were the subject of an investigation of Aponte by the DOJ Office of Inspector General ("OIG"), resulting in a report issued on October 25, 2018, while this case was pending before the D.C. Circuit, which report was produced in the additional discovery on remand.  Pl.'s Opp'n at 23–24.  The OIG concluded, *inter alia*, that over the course of his tenure Aponte had sexually harassed multiple female subordinates by such conduct as pressuring one "into a sexual relationship with him in exchange for a promotion," "ma[king] verbal sexual advances to" and "ultimately sexually assault[ing]" another, and "engaging in sexually inappropriate conduct toward" still another woman.  Pl.'s Opp'n at 24 (quoting Pl.'s Ex. 72 at 1–2, ECF No. 44-9).  The findings are alarming, and appear to have precipitated Aponte's retirement.  *See id.*  Plaintiff's attempt to use the report to sustain a claim of sex discrimination against *him*, however, is unconvincing.

To tie the OIG report and Aponte's behavior to plaintiff's non-selection, plaintiff observes that Aponte, more than once, "shared the interview questions with" a female subordinate in the OJP and "told her who would be on the interview panel" in exchange for sexual favors, Pl.'s Opp'n at 24–25; Pl.'s Ex. 72 at 10, ECF No. 44-9, relatively disadvantaging male applicants.  More specifically to the non-selection at issue here, because Aponte encouraged E.W. to apply for the 2011 SGP position "on several occasions," Pl.'s Ex. 82 at 10–12, ECF No. 44-19, plaintiff argues that Aponte favored the selectee because of her sex.  Plaintiff proffers the affidavit of a witness involved in an EEO proceeding underlying the OIG investigation stating that after the witness expressed reservations about E.W. being chosen for

the SGP position because E.W. lacked "any manager experience," Aponte "just grinned and said she was nice to look at."  Pl.'s Ex. 74 ¶ 24, ECF No 44-11.  This witness also said that "many times [she] would go to Ed [Aponte] and complain about [E.W.'s] lack of people skills and he would agree, but smile and say she would do anything he asked."  *Id.*  While this evidence may be probative with respect to E.W.'s hiring, defendant asserts that these statements are inadmissible hearsay.  Def.'s Reply at 13–14; *see also* FED. R. EVID. 801(c); *Jeffries*, 965 F.3d at 865 n.11 (noting that plaintiff cannot rely on "inadmissible hearsay to create a genuine issue of fact").[25]

Assuming, *arguendo*, that the hearsay statements about E.W.'s hiring were admissible and accurate, and that Aponte had a history of furnishing interview questions to certain female applicants in a *quid pro quo* manner, such conduct cannot sustain a claim of sex discrimination against plaintiff as a man.  The core premise of plaintiff's argument is that Aponte favored certain specific women, in this case E.W., for positions in OJP, to the disadvantage of plaintiff as a man.  *See* Pl.'s Opp'n at 23–26.  This Circuit has not considered the question whether a supervisor's sexual interest in a specific employee constitutes sex discrimination towards another, but the Ninth Circuit in *Maner v. Dignity Health*, 9 F.4th 1114 (9th Cir. 2021), provides guidance regarding a somewhat analogous situation, finding that a supervisor favoring a sexual or romantic partner over another employee is not a Title VII violation with respect to the non-favored employee.

---

[25]     In its current written form, this testimony from a prior, extra-judicial proceeding also does not fall into one of the categorical exemptions to the general inadmissibility of hearsay, FED. R. EVID. 802, the unavailability-of-the-witness exception, *id.* R. 804 (defendant did not have "an opportunity and similar motive to develop [the testimony] by direct, cross-, or redirect examination, *id.* R. 802(b)(1)(B)), or the residual exception, *id.* R. 807 (there are no "guarantees of trustworthiness," *id.* R. 807(a)(1), nor is the testimony "more probative" than the other evidence presented here, *id.* R. 807(a)(2)).  As discussed in note 10, *supra*, however, the current record does not exclude the possibility that the witness could testify at trial, so this evidence cannot be categorically dismissed at summary judgment.

In *Maner*, the court held that an employer exercising "'paramour preference' for one employee over another because of a workplace romance" does not violate Title VII. 9 F.4th at 1120. The opinion rested in part on *DeCintio v. Westchester County Medical Center*, 807 F.2d 304 (2d Cir. 1986), which held that "sex" within Title VII did not encompass "sexual liaisons" or "sexual attractions," *id.* at 306, and, thus, male plaintiffs alleging that they had been discriminated against on the basis of their sex because a woman with whom the supervisor had had an affair was chosen for a particular position "faced exactly the same predicament as that faced by any *woman* applicant for the promotion," namely that "[n]o one but [the paramour] could be considered for the appointment," *id.* at 308 (emphasis added). Put another way, for Title VII purposes, "sex" refers to an attribute of the aggrieved employee and not to behavior. Applying the logic of *Maner* and *DeCintio* to the instant case, even if a jury could infer (from admissible evidence) that Aponte's alleged sexual attraction towards E.W. motivated plaintiff's non-selection, E.W.'s advantage—if any—is not probative of sex-based discrimination against him (or against men generally) because it stems from her being Aponte's potential "paramour" or from Aponte's purported interest in her specifically, not from the fact of her being a woman *per se*.

If anything, plaintiff's theory with respect to E.W. and her effect on plaintiff's non-selection leans *against* concluding that defendant discriminated against plaintiff on any protected basis. Specifically, plaintiff advances a hypothesis that, if credited, provides a tangible reason for his non-selection that, while inappropriate, is not unlawful by way of being motivated by race, sex, or prior EEO activity.

### 3.    *Prior EEO Activity (Retaliation)*

Plaintiff alleges that defendant did not hire him for the SGP position because he had previously filed complaints with the EEOC. Here, neither party disputes that plaintiff's prior

EEO activity constitutes legally protected activity, and the two potentially relevant adverse actions here are his 2011 non-selection and, less importantly, defendant's alleged failure to afford plaintiff the complete benefit of the priority consideration process.

Plaintiff notes that he participated in EEO activity in and before 2008 and that some of that activity identified both Aponte and Foley as responsible officials.  *See* Part I.A, *supra*.[26]  The mere fact that plaintiff can identify past protected activity, however, does not suffice.  Indeed, "Title VII does not permit past protected activity to be used as a permanent shield against any and all unpleasant employment outcomes." *Rochon v. Lynch*, 139 F. Supp. 3d 394, 402 (D.D.C. 2015), *aff'd*, 664 F. App'x 8 (D.C. Cir. 2016).  Rather, *some* indication that a reasonable jury could find a causal link between the protected activity and defendant's later actions must exist.

As defendant points out, plaintiff here cannot rely on temporal proximity as providing an automatic inference of causation between the protected activity and the alleged retaliatory conduct—the five-year gap is fatal to that argument.  *See* Def.'s Reply at 3; *see also, e.g.*, *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (holding that a three month interval was too distant to support an inference of causation on its own); *Pueschel v. Chao*, 955 F.3d 163, 167 (D.C. Cir. 2020) ("This court, too, has often analyzed temporal proximity in terms of months— not years.").  The analysis does not quite end there, however, because temporal proximity is merely one way, albeit a very effective way, of establishing causation for retaliation purposes.  *See Pueschel*, 955 F.3d at 167 ("Here, the lack of temporal proximity prevents the court from

---

[26]      Plaintiff is correct that Trautman's lack of awareness of the prior EEO activity is of little significance.  The D.C. Circuit consistently has expressed openness to a "cat's paw" theory whereby retaliation can be found even when the ultimate decisionmaker had no retaliatory motive but instead was influenced by a subordinate, thereby becoming "an unwitting conduit of another actor's illicit motives."  *Toomer v. Austin*, No. 20-5184, 2022 WL 301561, at *4 (D.C. Cir. Jan. 21, 2022) (per curiam) (quoting *Walker*, 798 F.3d at 1095); *see also Burley*, 801 F.3d at 297; *Hampton*, 685 F.3d at 1102 (endorsing the applicability of the "cat's paw" theory to discrimination claims).

drawing a reasonable inference of causality *when no additional factual allegations support causation*." (emphasis added)).

Plaintiff stumbles, however, when attempting to articulate "additional factual allegations" supporting an inference of retaliation.  First, even though *five years* elapsed between Aponte and Faley's involvement with plaintiff's EEO activity in 2006 and the 2011 SGP non-selection, plaintiff argues that the latter was the "first opportunity" Aponte and Faley had for retaliation. Pl.'s Opp'n at 43.  As defendant points out, however, the 2011 SGP non-selection was not in fact the first opportunity, at least with respect to Aponte, given that even after the EEO activity commenced Aponte gave plaintiff a favorable review, recommended a cash performance award, and signed off on a within grade increase.  Def.'s Reply at 11 (citing Def.'s Exs. 88, 89, ECF No. 47-1.[27]  The record is silent as to whether Faley had an earlier "opportunity" to retaliate, but given the five year gap in time, only pure speculation could yield a conclusion that he was retaliating in 2011.

Second, plaintiff cites an EEO counselor's report wherein another employee reports, *inter alia*, that Aponte "communicated veiled threats to the [aggrieved party] of potential adverse action if she came forward with allegations of sexual harassment or otherwise responded to any inquiries into allegations of sexual harassment against him."  Pl.'s Ex. 73 at 2, ECF No. 44-10; Pl.'s Opp'n at 44.  As an initial matter, this allegation likely constitutes inadmissible, though

---

[27]     Plaintiff attempts, unconvincingly, to spin Aponte's favorable 2007 review of plaintiff into evidence of pretext with respect to plaintiff's non-selection in 2011, *see* Pl.'s Opp'n at 34–35, but the cases he cites in support do not advance his position.  In *Henry v. Abbott Labs.*, 651 F. App'x 494, 502–03 (6th Cir. 2016), the Sixth Circuit found that a jury could disbelieve the employer's explanations for declining to promote the plaintiff because the plaintiff consistently received favorable evaluations in a "level I" position that regularly served as a stepping stone for promotion into the corresponding "level II" position, unlike the situation here where plaintiff interviewed for a distinct position and interview performance was a critical factor in the selection.  *Kalinoski v. Gutierrez*, 435 F. Supp. 2d 55, 72 (D.D.C. 2006), is likewise unhelpful because that case involved "uncontroverted evidence of plaintiff's stellar performance reviews, her substantial experience, and her score relative to [the selectee] on the objective qualifications evaluation," a far cry from what plaintiff brought to the table for the SGP position.

perhaps curable, hearsay.  *See* note 10, *supra*.  Further, as defendant observes, this account "show[s], at most, that Aponte was capable of retaliatory conduct, but do[es] not show that he took any with regard to Plaintiff."  Def.'s Reply at 12 n.6.  Finally, this type of alleged threatened retaliation—dangling the threat of retribution for the purpose of suppressing reporting of misconduct of a kind that in Aponte's case was ultimately career-ending—is entirely different in kind than the type plaintiff hypothesizes applied to him—seeking retribution for settled EEO activity in the fairly distant past.

Third, plaintiff again trots out a 2013 "joke" email thread wherein Faley and Trautman share their amusement at reactions observed when Faley provoked others by suggesting that plaintiff was being selected to fill a vacant position (the fifth non-selection at issue in the Complaint).  Pl.'s Opp'n at 44 (citing Pl.'s Ex. 19, ECF No. 9-8).  This thread may well be evidence that some of these officials, in 2013, viewed plaintiff with some derision.  The Circuit has already pondered and jettisoned this exchange, however, noting in its discussion of *the very non-selection to which the email pertains* that "while it was perhaps inappropriate, no reasonable jury could, on the basis of the email exchange, disbelieve DOJ's proffered qualifications-based explanation or conclude that explanation was pretextual."  *Jeffries*, 965 F.3d at 863–64.  It would be incongruent to assign this exchange *more* probative value with respect to the first non-selection that happened two years *before* the emails, and plaintiff offers no reason to revisit this Court's previous observation that "there is no evidence that would permit a jury to conclude that the authors' attitudes toward the plaintiff were rooted in his race, sex, or protected activity."  *Jeffries*, 217 F. Supp. 3d at 231.

*　　*　　*

Plaintiff presents enough anecdotes and grievances to show that he clearly has a contentious relationship with certain management.  The Court's task, however, is to determine whether plaintiff has made enough of a showing that defendant's conduct was *unlawful* to allow this matter to proceed to trial.  All told, even with the benefit of an additional year of discovery on remand, plaintiff still fails to present evidence that sufficiently undermines defendant's non-discriminatory explanation for his non-selection so as to create a genuine issue of material fact that could allow a reasonable jury to render a verdict in his favor.  Accordingly, summary judgment must be granted for defendant.

## IV.   CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED.

An order consistent with this Memorandum Opinion will be entered contemporaneously.

Date:  July 27, 2022

_____
BERYL A. HOWELL
Chief Judge